Bryan Caforio (SBN 261265)
Krysta Kauble Pachman (SBN 280951)
Erik L. Wilson (SBN 339111)
Julian Schneider (SBN 347246)
**SUSMAN GODFREY L.L.P.**
1900 Avenue of the Stars, Suite 1400
Los Angeles, California 90067
Tel: (310) 789-3100
bcaforio@susmangodfrey.com
kpachman@susmangodfrey.com
ewilson@susmangodfrey.com
jschneider@susmangodfrey.com

*Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO / OAKLAND DIVISION

| | |
|---|---|
| JOHN BROWN, TRENA OSTLUND, CLEVELAND GRANDERSON, MATTHEW BLATT, ZACHARY PARKER, KARIM LAURY, and EVE FIELDS on behalf of themselves and all others similarly situated; <br><br> Plaintiffs, <br><br> v. <br><br> VGW HOLDINGS US INC., VGW US, INC., VGW LUCKYLAND INC., LAURENCE ESCALANTE, VGW HOLDINGS LIMITED, VGW MALTA HOLDING LIMITED, VGW MALTA LIMITED, VGW GAMES LIMITED, VGW GP LIMITED, JUMIO CORPORATION, YODLEE, INC., TRUSTLY, INC., and BRIAN CHRISTOPHER MISFUD; <br><br> Defendants. | Case No. <br><br> **COMPLAINT** <br><br> **CLASS ACTION** <br><br> **JURY TRIAL DEMANDED** |

1

## TABLE OF CONTENTS

2      **INTRODUCTION** ................................................................................................................ **5**

3      **THE PARTIES** ................................................................................................................. **11**

4      **I.**      **PLAINTIFFS** ......................................................................................................... **11**

5              A.      Plaintiff John Brown ...................................................................................... 11

6              B.      Plaintiff Trena Ostlund .................................................................................. 12

7              C.      Plaintiff Matthew Blatt .................................................................................. 14

8              D.      Plaintiff Zachary Parker ................................................................................ 15

9              E.      Plaintiff Cleveland Granderson ...................................................................... 16

10             F.      Plaintiff Karim Laury .................................................................................... 17

11             G.      Plaintiff Eve Fields ....................................................................................... 18

12     **II.**     **DEFENDANTS** ...................................................................................................... **20**

13             A.      Defendant VGW Holdings US Inc. ................................................................ 20

14             B.      Defendant VGW US, Inc. ............................................................................... 20

15             C.      Defendant VGW LuckyLand Inc. ................................................................... 21

16             D.      Defendant Laurence Escalante ....................................................................... 21

17             E.      Defendant VGW Holdings Limited and Its Controlled Subsidiaries .................. 21

18             F.      Defendant VGW Malta Holding Limited ......................................................... 23

19             G.      Defendant VGW Malta Limited ..................................................................... 24

20             H.      Defendant VGW Games Limited .................................................................... 24

21             I.      Defendant VGW GP Limited .......................................................................... 24

22             J.      Defendant Jumio Corporation ......................................................................... 24

23             K.      Defendant Yodlee, Inc. .................................................................................. 25

24             L.      Defendant Trustly, Inc. .................................................................................. 26

25             M.      Defendant Brian Christopher Misfud ............................................................. 26

26     **JURISDICTION AND VENUE** ....................................................................................... **28**

27     **I.**      **SUBJECT MATTER JURISDICTION** ................................................................. **28**

28     **II.**     **PERSONAL JURISDICTION** ............................................................................... **28**

COMPLAINT

A.   VGW's Claim That No Court Has Personal Jurisdiction ...................................... 28

B.   Personal Jurisdiction Over VGW US Entities ....................................... 29

C.   Personal Jurisdiction Over Laurence Escalante, VGW Holdings Limited, VGW Malta Holding Limited, VGW Malta Limited, VGW Games Limited, and VGW GP Limited ................................................................ 34

D.   Personal Jurisdiction Over Jumio ....................................................... 36

E.   Personal Jurisdiction Over Yodlee ...................................................... 36

F.   Personal Jurisdiction Over Trustly ...................................................... 37

G.   Personal Jurisdiction Over Brian Christopher ....................................... 38

III.    VENUE AND DIVISIONAL ASSIGNMENT .......................................... 38

A.   Venue ................................................................................................. 38

B.   Divisional Assignment ........................................................................ 39

FACTUAL ALLEGATIONS ................................................................................. 39

I.    VGW'S ILLEGAL "SOCIAL" AND "SWEEPSTAKES" CASINOS ...... 39

II.    VGW ADMITS IT RUNS REAL MONEY CASINOS ............................ 48

III.    VGW TARGETS GAMBLERS IN STATES WHERE GAMBLING IS ILLEGAL .............................................................................................. 50

IV.    VGW USES MULTIPLE CALIFORNIA PROMOTERS TO TARGET AND TRICK UNSUSPECTING GAMBLERS IN THEIR HOME STATES ...... 57

V.    VGW VERIFIES THE AGE, GEOLOCATION, AND IDENTITY OF EACH GAMBLER THROUGH CALIFORNIA, AND REPEATEDLY RE-VERIFIES GAMBLERS' LOCATIONS FROM CALIFORNIA .................................. 74

VI.    VGW CONNECTS TO GAMBLERS' FINANCIAL ACCOUNTS, WITHDRAWS MONEY FROM THOSE ACCOUNTS, AND DEPOSITS GAMBLERS' CASH WINNINGS BACK INTO THOSE ACCOUNTS THROUGH CALIFORNIA ...................................................................... 75

A.   VGW Uses Yodlee to Connect to Gamblers' Bank Accounts Through California .............................................................................................. 76

B.   VGW Uses Trustly to Transfer Money In And Out of Gamblers' Bank Accounts Through California ............................................................... 79

CLASS ACTION ALLEGATIONS ....................................................................... 83

FIRST CAUSE OF ACTION ................................................................................. 90

SECOND CAUSE OF ACTION ............................................................................ 96

3

**THIRD CAUSE OF ACTION** ................................................................. **98**

**FOURTH CAUSE OF ACTION** ............................................................. **101**

**FIFTH CAUSE OF ACTION** .................................................................. **103**

**SIXTH CAUSE OF ACTION** .................................................................. **105**

**SEVENTH CAUSE OF ACTION** ........................................................... **108**

**EIGHTH CAUSE OF ACTION** .............................................................. **110**

**NINTH CAUSE OF ACTION** ................................................................. **112**

**TENTH CAUSE OF ACTION** ................................................................. **115**

**ELEVENTH CAUSE OF ACTION** ......................................................... **117**

**TWELFTH CAUSE OF ACTION** ........................................................... **120**

**THIRTEENTH CAUSE OF ACTION** ..................................................... **122**

**FOURTEENTH CAUSE OF ACTION** .................................................... **125**

**PRAYER FOR RELIEF** ......................................................................... **127**

4

Plaintiffs John Brown, Trena Ostlund, Cleveland Granderson, Matthew Blatt, Zachary Parker, Karim Laury, and Eve Fields (collectively, "Plaintiffs"), individually and on behalf of the Classes defined below, bring this civil action against Defendants VGW Holdings US Inc.; VGW US, Inc.; VGW LuckyLand Inc.; Laurence Escalante, VGW Holdings Limited; VGW Malta Holding Limited; VGW Malta Limited; VGW Games Limited; and VGW GP Limited (collectively, "VGW"); Jumio Corporation; Yodlee, Inc.; Trustly, Inc.; and Brian Christopher Misfud (together with VGW, "Defendants") to: (1) recover monies Defendants unlawfully obtained from the spouses and parents of Plaintiffs and Class Members through (or in support of) VGW's illegal gambling enterprises; and (2) enjoin Defendants from continuing to operate or support VGW's illegal casinos. Plaintiffs allege the following facts based on investigation, information, or belief:

**INTRODUCTION**

1.      Gambling is, and has always been, illegal or heavily regulated in most states. These states have made it illegal to operate in person or online casinos, or otherwise facilitate winning or losing something of value in a game with elements of chance. This ban encompasses traditional casino games like slot machines, video poker, dice games (*e.g.*, craps), and card games (*e.g.*, blackjack and poker).

2.      VGW owns and operates (or at all relevant times operated) at least three of the United States' most popular online casinos—Chumba Casino, LuckyLand Slots, and Global Poker ("VGW Casinos")—in numerous states that expressly prohibit such gambling. The VGW Casinos operate largely the same as any other casino: the casinos take and convert gamblers' cash into virtual casino chips or slot machine credits (referred to as "coins"), and then gamblers wager those virtual casino coins in a variety of games of chance, including slot machines, craps, blackjack, and poker.

3.      As shown below, these games are designed to look and feel just like traditional casino games in traditional casinos, and even involve live table games, complete with interactive dealers and croupiers:

5

COMPLAINT



4.      If the gambler wins the bet, the casinos pay the gambler his or her winnings in additional virtual casino coins. This gives the gambler the opportunity to place more bets or redeem the casino coins for cash. This is quintessential gambling. The VGW Casinos raked in more than

7

$4 billion in global gambling revenues in 2024 alone, with the vast majority coming from the United States—and the majority of that coming from states that expressly prohibit online gambling.

5.    VGW attempts to skirt these states' anti-gambling laws by giving gamblers two types of casino coins: (1) "gold" coins ("GC"), which can be wagered but cannot be redeemed for cash; and (2) "sweepstakes" coins ("SC"), which are each worth $1 and can be redeemed for $1 in cash. Gamblers purchase packages of GC that come with "free" SC worth at least the purchase price (or more). For example, if a gambler deposits $300 at Chumba Casino, he/she receives $315 worth of cash-redeemable sweepstakes coins (and millions of unredeemable gold coins).

6.    VGW's gold coins work like gift cards: VGW converts gamblers' cash into digital credits that can be redeemed only for valuable services at a particular company, and the company will not redeem the credits for cash once purchased. Gamblers can redeem their gold coins only within the casino for casino game play. Like gift cards and other casino chips, gold coins are things of value.

7.    Sweepstakes coins are direct equivalents to traditional casino chips: they have a cash value, can be gambled like cash, and the VGW Casinos agree to exchange them for their designated cash value. If the gambler wins 10,000 sweepstakes coins, VGW agrees it must pay the gambler $10,000 in cash.

8.    Gamblers pay real money to purchase packages of gold coins and sweepstakes coins together. Gamblers then wager both types of coins in the hopes of winning more coins, which can be either used for additional bets or cashed out for real money in a direct dollar-for-dollar exchange. That VGW claims the sweepstakes coins are "free" does not make them valueless, and that the gold coins cannot be redeemed for cash does not make them valueless, either. Gambling with either is still gambling. After all, depending on luck, the gambler will either lose the wagered coins or win more coins. That the casino has structured itself to take in cash with its left hand while paying out cash only with its right hand does not convert gambling into something else.

9.    This is the same business model used by other purveyors of illegal or highly regulated vices: VGW uses the gold coins to give users a "taste" of VGW's real-money gambling, get gamblers "hooked" on that gambling, and get gamblers to keep coming back to the casino with

more and more cash in hand. Further, by giving gamblers hundreds of thousands to millions of gold coins and then forcing gamblers to bet hundreds (and up to millions) of gold coins on each hand or spin, VGW grooms gamblers to place consistently large bets on each spin or hand.

10.     The VGW Casinos intentionally design their casino games to exploit this grooming by (as shown below) allowing the gamblers to instantly switch from gold coins to sweepstakes coins between every slot pull, hand of cards, or roll of the dice. The gambler that gets the taste of a big win with gold coins can immediately chase the rush with sweepstakes coins. The gambler on the long losing streak with gold coins can switch mid-game to sweepstakes coins when they become convinced their losing streak is about to break.

You may switch the coins you are using in the game by clicking on the icon of the type of coin that you want to use.



11.     The VGW Casinos also groom gamblers with vivid colors, dynamic animations, high quality graphics, engrossing sound effects, and other enticements carefully designed to hijack the gamblers' attention and keep them betting. If the gamblers run out of sweepstakes coins, gold coins can tide them over until the itch to gamble real money sweepstakes coins takes over and the gamblers put more real money on the table.

12.     Indeed, VGW itself has admitted that its companies "develop[] and operate[] proprietary technology in ***real money gaming***," that the VGW Casinos are "***targeting*** . . . the unrealised United States ***real-money gaming market***," and that their "***[s]weepstakes gameplay entails [] real money, online gaming***" in the United States, "where [real money] online gaming is largely prohibited."

13.     Every aspect of the VGW Casinos is carefully curated to create and capitalize upon compulsive, addictive, and destructive behaviors. Protecting citizens and their families from predatory casinos is why states passed anti-gambling laws. Bars cannot sell alcohol to minors by

selling them something non-alcoholic and then including an alcoholic drink as a "free gift." VGW cannot use these same tactics to avoid gambling laws or deny that they offer real money gambling.

14.    Multiple states, including Idaho, Washington, Delaware, Connecticut, Maryland, and Nevada have become aware of the VGW Casinos and sent VGW cease-and-desist letters for violating nearly identical anti-gambling statutes. VGW has shut down, or is in the process of shutting down, its offending operations instead of fighting. It speaks volumes that VGW would rather abandon tens to hundreds of millions of dollars in annual revenues from these states instead of defending the claimed legality of their scheme to an attorney general or state gambling regulator.

15.    Plaintiffs and Class Members live in states that not only prohibit illicit casino gambling, but expressly permit gamblers—or their spouses and/or children—to recover anything and everything gambled and lost in VGW's illegal casinos. These states include the District of Columbia, Georgia, Illinois, Kentucky, Massachusetts, Mississippi, Missouri, New Jersey, New Mexico, Ohio, South Carolina, Tennessee, and Wisconsin. The states force casinos to disgorge any losses to the gamblers or their spouses/children for a variety of reasons, including to: (1) discourage gambling; (2) prevent casinos from profiting from illegal gambling; (3) prevent gambling addiction and its destructive societal harms; (4) protect families from the financial devastation that gambling can wreak on families; and (5) ensure that any gambling in the state is authorized, properly regulated, and taxed for the benefit of its state residents. The VGW Casinos are especially pernicious and addictive because gamblers can access these casinos 24 hours a day, seven days a week, directly from a mobile phone or computer. Money that would otherwise be used to pay for rents, mortgages, utilities, food, clothing, school supplies, and medical care goes instead to VGW's illegal casinos. Individuals and families are left in financial ruin. These are the exact harms these laws are designed to prevent.

16.    VGW's illegal gambling enterprise is not, and cannot be, operated by VGW alone. The illegal enterprise is only possible with the aid and assistance of multiple partners. VGW runs much or all of its operation through California, and has partnered with certain California-based individuals and companies, which provide essential gambling services to the VGW Casinos. These

California partners include: (1) Jumio Corporation; (2) Yodlee, Inc.; (3) Trustly, Inc.; and (4) Mr. Brian Christopher Misfud ("California Partners").

17.    All the California Partners' services are provided in or through California. These essential services include: (1) age, location, and identity verification for would-be and actual gamblers at the VGW Casinos;  (2) connecting gamblers' bank and other financial accounts to the VGW Casinos; (3) electronically transferring funds between gamblers and the VGW Casinos; and (4) celebrity marketing, promoting, and advertising of the VGW Casinos. Without the first three categories of California conduct, no gambling could occur. And, without VGW's California-based celebrity sponsorships, VGW would have significantly lower revenues.

18.    Plaintiffs and Class Members are spouses and children of gamblers who lost tens or hundreds of millions of dollars or more in real money gambling at the VGW Casinos. Plaintiffs and Class Members have statutory and common law rights to recover the losses from Defendants and bring this action to force Defendants to disgorge or pay over those losses (and other damages) under state and federal laws.

## THE PARTIES

**I.    PLAINTIFFS**

### A.    Plaintiff John Brown

19.    Plaintiff John Brown is, and at all relevant times was, an adult natural person and a resident of Illinois. Plaintiff Brown is, and at all relevant times was, the spouse of Courtney Brown, an adult natural person and resident of Illinois.

20.    At least between September 4, 2024, and March 2, 2025, and while located within Illinois, Courtney Brown gambled and lost at least $33,600 in money, cryptocurrency, utility or security tokens, virtual casino chips, and/or other property or things of value at Chumba Casino. Mrs. Brown played at the Chumba Casino on a near-daily basis between these dates. Mrs. Brown deposited or otherwise transferred money into Chumba Casino on a near daily basis in increments of between $15 to $300. Each time Mrs. Brown deposited money into Chumba Casino, she received cryptocurrency, utility or security tokens, virtual casino chips, and/or other things of value in exchange. Mrs. Brown then wagered these cryptocurrency, utility or security tokens, virtual casino

chips, and/or other things of value on casino games and/or other games of chance at Chumba Casino. Mrs. Brown lost everything she wagered. She has not sued to recover her losses.

21.    Plaintiff Brown and Mrs. Brown share joint bank accounts, joint credit cards, and hold their money and property jointly. The money, cryptocurrency, utility or security tokens, virtual casino chips, and/or other property or things of value Mrs. Brown gambled and lost at the VGW Casinos was her and Plaintiff Brown's joint marital property. Thus, Plaintiff Brown suffered a direct and concrete financial harm as a result of VGW's illegal gambling enterprise. Plaintiff Brown (like all Plaintiffs and Class Members) therefore brings a direct personal claim based on the independent harm caused to him and his property interests by VGW's violations of Illinois law. Illinois law creates independent rights, remedies, and causes of actions for the spouses and children of gamblers against illegal casinos, allowing harmed spouses and children to recover monies lost by a spouse or parent to an illegal casino.

22.    Plaintiff Brown never gambled on, or otherwise accessed or used, the VGW Casinos. He never reviewed, signed, accepted, or consented to any agreement with VGW (including but not limited to any of VGW's purported Terms and Conditions or arbitration agreements). Plaintiff Brown also never waived or impaired any rights or claims against VGW (including but not limited to any class action waivers). At all relevant times, he was unaware of the terms of any agreements that Mrs. Brown may have entered into with VGW (including but not limited to any of VGW's purported Terms and Conditions, arbitration agreements, or class action waivers). At all relevant times, Plaintiff Brown and Mrs. Brown were unaware that the VGW Casinos were illegal gambling enterprises under Illinois state law and federal law.

**B.    Plaintiff Trena Ostlund**

23.    Plaintiff Trena Ostlund is, and at all relevant times was, an adult natural person and a resident of Kentucky. Plaintiff Ostlund is, and at all relevant times was, the spouse of Jose Ostlund, an adult natural person and resident of Kentucky.

24.    At least between August 8, 2024, and January 22, 2025, and while located within Kentucky, Mr. Ostlund gambled and lost at least $915 in money, cryptocurrency, utility or security tokens, virtual casino chips, and/or other property or things of value at LuckyLand Slots.

Mr. Ostlund played at the LuckyLand Slots casino on a near-daily basis between these dates. Mr. Ostlund deposited or otherwise transferred money into the LuckyLand Slots casino at least once per week (and sometimes daily to multiple times per day) in increments of between $10 and $21. Each time Mr. Ostlund deposited money into LuckyLand Slots, he received cryptocurrency, utility or security tokens, virtual casino chips, and/or other things of value in exchange. Mr. Ostlund then wagered these cryptocurrency, utility or security tokens, virtual casino chips, and/or other things of value on casino games and/or other games of chance at LuckyLand Slots. Mr. Ostlund lost everything he wagered. He has not sued to recover his losses.

25.    Plaintiff Ostlund and Mr. Ostlund share joint bank accounts, joint credit cards, and hold their money and property jointly. The money, cryptocurrency, utility or security tokens, virtual casino chips, and/or other property or things of value Mr. Ostlund gambled and lost at the VGW Casinos was his and Plaintiff Ostlund's joint marital property. Thus, Plaintiff Ostlund suffered a direct and concrete financial harm as a result of VGW's illegal gambling enterprise. Plaintiff Ostlund (like all Plaintiffs and Class Members) therefore brings a direct personal claim based on the independent harm caused to her and her property interests by VGW's violations of Kentucky law. Kentucky law creates independent rights, remedies, and causes of actions for the spouses and children of gamblers against illegal casinos, allowing harmed spouses and children to recover monies lost by a spouse or parent to an illegal casino.

26.    Plaintiff Ostlund never gambled on, or otherwise accessed or used, the VGW Casinos. She never reviewed, signed, accepted, or consented to any agreement with VGW (including but not limited to any of VGW's purported Terms and Conditions or arbitration agreements). Plaintiff Ostlund also never waived or impaired any rights or claims against VGW (including but not limited to any class action waivers). At all relevant times, she was unaware of the terms of any agreements that Mr. Ostlund may have entered into with VGW (including but not limited to any of VGW's purported Terms and Conditions, arbitration agreements, or class action waivers). At all relevant times, Plaintiff Ostlund and Mr. Ostlund were unaware that the VGW Casinos were illegal gambling enterprises under Kentucky state law and federal law.

13

### C.    **Plaintiff Matthew Blatt**

27.    Plaintiff Matthew Blatt is, and at all relevant times was, an adult natural person and a resident of Missouri. Plaintiff Blatt is, and at all relevant times was, the spouse of Elizabeth Moise, an adult natural person and resident of Missouri.

28.    At least between December 12, 2024, and June 9, 2025, and while located within Missouri, Elizabeth Moise gambled and lost at least $2,800 in money, cryptocurrency, utility or security tokens, virtual casino chips, and/or other property or things of value at Chumba Casino and LuckyLand Slots. Ms. Moise played at the Chumba Casino or LuckyLand Slots on a near-daily basis between these dates. Ms. Moise deposited or otherwise transferred money into Chumba Casino or LuckyLand Slots on a semi-weekly to near-daily basis in increments of between $5 to $50. Each time Ms. Moise deposited money into Chumba Casino or LuckyLand Slots, she received cryptocurrency, utility or security tokens, virtual casino chips, and/or other things of value in exchange. Ms. Moise then wagered these cryptocurrency, utility or security tokens, virtual casino chips, and/or other things of value on casino games and/or other games of chance at Chumba Casino or LuckyLand Slots. Ms. Moise lost everything she wagered. She has not sued to recover her losses.

29.    Plaintiff Blatt and Ms. Moise share joint bank accounts, joint credit cards, and hold their money and property jointly. The money, cryptocurrency, utility or security tokens, virtual casino chips, and/or other property or things of value Ms. Moise gambled and lost at the VGW Casinos was her and Plaintiff Blatt's joint marital property. Thus, Plaintiff Blatt suffered a direct and concrete financial harm as a result of VGW's illegal gambling enterprise. Plaintiff Blatt (like all Plaintiffs and Class Members) therefore brings a direct personal claim based on the independent harm caused to him and his property interests by VGW's violations of Missouri law. Missouri law creates independent rights, remedies, and causes of actions for the spouses of gamblers against illegal casinos, allowing harmed spouses to recover monies lost by their spouse to an illegal casino.

30.    Plaintiff Blatt never gambled on, or otherwise accessed or used, the VGW Casinos. He never reviewed, signed, accepted, or consented to any agreement with VGW (including but not limited to any of VGW's purported Terms and Conditions or arbitration agreements). Plaintiff Blatt also never waived or impaired any rights or claims against VGW (including but not limited to any

14

class action waivers). At all relevant times, he was unaware of the terms of any agreements that Ms. Moise may have entered into with VGW (including but not limited to any of VGW's purported Terms and Conditions, arbitration agreements, or class action waivers). At all relevant times, Plaintiff Blatt and Ms. Moise were unaware that the VGW Casinos were illegal gambling enterprises under Missouri state law and federal law.

### D. **Plaintiff Zachary Parker**

31.     Plaintiff Zachary Parker is, and at all relevant times was, an adult natural person and a resident of Missouri. Plaintiff Parker is, and at all relevant times was, the spouse of Megan Krentz, an adult natural person and resident of Missouri.

32.     At least between October 16, 2022, and June 3, 2025, and while located within Missouri, Megan Krentz gambled and lost at least $685 in money, cryptocurrency, utility or security tokens, virtual casino chips, and/or other property or things of value at Chumba Casino. Ms. Krentz played at the Chumba Casino on a near-daily basis between these dates. Ms. Krentz deposited or otherwise transferred money into Chumba Casino on a semi-weekly to near-daily basis in increments of between $5 to $100. She gambled at least $21,900 and won approximately $21,215. Each time Ms. Krentz deposited money into Chumba Casino, she received cryptocurrency, utility or security tokens, virtual casino chips, and/or other things of value in exchange. Ms. Krentz then wagered these cryptocurrency, utility or security tokens, virtual casino chips, and/or other things of value on casino games and/or other games of chance at Chumba Casino. Ms. Krentz has not sued to recover her losses.

33.     Plaintiff Parker and Ms. Krentz share joint bank accounts, joint credit cards, and hold their money and property jointly. The money, cryptocurrency, utility or security tokens, virtual casino chips, and/or other property or things of value Ms. Krentz gambled and lost at the VGW Casinos was her and Plaintiff Parker's joint marital property. Thus, Plaintiff Parker suffered a direct and concrete financial harm as a result of VGW's illegal gambling enterprise. Plaintiff Parker (like all Plaintiffs and Class Members) therefore brings a direct personal claim based on the independent harm caused to him and his property interests by VGW's violations of Missouri law. Missouri law

COMPLAINT

1    creates independent rights, remedies, and causes of actions for the spouses of gamblers against

2    illegal casinos, allowing harmed spouses to recover monies lost by their spouse to an illegal casino.

3         34.    Plaintiff Parker never gambled on, or otherwise accessed or used, the VGW Casinos.

4    He never reviewed, signed, accepted, or consented to any agreement with VGW (including but not

5    limited to any of VGW's purported Terms and Conditions or arbitration agreements). Plaintiff

6    Parker also never waived or impaired any rights or claims against VGW (including but not limited

7    to any class action waivers). At all relevant times, he was unaware of the terms of any agreements

8    that Ms. Krentz may have entered into with VGW (including but not limited to any of VGW's

9    purported Terms and Conditions, arbitration agreements, or class action waivers). At all relevant

10   times, Plaintiff Parker and Ms. Krentz were unaware that the VGW Casinos were illegal gambling

11   enterprises under Missouri state law and federal law.

12        **E.    Plaintiff Cleveland Granderson**

13        35.    Plaintiff Cleveland Granderson is, and at all relevant times was, an adult natural

14   person and a resident of Mississippi. Plaintiff Granderson is, and at all relevant times was, the

15   spouse of Rekeisha Granderson, an adult natural person and resident of Mississippi.

16        36.    At least between February 28, 2020, and April 30, 2025, and while located within

17   Mississippi, Rekeisha Granderson gambled and lost at least $312,900 in money, cryptocurrency,

18   utility or security tokens, virtual casino chips, and/or other property or things of value at Chumba

19   Casino. She gambled at least $327,200 and won approximately $14,320 (Ms. Granderson attempted

20   to cash in a $206,000 jackpot win in January 2025, but Chumba Casino has refused to pay it). Mrs.

21   Granderson played at the Chumba Casino on a near-daily to near-weekly basis between these dates.

22   Mrs. Granderson deposited or otherwise transferred money into Chumba Casino on a near daily

23   basis in increments of between $1 to $1,000. Each time Mrs. Granderson deposited money into

24   Chumba Casino, she received cryptocurrency, utility or security tokens, virtual casino chips, and/or

25   other things of value in exchange. Mrs. Granderson then wagered these cryptocurrency, utility or

26   security tokens, virtual casino chips, and/or other things of value on casino games and/or other

27   games of chance at Chumba Casino. Mrs. Granderson has not sued to recover her losses.

28

COMPLAINT

37.     Plaintiff Granderson and Mrs. Granderson share joint bank accounts, joint credit cards, and hold their money and property jointly. The money, cryptocurrency, utility or security tokens, virtual casino chips, and/or other property or things of value Mrs. Granderson gambled and lost at the VGW Casinos was her and Plaintiff Granderson's joint marital property. Thus, Plaintiff Granderson suffered a direct and concrete financial harm as a result of VGW's illegal gambling enterprise. Plaintiff Granderson (like all Plaintiffs and Class Members) therefore brings a direct personal claim based on the independent harm caused to him and his property interests by VGW's violations of Mississippi law. Mississippi law creates independent rights, remedies, and causes of actions for the spouses and children of gamblers against illegal casinos, allowing harmed spouses and children to recover monies lost by a spouse or parent to an illegal casino.

38.     Plaintiff Granderson never gambled on, or otherwise accessed or used, the VGW Casinos. He never reviewed, signed, accepted, or consented to any agreement with VGW (including but not limited to any of VGW's purported Terms and Conditions or arbitration agreements). Plaintiff Granderson also never waived or impaired any rights or claims against VGW (including but not limited to any class action waivers). At all relevant times, he was unaware of the terms of any agreements that Mrs. Granderson may have entered into with VGW (including but not limited to any of VGW's purported Terms and Conditions, arbitration agreements, or class action waivers). At all relevant times, Plaintiff Granderson and Mrs. Granderson were unaware that the VGW Casinos were illegal gambling enterprises under Mississippi state law and federal law.

**F.     Plaintiff Karim Laury**

39.     Plaintiff Karim Laury is, and at all relevant times was, an adult natural person and a resident of Ohio. Plaintiff Laury is, and at all relevant times was, the spouse of Cody Kuchan, an adult natural person and resident of Ohio.

40.     At least between June 6, 2024, and February 28, 2025, and while located within Ohio, Mr. Kuchan gambled and lost at least $2,400 in money, cryptocurrency, utility or security tokens, virtual casino chips, and/or other property or things of value at Chumba Casino. Mr. Kuchan played at the Chumba Casino on a near-daily basis between these dates. Mr. Kuchan deposited or otherwise transferred money into Chumba Casino approximately every few days in increments of

17

between $1 to $20. Each time Mr. Kuchan deposited money into Chumba Casino, he received cryptocurrency, utility or security tokens, virtual casino chips, and/or other things of value in exchange. Mr. Kuchan then wagered these cryptocurrency, utility or security tokens, virtual casino chips, and/or other things of value on casino games and/or other games of chance at Chumba Casino. Mr. Kuchan lost everything he wagered. He has not sued to recover his losses.

41.     Plaintiff Laury and Mr. Kuchan share joint bank accounts, joint credit cards, and hold their money and property jointly. The money, cryptocurrency, utility or security tokens, virtual casino chips, and/or other property or things of value Mr. Kuchan gambled and lost at the VGW Casinos was his and Plaintiff Laury's joint marital property. Thus, Plaintiff Laury suffered a direct and concrete financial harm as a result of VGW's illegal gambling enterprise. Plaintiff Laury (like all Plaintiffs and Class Members) therefore brings a direct personal claim based on the independent harm caused to him and his property interests by VGW's violations of Ohio law. Ohio law creates independent rights, remedies, and causes of actions for the spouses and children of gamblers against illegal casinos, allowing harmed spouses and children to recover monies lost by a spouse or parent to an illegal casino.

42.     Plaintiff Laury never gambled on, or otherwise accessed or used, the VGW Casinos. He never reviewed, signed, accepted, or consented to any agreement with VGW (including but not limited to any of VGW's purported Terms and Conditions or arbitration agreements). Plaintiff Laury also never waived or impaired any rights or claims against VGW (including but not limited to any class action waivers). At all relevant times, he was unaware of the terms of any agreements that Mr. Kuchan may have entered into with VGW (including but not limited to any of VGW's purported Terms and Conditions, arbitration agreements, or class action waivers). At all relevant times, Plaintiff Laury and Mr. Kuchan were unaware that the VGW Casinos were illegal gambling enterprises under Ohio state law and federal law.

### G.    Plaintiff Eve Fields

43.     Plaintiff Eve Fields is, and at all relevant times was, an adult natural person and a resident of Tennessee. Plaintiff Fields is, and at all relevant times was, the spouse of Daniel Fields, an adult natural person and resident of Tennessee.

18

44.    At least between December 29, 2023, and February 3, 2025, and while located within Tennessee, Mr. Fields gambled and lost at least $3,400 in money, cryptocurrency, utility or security tokens, virtual casino chips, and/or other property or things of value at the VGW Casinos. Mr. Fields gambled at least $5,300 at the Chumba Casino ($1,100), LuckyLand Slots ($2,200), and Global Poker ($1,900), and only won $1,825. Mr. Fields played at the Chumba Casino, LuckyLand Slots, and/or Global Poker casino on a near-daily basis between these dates. Mr. Fields deposited or otherwise transferred money into these casinos every few days in increments of between $1.98 and $49.99. Each time Mr. Fields deposited money into these casinos, he received cryptocurrency, utility or security tokens, virtual casino chips, and/or other things of value in exchange. Mr. Fields then wagered these cryptocurrency, utility or security tokens, virtual casino chips, and/or other things of value on casino games and/or other games of chance. Mr. Fields lost at least $3,400. He has not sued to recover his losses.

45.    Plaintiff Fields and Mr. Fields share joint bank accounts, joint credit cards, and hold their money and property jointly. The money, cryptocurrency, utility or security tokens, virtual casino chips, and/or other property or things of value Mr. Fields gambled and lost at the VGW Casinos was his and Plaintiff Fields' joint marital property. Thus, Plaintiff Fields suffered a direct and concrete financial harm as a result of VGW's illegal gambling enterprise. Plaintiff Fields (like all Plaintiffs and Class Members) therefore brings a direct personal claim based on the independent harm caused to her and her property interests by VGW's violations of Tennessee law. Tennessee law creates independent rights, remedies, and causes of actions for the spouses and children of gamblers against illegal casinos, allowing harmed spouses and children to recover monies lost by a spouse or parent to an illegal casino.

46.    Plaintiff Fields never gambled on, or otherwise accessed or used, the VGW Casinos. She never reviewed, signed, accepted, or consented to any agreement with VGW (including but not limited to any of VGW's purported Terms and Conditions or arbitration agreements). Plaintiff Fields also never waived or impaired any rights or claims against VGW (including but not limited to any class action waivers). At all relevant times, she was unaware of the terms of any agreements that Mr. Fields may have entered into with VGW (including but not limited to any of VGW's

purported Terms and Conditions, arbitration agreements, or class action waivers). At all relevant times, Plaintiff Fields and Mr. Fields were unaware that the VGW Casinos were illegal gambling enterprises under Tennessee state law and federal law.

## II.    **DEFENDANTS**

### A.    **Defendant VGW Holdings US Inc.**

47.    Defendant VGW Holdings US Inc. is a Delaware corporation. Currently and/or during the events at issue in this action, VGW Holdings US Inc.'s principal place of business is or was located in San Francisco, California (at the same office that serves or served as the principal place of business for VGW US, Inc. and VGW LuckyLand Inc.; VGW internally refers to these three entities as "VGW US"). Since at least November 2019, VGW Holdings US Inc. has been registered with the California Secretary of State to conduct business in California. VGW Holdings US Inc. owns and operates a series of wholly owned subsidiaries, including VGW US, Inc. and VGW LuckyLand Inc. (which owns LuckyLand Slots). All of these companies have the same California registered agent.[1] VGW Holdings US Inc. controls the illegal gambling operations of these wholly owned subsidiaries under the ultimate direction of Defendants Laurence Escalante and VGW Parent (defined below).

### B.    **Defendant VGW US, Inc.**

48.    Defendant VGW US, Inc. is a Delaware corporation. Currently and/or during the events at issue in this action, VGW US, Inc.'s principal place of business is or was located in San Francisco, California (at the same office that serves or served as the principal place of business for VGW Holdings US Inc. and VGW LuckyLand Inc.). Since at least August 2017, VGW US, Inc. has been registered with the California Secretary of State to conduct business in California. VGW US, Inc., in conjunction with other VGW entities, co-operates the illegal gambling operations of the VGW Casinos under the ultimate direction of Defendants Laurence Escalante and VGW Parent (defined below).

---

[1] VGW Holdings US Inc. and VGW US, Inc. also have the same corporate agent registered with the Delaware Secretary of State.

C.    **Defendant VGW LuckyLand Inc.**

49.    Defendant VGW LuckyLand Inc. is a Delaware corporation. VGW LuckyLand Inc. owns and co-operates LuckyLand Slots (https://luckylandslots.com/) with VGW Games Limited. Currently and/or during the events at issue in this action, VGW LuckyLand Inc.'s principal place of business is or was located in San Francisco, California (at the same office that serves or served as the principal place of business for VGW Holdings US Inc. and VGW US, Inc.). VGW LuckyLand Inc. also operates LuckyLand Slots' social media accounts, promotions, and advertising out of its San Francisco office. Since at least January 2018, VGW LuckyLand Inc. has been registered with the California Secretary of State to conduct business in California.

50.    LuckyLand Slots was originally created by San Francisco-based company OpenWager, which was later purchased by VGW in 2017. VGW then rebranded LuckyLand Slots while retaining San Francisco as its nerve center and principal place of operations. VGW LuckyLand Inc. co-operates the illegal gambling operations of LuckyLand Slots in the Class States under the ultimate direction of Defendants Laurence Escalante and VGW Parent (defined below).

D.    **Defendant Laurence Escalante**

51.    Defendant Laurence Escalante is an individual who resides in Perth, Australia. Mr. Escalante is the founder, director, Chief Executive Officer, and 100% owner of VGW[2] who runs and controls the VGW empire he created. Mr. Escalante created and developed the dual-coin system VGW uses to attempt to evade anti-gambling laws in the United States. Mr. Escalante controls and directs the downstream operations of the entire VGW network of entities, including VGW Holdings Limited and all its controlled subsidiaries.

E.    **Defendant VGW Holdings Limited and Its Controlled Subsidiaries**

52.    VGW Holdings Limited ("VGW Parent") is an Australian parent company that fully controls and directs the downstream operations of a large network of wholly owned subsidiary

---

[2] Press Release, VGW, *Statement from VGW Founder and CEO Laurence Escalante* (August 5, 2025) (reporting Australian court approval of Mr. Escalante's complete acquisition of VGW) (accessible at https://bit.ly/418lrnY) (last accessed August 16, 2025); Christian Lee, *VGW shareholders angered by Laurence Escalante's latest plans*, iGaming Expert (July 8, 2025), https://bit.ly/3U7WMw3 (stating Mr. Escalante currently owns approximately 70% of VGW and is in the process of purchasing the remaining 30%).

1  companies, including VGW Malta Holding Limited; VGW Malta Limited; VGW Games Limited;

2  VGW GP Limited; VGW Holdings US Inc.; VGW US, Inc.; and VGW LuckyLand Inc.

3  ("Controlled Subsidiaries").

4      53.    VGW Parent refers to these wholly owned subsidiaries as "controlled entities" in its

5  public financial reports and includes these subsidiaries' revenues as its own. VGW Parent owns

6  and operates VGW Play (https://vgwplay.com/), which directly links consumers to all three VGW

7  Casinos: Chumba Casino, LuckyLand Slots, and Global Poker. In this way, VGW Parent presents

8  itself, the VGW Casinos, and its Controlled Subsidiaries as a single unified entity under VGW

9  Parent's control:



21      54.    The VGW Play Terms and Conditions also expressly distinguish between VGW

22  Parent's "Platform" (which encompasses the VGW Casinos and all their games) and a "Third Party

23  Website" (which "means a third party website not controlled by us").[3] As the Terms and Conditions

24  make clear, Chumba Casino, LuckyLand Slots, and Global Poker are not considered third party

25  websites, and are instead "controlled by" VGW Parent.

26

27

28  [3]  VGW Play Terms & Conditions (version 1.0; dated Feb. 27, 2023) § 1 (accessible at
    https://bit.ly/4m0Wkfj).

55.    Similarly, the VGW (and VGW Play) Privacy Policy presents VGW as a single unified "VGW Group," applies the Privacy Policy to the entire group, and expressly notes that "VGW Holdings Limited is the ultimate parent company of this group of entities."[4]

56.    Further, each of the VGW Casinos has an additional privacy policy, each of which notes that *VGW*—defined as "VGW Holdings Limited and any applicable subsidiaries"—operate the VGW Casinos and their websites.[5]

57.    The VGW Casinos are illegal gambling enterprises under the laws of the numerous states, including the District of Columbia, Georgia, Illinois, Kentucky, Massachusetts, Mississippi, Missouri, New Jersey, New Mexico, Ohio, South Carolina, Tennessee, and Wisconsin ("Class States"). VGW Parent, through the Controlled Subsidiaries, controls, operates, and markets (or at all relevant times controlled, operated, and marketed) the VGW Casinos across the United States, including in the Class States. VGW Parent described itself in a prospectus as "operat[ing] a social (or online) casino through its wholly owned gaming platform[s]" and "deriv[ing] the majority of revenues from its wholly owned gaming platform[s]." VGW Parent exercises complete dominion and control over the Controlled Subsidiaries' finances and operations. As VGW itself admits, the Controlled Subsidiaries are fully controlled subsidiaries and therefore mere agents or alter egos of VGW Parent.

**F.    Defendant VGW Malta Holding Limited**

58.    Defendant VGW Malta Holding Limited is an Island of Malta company that maintains offices in Australia. VGW Malta Holding Limited owns and operates a series of wholly owned subsidiaries, including VGW Malta Limited (which owns Chumba Casino), VGW Games Limited (which co-operates all three VGW Casinos), and VGW GP Limited (which owns Global Poker). All of these entities operate out of the same office. VGW Malta Holding Limited controls

---

[4] VGW, VGW Website Privacy Policy (version 1.0; dated Feb. 27, 2023) at 1 (accessible at https://bit.ly/45xHYNt).

[5] Chumba Casino, Chumba Casino Privacy Policy (version 6.0; dated Jul. 17, 2025) (accessible at https://bit.ly/4m1HqFA); LuckyLand Slots, LuckyLand Slots Privacy Policy (version 6.0; dated Jul. 17, 2025) (accessible at https://bit.ly/4fsEK1m); Global Poker, Global Poker Privacy Policy (version 6.0; dated Jul. 17, 2025) (accessible at https://bit.ly/45gWqIC).

COMPLAINT

the illegal gambling operations of its wholly owned subsidiaries under the ultimate direction of Defendants Laurence Escalante and VGW Parent.

### G.    Defendant VGW Malta Limited

59.    Defendant VGW Malta Limited is an Island of Malta company that maintains offices in Australia. VGW Malta Limited owns Chumba Casino (https://www.chumbacasino.com/) and co-operates it with VGW Games Limited. VGW Malta Limited co-operates (or at all relevant times co-operated) the illegal gambling operations of Chumba Casino in the Class States under the ultimate direction of Defendants Laurence Escalante and VGW Parent.

### H.    Defendant VGW Games Limited

60.    Defendant VGW Games Limited is an Island of Malta company that maintains offices in Australia. VGW Games Limited co-operates the VGW Casinos with VGW Malta Limited, VGW LuckyLand Inc., and VGW GP Limited. VGW Games Limited co-operates the illegal gambling operations of the VGW Casinos under the ultimate direction of Defendants Laurence Escalante and VGW Parent.

### I.    Defendant VGW GP Limited

61.    Defendant VGW GP Limited is an Island of Malta company that maintains offices in Australia. VGW GP Limited owns and co-operates Global Poker (https://globalpoker.com/) with VGW Games Limited. VGW GP Limited co-operates (or at all relevant times co-operated) the illegal gambling operations of Global Poker in the Class States under the ultimate direction of Defendants Laurence Escalante and VGW Parent.

### J.    Defendant Jumio Corporation

62.    Defendant Jumio Corporation ("Jumio") is a Delaware corporation with its principal place of business and global headquarters in Sunnyvale, California. Jumio's key officers work out of its Sunnyvale location and several of its directors are residents of California that also work in California. Since at least July 2016, Jumio Corporation has been registered with the California Secretary of State to conduct business in California.

63.    VGW contracts with Jumio to verify the identity, age, and location (*i.e.*, ensuring the gambler is actually located in a VGW-approved state when gambling) of each gambler using

the VGW Casinos. As part of the verification services, Jumio installs tracking software called "cookies," "web beacons," and/or "tracking pixels" on gamblers' computers or mobile devices from California that sends information from the gamblers' devices to Jumio in California in order to allow Jumio to provide its services. Jumio stores the verification-related information in California for an indefinite period of time. In short, Jumio verifies the age, identity, and geographic location of each visitor to the VGW Casinos before VGW permits them to enter and gamble—and then re-verifies that geolocation data in order to allow the visitor to keep gambling. Jumio's tracking software also allows Jumio to collect information on gamblers for customized ads and other marketing. In other words, every gambler that visits the VGW Casinos first must pass through a security check that occurs in or through California (and be subject to additional monitoring or data collection in or through California). Without Jumio's California services, no one could gamble at the VGW Casinos.

**K.    Defendant Yodlee, Inc.**

64.    Defendant Yodlee, Inc. ("Yodlee") is a Delaware corporation. Currently and/or during the events at issue in this action, Yodlee's principal place of business and headquarters were located in Redwood City, California. Yodlee's servers are located in California,[6] and its website Terms & Conditions state that Yodlee's website "is operated from a site in the State of California, USA," and that Yodlee submits to jurisdiction of California state and federal courts. Since at least February 1999, Yodlee has been registered with the California Secretary of State to conduct business in California.

65.    VGW contracts with Yodlee to link gamblers' bank or other financial accounts to the VGW Casinos so gamblers can purchase casino coins and gamble at the VGW Casinos. Yodlee also verifies gamblers' account information and ensures the accounts contain sufficient funds to clear the gamblers' anticipated transactions. Yodlee then processes the financial transaction for VGW so each gambler may begin to spend and lose money to VGW.

---

[6] *See Clark v. Yodlee, Inc.*, 3:20-cv-05991-SK (N.D. Cal.) (Dkt. No. 627 at 4 & n.13 [stating that Yodlee stores customer login and banking data "on its California Servers"]; Dkt. No. 635 at 7 [acknowledging and failing to deny that Yodlee has "servers and personnel" in California and "store[s] retrieved data at a center in [California]"]).

66.    In short, Yodlee acts as one of the VGW Casinos' cashiers, creating a channel between the gamblers' bank and VGW, and then transferring cash between them. Without such channels, gamblers could not purchase coins to gamble or receive any gambling winnings from VGW back into their accounts. In other words, the relevant gamblers' bank accounts, credit cards, and other financial vehicles used for gambling at the VGW Casinos are linked from the gambler to the VGW Casinos in or through California.

**L.    Defendant Trustly, Inc.**

67.    Defendant Trustly, Inc. ("Trustly") is a Delaware corporation with its principal place of business in San Carlos, California. All Trustly's key officers and directors work out of Trustly's San Carlos location. Trustly's main point of contact for customers is its San Carlos location. Since at least October 2019, Trustly has been registered with the California Secretary of State to conduct business in California.

68.    VGW contracts with Trustly to transfer gamblers' money out of their bank or other financial accounts to the VGW Casinos so gamblers can purchase casino coins and gamble at the VGW Casinos. Yodlee creates the channel connecting the gamblers' and VGW's accounts; it is Trustly's job to transport the money between those accounts. Yodlee builds the tunnel, Trustly moves the cash through the tunnel. As part of its services, Trustly installs tracking cookies onto gamblers' computers or mobile devices that send information from the gamblers' devices to Trustly in California in order to allow Trustly to provide its services. In this way, Trustly acts as another of the VGW Casinos' cashiers because it directly facilitates the transfer of money from gamblers to VGW—for the purchase of casino coin packages that players use to gamble—and vice versa—so VGW can deposit any cash gambling winnings into the gamblers' bank or other accounts. In other words, every Trustly deposit to or from the VGW Casinos occurs in or through California. Without Trustly's California services, gamblers would be unable to exchange real money for casino coins or gamble at the VGW Casinos.

**M.    Defendant Brian Christopher Misfud**

69.    Defendant Brian Christopher Misfud ("Brian Christopher") is an individual who resides in Palm Springs, California and/or resided in California during the events at issue in this

action. Brian Christopher is one of the most famous gambling influencers in the United States and has partnered with both Chumba Casino and LuckyLand Slots as their primary social media influencer. Brian Christopher has continuously and prolifically promoted Chumba Casino and LuckyLand Slots on various social media, streaming, and website platforms, including through posting countless videos of himself gambling at Chumba Casino and LuckyLand Slots. Brian Christopher also earns commissions from VGW when gamblers sign up for and deposit money into Chumba Casino or LuckyLand Slots as a result of his ads or endorsements. Brian Christopher's VGW-related activities occur in California, including through his company, BC Ventures LLC ("BC Ventures").

70.    BC Ventures is a California company with its principal place of business in Palm Springs, California. Since at least July 2019, BC Ventures has been registered with the California Secretary of State to conduct business in California. BC Ventures' two managers are Brian Christopher and Marco Bianchi who are both California residents. Brian Christopher is the is the co-owner, President, and Chief Executive Officer of the company. BC Ventures is the business entity through which Brian Christopher controls his social media empire and partnerships, including the VGW partnership. BC Ventures assists Brian Christopher in the advertising and other work involved with Brian Christopher's partnership with VGW

71.    Brian Christopher dominates and controls BC Ventures, including because he: owns BC Ventures; is the Chief Executive Officer and President of the company; creates and controls the use of his image and likeness; directs and controls the various sponsorship deals into which the company enters using his name, likeness, and performances (such as his VGW advertisements); controls strategic and operational-level decisions; makes all the gambling decisions; and routinely commingles his personal and BC Ventures' company funds (and publicly advertises that commingling as a mark of authenticity that he uses to promote VGW).

72.    Indeed, one of Brian Christopher's websites, Flip The Switch, purports to dispel "myths" that the casinos fund his gambling by stating that "Brian's an advocate of, and **sticks 100 percent to**, what's known as Authentic Play. That means you're seeing the real deal – **it's Brian's own money going in**, and he wins, or loses, what you see there. **He sets his own budget**, **decides**

1    *what he's willing to put on the line*, and ***personally deals with the wins and losses himself***."[7] Brian

2    Christopher also states on his BCSlots Website's FAQs that "[m]oney is a delicate matter as it is

3    ***very personal***."[8] Brian Christopher started out as a one-man operation with the power to make all

4    key decisions. The company he has since built around himself—that stars and centers around

5    himself—is still under his power, control, and direction.

6                                **JURISDICTION AND VENUE**

7    **I.    SUBJECT MATTER JURISDICTION**

8          73.    This Court has subject matter jurisdiction over Plaintiffs' claims under the Class

9    Action Fairness Act, 28 U.S.C. § 1332(d) ("CAFA"), because: (1) this is a class action with

10   minimal diversity between at least one Plaintiff and one Defendant (*i.e.*, at least one class member

11   is a citizen of a state of which one Defendant is not a citizen); (2) there are at least 100 class

12   members; (iii) the aggregate amount of damages exceeds $5,000,000 exclusive of interest and costs;

13   and (iv) no other reasons exist under CAFA for this Court to decline jurisdiction.

14   **II.    PERSONAL JURISDICTION**

15         **A.    VGW's Claim That No Court Has Personal Jurisdiction**

16         74.    On April 28, 2025, certain Plaintiffs sued VGW in the District of Montana for its

17   illegal gambling enterprise. *See Lighter et al. v. VGW Holdings Limited et al.*, Case No. 25-cv-0062

18   (D. Mont.). In response, VGW informed Plaintiffs that VGW would not agree to litigate in Montana

19   because its nationwide operations were not connected to Montana. Those Plaintiffs asked VGW if

20   there were any judicial district in which it would agree to litigate. VGW insisted there was ***no***

21   ***judicial district*** in the United States in which it would agree to litigate that matter for all plaintiffs

22   and all defendants. But VGW's United States gambling enterprise, consisting of multiple controlled

23   entities, is principally headquartered and operated out of San Francisco, California. In addition to

24   being the nexus for strategic and operational decisions in the U.S., other essential aspects of VGW's

25   casino operations are conducted in California: VGW connects to gamblers' bank accounts in

26
     ─────────────────────
27   [7] FlipTheSwitch, *Do the Casinos Bankroll Brian Christopher's Slot Play?*, https://bit.ly/3UHd13f
     (last visited July 31, 2025) (emphasis added).

28   [8] Brian Christopher Slots, *Frequently Asked Questions to BC*, https://bit.ly/47b8DRp (last visited
     July 31, 2025) (emphasis added).

California; transfers money into and out of gamblers' bank accounts and completes coin purchases and redemptions in California; verifies gamblers' age, identity, and location (including verifying that gamblers are located in the Class States) in California; stores gamblers' location tracking data in California; places tracking software on gamblers' computers and mobile devices from California; and creates, develops, and distributes misleading targeted advertisements from California into the Class States. Plaintiffs have therefore brought this case to California, where VGW and its related and affiliated companies operate and reside.

75.    The parties agreed that if the Montana Plaintiffs dismissed the Montana action and refiled in this venue, the claims for those plaintiffs and putative class members will relate back to the original April 28, 2025, filing date in the Montana action. The parties also agreed that the VGW defendants reserved all defenses and objections, including those based on personal jurisdiction and any purported right to move to compel arbitration.

## B.    Personal Jurisdiction Over VGW US Entities

76.    This Court has general personal jurisdiction over Defendants VGW LuckyLand Inc., VGW Holdings US Inc., and Defendant VGW US, Inc. because they are each "at home" in California. These entities: (1) are each principally operated and headquartered out of a single office in San Francisco, California; (2) are treated by VGW as a single unit (VGW US); (3) have the same corporate agent registered with the California Secretary of State; and (4) are managed by the same officer (VGW US's President and former General Manager, Derek Brinkman) who held that position since VGW US (and LuckyLand Slots) was created in 2017 through the acquisition of OpenWager (a San Francisco-based company that created the original LuckyLand casino that VGW purchased and rebranded as LuckyLand Slots). Mr. Brinkman had been the VP of Product for OpenWager, and he had worked out of OpenWager's San Francisco headquarters and principal place of business, since 2013:

COMPLAINT

## Derek Brinkman ⊘ · 3rd

General Manager of VGW US at VGW

San Francisco, California, United States · Contact info

### Experience

**General Manager of VGW US**
VGW
Sep 2017 - Present · 8 yrs
San Francisco Bay Area

After VGW acquired OpenWager's platform, content, and team, I worked to start a new US subsidiary of VGW based in San Francisco. I manage the overall business, P&L, and team of 100 FTE's and 2 game studios for VGW US. VGW US's core initial product was transformed into VGW's LuckyLand Slots. LuckyLand Slots has experienced massive success and growth since it left beta in January 2019.

**VP Product**
OpenWager
May 2013 - Aug 2017 · 4 yrs 4 mos
San Francisco Bay Area

I was the founding Product Lead for OpenWager, a company that built and operated a social casino platform licensed to media companies & land-based casinos (Penn National Gaming, SKY Media, WarnerBros).

OpenWager had it's platform & games acquired by VGW, and I facilitated opening the VGW US wholly owned subsidiary and retained 90% of the original OW employees to work on building new games on the original platform for VGW US.

77.    Additionally, other key officers supporting Mr. Brinkman and VGW US also work or worked out of the same San Francisco office, including VGW US's Vice President of Product (Hui Cheng); and Director of Operations (Abe Barakat).

78.    Upon information and belief, VGW US's San Francisco offices also are (or were during the events at issue in this action) VGW's largest U.S. offices and where most of VGW's U.S.-based employees are located or based.

30

COMPLAINT

79.     LuckyLand Slots' marketing, including its social media marketing, is also operated out of VGW US's San Francisco office, as prominently displayed on LuckyLand Slots' X, formerly known as Twitter, page:



80.     Upon information and belief, other key VGW functions and employees are also located in, and operate out of, California. For example, VGW employs human resources personnel in California. VGW also designs and creates illegal casino games in California. In or around February 2025, VGW was publicly advertising for slot game designer positions (*i.e.*, Senior Animators and Concept Artists) with work locations in California. These positions were promoted by Mr. Cheng from California on his LinkedIn page:



31

81.    VGW also advertised for a "UI Designer" for slot machines to work out of VGW's San Francisco office, noting that VGW was "expanding [its] Product Management team in San Francisco" due to the office's "hyper growth." VGW did not mention a single other US office:



VGW is hiring

# UI Designer

TYPE          CATEGORY        LOCATION
Full Time      UI Design      San Francisco, CA • United States

UI Designer

VGW is a fast-growing technology company and creator of market-leading online social games. With offices across Australia, San Francisco, Toronto, Malta and the Philippines we are on a mission to be the biggest gaming company in the world!

Due to hyper growth we are expanding our Product Management team in San Francisco and currently looking for a UI Designer to join the team.

82.    Other departments, including casino Product Managers, Human Resources department personnel, and other game design employees work in California—either physically in, or remotely from, the San Francisco office.

83.    VGW also receives cease-and-desist letters sent from state gambling regulators to its San Francisco, California office—indicating that state gaming regulators recognize VGW US's headquarters and principal place of business is at VGW US's offices in San Francisco. As just one example, when the Michigan Gaming Control Board sent VGW a cease-and-desist letter for its illegal gambling operations in 2023, the letter was sent to VGW's San Francisco office. VGW subsequently shut down operations in Michigan.

COMPLAINT

84. Dun & Bradstreet, the Better Business Bureau, job posting sites like Built In, and other reputable third-party sources also identify VGW US entities and/or the VGW Casinos as being headquartered and principally operated out of its San Francisco, California office (and no other US locations):



33



85.     To the extent this Court does not have general personal jurisdiction over VGW LuckyLand Inc., VGW Holdings US Inc., and/or VGW US, Inc., this Court has specific personal jurisdiction over these VGW US entities because, pursuant to the facts alleged above and throughout this Complaint, each entity has sufficient minimum contacts in California—including via its partnerships with the California Partners—to render the exercise of jurisdiction proper, necessary, and fair.

C.     **Personal Jurisdiction Over Laurence Escalante, VGW Holdings Limited, VGW Malta Holding Limited, VGW Malta Limited, VGW Games Limited, and VGW GP Limited**

86.     This Court has specific personal jurisdiction over Defendants Laurence Escalante, VGW Holdings Limited, VGW Malta Holding Limited, VGW Malta Limited, VGW Games Limited, and VGW GP Limited because, pursuant to the facts alleged throughout this Complaint, each entity directly controls the operations of his/its downstream entities, which operate in or through California, as a single globally controlled entity with merged finances and comingled advertisement budgets (at the very least).

34

COMPLAINT

87.    Mr. Escalante owns 100% of VGW.[9] Mr. Escalante sits at the top of the VGW pyramid, directing and controlling each and every downstream entity, including all California operations and all operations occurring in or through California. According to VGW's filings with the California Secretary of State, Mr. Escalante is the Chief Executive Officer and Chief Finance Officer *of every VGW entity registered to do business in California.* These entities include VGW Holdings US Inc.; VGW US, Inc.; and VGW LuckyLand Inc.

88.    Mr. Escalante's pervasive control is exemplified in his recent communications with shareholders who were concerned that VGW's operations are illegal in most of the United States and that VGW was not being transparent about that fact. Mr. Escalante launched an "expletive-laden rant to investors, telling them to sell their shares in ***his*** gaming business Virtual Gaming Worlds (VGW) if they don't trust ***him***."[10]

89.    Laurence Escalante, VGW Holdings Limited, VGW Malta Holding Limited, VGW Malta Limited, VGW Games Limited, and VGW GP Limited are entities that operate and control the VGW Casinos.

90.    The VGW Casinos operate primarily in the United States, and their revenues come primarily from its U.S.-based operations—which are headquartered and principally operated out of San Francisco, California. Thus, Plaintiffs' and Class Members' claims directly arise out of, and are related and connected to, Mr. Escalante's, VGW Holdings Limited's, VGW Malta Holding Limited's, VGW Malta Limited's, VGW Games Limited's, and VGW GP Limited's California conduct—including designing and creating illegal online casino games, marketing illegal online casino games, receiving money for illegal online gambling, and otherwise running an illegal online casino for residents of California and the Class States.

---

[9] Press Release, VGW, *Statement from VGW Founder and CEO Laurence Escalante* (August 5, 2025) (reporting Australian court approval of Mr. Escalante's complete acquisition of VGW) (accessible at https://bit.ly/418lrnY) (last accessed August 16, 2025); Christian Lee, *VGW shareholders angered by Laurence Escalante's latest plans*, iGaming Expert (July 8, 2025), https://bit.ly/3U7WMw3 (stating Mr. Escalante currently owns approximately 70% of VGW and is in the process of purchasing the remaining 30%).

[10] Adam Roarty, *Gambling Billionaire Escalante In Expletive Laden Rant To Investors* (May 9, 2025), https://bit.ly/4lbxx78 (emphasis added).

91.     Accordingly, the exercise of specific personal jurisdiction by this Court over Laurence Escalante, VGW Holdings Limited, VGW Malta Holding Limited, VGW Malta Limited, VGW Games Limited, and VGW GP Limited is proper, necessary, and fair.

**D.     Personal Jurisdiction Over Jumio**

92.     This Court has general personal jurisdiction over Defendant Jumio because Jumio is "at home" in California, has its principal places of business and headquarters in California, has consented to the jurisdiction of California courts in its Terms & Conditions for claims relating to its services, and has admitted in other lawsuits that it is subject to general jurisdiction in California.[11]

93.     To the extent this Court does not have general personal jurisdiction over Jumio, this Court has specific personal jurisdiction over Jumio because, pursuant to the facts alleged above and throughout this Complaint, VGW requires every gambler (including spouses and parents of Plaintiffs and Class Members) to pass through Jumio, VGW's California "bouncer," before the gamblers may enter the VGW Casinos to gamble. Thus, Plaintiffs' and Class Members' claims directly arise out of, and are related and connected to, Jumio's California operations.

94.     Accordingly, the exercise of specific personal jurisdiction by this Court over Jumio is proper, necessary, and fair.

**E.     Personal Jurisdiction Over Yodlee**

95.     This Court has general personal jurisdiction over Defendant Yodlee because it is "at home" in California, has its principal places of business and headquarters in California, has its servers located in California, has submitted to the jurisdiction of California courts, and has admitted in other lawsuits that it is subject to general jurisdiction in California.[12]

---

[11] *See* Complaint ¶ 5, Dkt. No. 1, *Jumio Corporation v. Optimus Cards*, Case No. 5:20-cv-07339-LHK (N.D. Cal.) (alleging "Jumio is a citizen of Delaware and California"); *see also* Jumio Answer ¶ 7, Dkt. No. 18, *FaceTec, Inc. v. Jumio Corporation*, Case No. 3:24-cv-03626-RFL (N.D. Cal.) ("Jumio admits that it has its headquarters and a regular and established place of business in Sunnyvale, California.").

[12] *See Clark v. Yodlee, Inc.*, 3:20-cv-05991-SK (N.D.Cal.) (Dkt. No. 362 at ¶ 20 ["Yodlee admits that this Court has general personal jurisdiction over it"]).

96.    To the extent this Court does not have general personal jurisdiction over Yodlee, this Court has specific personal jurisdiction over these entities because, pursuant to the facts alleged above and throughout this Complaint, gamblers (including spouses and parents of Plaintiffs and/or Class Members) link their financial accounts to VGW through Yodlee in California. Yodlee verifies account information and ensures the accounts contain sufficient funds to clear the gamblers' anticipated transactions. Yodlee then processes the financial transactions. Yodlee thus directly facilitates gamblers' transfers of money into the VGW Casinos to gamble, and any payments from VGW to the gamblers' linked accounts. Thus, Plaintiffs' and Class Members' claims directly arise out of, and are related and connected to, Yodlee's California operations.

97.    Accordingly, the exercise of specific personal jurisdiction by this Court over Yodlee is proper, necessary, and fair.

### F.    Personal Jurisdiction Over Trustly

98.    This Court has general personal jurisdiction over Defendant Trustly because Trustly is "at home" in California, has its principal places of business in California, and has consented to the jurisdiction of California courts in its Terms & Conditions for claims relating to its services.

99.    To the extent this Court does not have general personal jurisdiction over Trustly, this Court has specific personal jurisdiction over Trustly because, pursuant to the facts alleged above and throughout this Complaint, gamblers (including spouses and parents of Plaintiffs and/or Class Members) use Trustly to transfer money out of their bank accounts to the VGW Casinos to gamble, and VGW uses Trustly to deposit gamblers' winnings back into the gamblers' bank accounts—all through California. Without Trustly's California-based services, gamblers could not transfer money into the VGW Casinos to gamble (or get any winnings back out). Thus, Plaintiffs' and Class Members' claims directly arise out of, and are related and connected to, Trustly's California operations.

100.    Accordingly, the exercise of specific personal jurisdiction by this Court over Trustly is proper, necessary, and fair.

COMPLAINT

### G.    Personal Jurisdiction Over Brian Christopher

101.    This Court has general personal jurisdiction over Defendant Brian Christopher because he is (and at all relevant times was) a resident of California.

102.    To the extent this Court does not have general personal jurisdiction over Brian Christopher, this Court has specific personal jurisdiction over him because, pursuant to the facts alleged above and throughout this Complaint, Brian Christopher—individually and through BC Ventures—operates his advertising, marketing, and commission partnership with VGW in and from California.

103.    Indeed, VGW and Brian Christopher intentionally solicited California and Class State residents for VGW's illegal gambling operations using social media platforms, websites, videos, and emails that were created in and distributed from California to targeted residents of California and the Class States. As Brian Christopher admits, he will "edit [his videos], create thumbnails, and post" the videos from California, even if they were recorded elsewhere.[13] Gamblers whose spouses and children are in the Classes were lured into Chumba Casino and LuckyLand Slots through Brian Christopher's California-based advertisements, videos, and marketing promotions—earning Brian Christopher his partnership commissions in California. Thus, Plaintiffs' and Class Members' claims directly arise out of, and are related and connected to, Brian Christopher's California operations.

104.    Accordingly, the exercise of specific personal jurisdiction by this Court over Brian Christopher is proper, necessary, and fair.

## III.    VENUE AND DIVISIONAL ASSIGNMENT

### A.    Venue

105.    Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred within this District. Multiple Defendants also reside in and conduct their relevant operations from the District.

---

[13] Christian Holmes, *'Influencers' Provide Some Of The Most Effective Marketing Casinos Could Ask For* (Apr. 15, 2024), https://bit.ly/46EMCKM.

COMPLAINT

**B.    Divisional Assignment**

106.    The San Francisco or Oakland Divisions are the proper divisional assignments under the Northern District of California's Civil Local Rules 3-2(c) and (d) because a substantial part of the events or omissions giving rise to the claim occurred in (and arise in) San Francisco County.

## FACTUAL ALLEGATIONS

## I.    VGW'S ILLEGAL "SOCIAL" AND "SWEEPSTAKES" CASINOS

107.    VGW publicly claims that it is the biggest "social casino" and "sweepstakes casino" operator in the world. Social and sweepstakes casinos are online casinos that were popularized through social media websites like Facebook. These casinos operate completely online using virtual casino chips (coins). Although social casinos use virtual coins that cannot be exchanged for real money, sweepstakes casinos involve virtual coins that can be exchanged for real money or other things of value.

108.    VGW operates three of the oldest and most popular social and sweepstakes casinos: Chumba Casino, LuckyLand Slots, and Global Poker. VGW Parent was founded in 2010. Global Poker launched in 2011, followed by Chumba Casino in 2012, and LuckyLand Slots in 2019.

109.    Based on publicly available information, VGW's revenues topped $4 billion in 2024, comprising approximately 50% of the current global social and sweepstakes casino market share. In earlier years, VGW's market share was reported to be as high as 90%.

110.    Chumba Casino is the most popular social and sweepstakes casino in the United States; it took in more than $3.3 billion in gambling revenues in 2024. LuckyLand Slots raked in $1.2 billion, while Global Poker pocketed nearly a quarter billion. The VGW Casinos' revenues are expected to continue increasing in 2025 and beyond, with the vast majority of those gambling revenues taken from gamblers and their families in the United States, and the majority of that coming from states, like the Class States, where gambling is illegal.

111.    The VGW Casinos operate online through their websites or mobile phone or computer applications. Chumba Casino allows gamblers to play over 200 slot machines and various casino table games like blackjack, roulette, and craps. LuckyLand Slots offers gamblers more than 100 slot machines. And Global Poker provides gamblers with various poker games, slot machines,

table games like blackjack and baccarat, and many other casino games. Once registered with a VGW Casino, gamblers can spend real money to buy virtual casino chip coins that can be used to play these casino games.

112.    The various casino games at the VGW Casinos are designed to look and operate just like familiar casino slot machines and table games at traditional casinos, including the same live table game card dealers, roulette croupiers, and hosts of other live games:





COMPLAINT

1

2

3

4

5

6



7

8

9

10

11

12



13

14

15

16

17

18



19

20

21

22

23

24       113.    VGW's social and sweepstakes casino model is based on a two-coin system.

25   Gamblers can operate VGW's casino games with either: (1) **gold** coins (GC), which can be played

26   but cannot be redeemed for cash (the "social casino" side); and (2) **sweepstakes** coins (SC), which

27   are each worth $1 and can be redeemed for $1 in cash (the "sweepstakes casino" side).

28

COMPLAINT

114.    VGW's GC work like gift cards: VGW converts gambler's cash into digital credits that can be redeemed only for valuable services at a particular company, and the company will not redeem the credits for cash once purchased. Gamblers can only redeem their GC within the casino for casino game play. Like gift cards and other casino chips, GC are things of value.

115.    SC are more direct equivalents to traditional casino chips: they have a cash value, can be gambled like cash, and the casino is required to exchange them for cash.

116.    Whenever a gambler purchases GC, the gambler also receives at least the amount they paid in SC. For example, if a gambler deposits $300 at Chumba, they will receive millions of unredeemable GC *and* $315 worth of cash-redeemable SC as a purported "free gift." Chumba even adds a dollar sign to the left of the "free" sweepstakes coins to remind gamblers that they will get *at least the value of their cash deposit in cash-redeemable SC*:



117.    Many gamblers, including the spouses and parents of Plaintiffs and Class Members, continue to purchase these GC/SC packages when they run out of (or low on) SC—despite the gamblers having already amassed hundreds of millions to *billions* of GC—further evidencing that the primary purpose of these transaction is to convert dollars into SC—not to obtain more unnecessary and unused GC.

118.    Just like in a traditional casino, VGW's casino games are based entirely or predominately on chance, not skill. A wager is placed on the outcome of a game, and the outcome

COMPLAINT

1    of that game is determined by randomizing algorithms (random/pseudorandom number generators)

2    whose outputs cannot be controlled by either party. These randomizing algorithms—not VGW or

3    the gambler—control where the reels of a slot machine will stop spinning, what sides of the dice

4    will face up, or what cards will be drawn next from the deck.

5        119.    Thus, it is chance, not skill, that determines the outcome of each wager, even though

6    strategies can be employed to maximize the gamblers' odds in certain games like blackjack, craps,

7    and poker.

8        120.    To the extent some degree of skill is involved in some or all of the VGW Casinos'

9    casino games, it is chance—not skill—that predominates and determines whether the gambler has

10   the winning hand. Indeed, even in poker, gamblers are betting on the odds of whether their current

11   or future cards will give them the winning hand. When all their chips have been bet, gamblers are

12   at the mercy of the random cards that they and the other gamblers were or will be dealt.

13       121.    If VGW's scheme occurred in a traditional brick-and-mortar casino, there would be

14   no question that it involves gambling. If, for example, Caesar's Palace in Las Vegas took $100

15   from a player in exchange for giving the player (1) 1,000 gold casino chips that could never be

16   cashed out, and (2) $100 in green casino chips that could be cashed out after they were played—

17   that would not convert traditional gambling, which always involves the process of converting cash

18   into chips and back into cash, into something else. It would still be gambling. VGW is doing exactly

19   the same thing here. Likewise, the fact that this gambling occurs over the internet with "virtual"

20   coins instead of inside a brick-and-mortar casino with clay chips does not transform gambling into

21   something else.

22       122.    Just like in a traditional casino, VGW's players wager things of value in games of

23   chance that will allow them to win other things of value or lose the thing of value that was wagered.

24       123.    And when a gambler finally gets lucky and wins big, the VGW Casinos promote it

25   to the world to lure in new gamblers and keep existing gamblers coming back in hopes that they

26   will be the next lucky winner (and that VGW will actually pay out their jackpot). Below is an

27   example of Chumba Casino advertising how "Leslie D" won $380,195 from a lucky $3 bet on a

28   slot machine:

                                          43



124.    Chumba, for example, also directly correlates the amount of SC won, with the amount of cash the player will receive—advertising players holding large checks *in dollars* that exactly match (to the dollar) the amount of SC won:



44

125.    Similarly, LuckyLand Slots advertises its "Billion Coin Ducks" and "Million Buck Ducks" on the front page of its website—admitting that "some of our ducks are a little luckier than others" and enticing gamblers with the prospect that they might be extra lucky, too:



126.    LuckyLand Slots uses these advertisements to lure in new gamblers on social media, too. For example, in the below Instagram post that was pinned to the top of LuckyLand Slots' page, LuckyLand Slots invites viewers to "[j]oin the frenzy and start spinning for your chance to join the #MillionBuckDuck club":



45

127.    For slot machines and table games like craps and blackjack, both the gambler and VGW put things of value at risk in every wager: the gambler puts up his or her gold or sweepstakes coins (both of which were obtained with the gambler's money); and the VGW Casinos promise to pay certain amounts of gold or sweepstakes coins if the gambler wins. If the gambler wins more GC, VGW loses those GC—and gamblers do not have to pay cash to obtain more GC to operate the casino games (which can be operated only using VGW's coins).

128.    The same is true for the sweepstakes coins. If the gambler wins more SC, VGW loses those SC. The gambler does not have to buy more coin packages to obtain additional SC, and the gambler can either gamble the additional SC or redeem them for cash in a one for one exchange. This is exactly how it works in a traditional casino.

129.    For poker games between gamblers, VGW also participates in the games and/or puts its own money at risk. For example, Global Poker operates by having VGW: (1) take a "rake" (a cut) of the bets, thereby taking a portion of the amounts lost; and/or (2) put its own money directly at risk by offering randomly selected jackpot bonuses to poker game players. Global Poker's Card Games Rules confirm that VGW awards randomly selected bonus jackpots of 2 to 200 times the number of sweepstakes coins in the prize pool using probability tables:

| PRIZE POOL MULTIPLIER | FOR AN SC 1 ENTRY, PLAYERS CAN PLAY FOR | FOR A GC 1,000 ENTRY, PLAYERS CAN PLAY FOR | FREQUENCY / PROBABILITY |
| --- | --- | --- | --- |
| 200x ('Jackpot Level') | SC 200 | GC 200,000 | 3 in 10,000 |
| 50x | SC 50 | GC 50,000 | 15 in 10,000 |
| 20x | SC 20 | GC 20,000 | 50 in 10,000 |
| 10x | SC 10 | GC 10,000 | 150 in 10,000 |
| 5x | SC 5 | GC 5,000 | 500 in 10,000 |
| 3x | SC 3 | GC 3,000 | 3,282 in 10,000 |
| 2x | SC 2 | GC 2,000 | 6,000 in 10,000 |

COMPLAINT

130.    VGW also designs its own casino games, in addition to commissioning and licensing casino games from third party game developers such as Playtech (VGW's largest third-party casino game developer). These game developers specifically design the casino games to operate on VGW's dual-coin system, and then use VGW as a distributor to put the developers' casino games in the hands of gamblers. In exchange, VGW pays the game developers a percentage of the value of what gamblers wagered and lost on the developers' games. As Playtech confirms, its operating model requires VGW to pay Playtech a percentage of VGW's "Net Gaming Revenue" (which Playtech defines as "Gross Wagers" minus the "Payout on Wagers" minus "Bonuses to Players" and "Tax[es]").[14]

131.    VGW uses its GC to condition gamblers into purchasing more and more SC. VGW's coin packages come with hundreds of thousands to millions of GC, but far fewer SC (approximately the same number of SC as dollars deposited). The VGW Casinos also require gamblers to bet hundreds of GC at a time, conditioning the gamblers to place larger bets of SC. When the gamblers inevitably lose all their SC due to the casino advantage, the gamblers can use their GC to keep gambling and keep getting their gambling "fix" until they can afford to buy more coin packages that include SC.

132.    VGW and its game developers intentionally design their casino games to exploit this conditioning by allowing the gambler to instantly switch from GC to SC between every slot pull, hand of cards, or roll of the dice:

**LuckyLand Slots**

You may switch the coins you are using in the game by clicking on the icon of the type of coin that you want to use.



---

[14]  Playtech plc 2024 Annual Report and Financial Statements at 25 (accessible at https://bit.ly/4mvXi37) (last visited July 31, 2025).

COMPLAINT

**Chumba Casino**



NOTE: Click the G (Gold Coins) or S (Sweeps Coins) icons to toggle between your Gold Coin and Sweeps Coin balances depending on your preferred gameplay mode.

**Global Poker**

You can switch between Gold Coin and Sweeps Coin game play. You can do this by simply clicking on the tab at the right top of your game screen, but take note that you cannot convert Gold Coins to Sweeps Coins or vice versa.

133.    Gamblers that win big with GC can immediately press their luck and chase a real money win with SC. And gamblers on a long losing streak with GC can switch mid-game to SC in the hopes their unlucky streak is about to end.

134.    VGW and its game developers also use vivid colors, dynamic animations, high quality graphics, engrossing sound effects, and other carefully crafted enticements to hijack the gamblers' attention and keep them betting. When the gamblers inevitably run out of SC, the GC can tide them over until they deposit more real money to gamble in the form of SC.

**II.    VGW ADMITS IT RUNS REAL MONEY CASINOS**

135.    Any question about whether VGW's "sweepstakes casinos" offer real money gambling has been eliminated by VGW itself. VGW has publicly admitted to the Australian press that its casinos are "real money" casinos that specifically target U.S. states in which gambling is illegal.

136.    For example, in one press release, VGW states that it: (1) "develops and operates proprietary technology in *real money gaming*"; (2) the VGW Casinos are "*targeting* . . . the unrealised United States *real-money gaming market*"; and (3) that VGW's "*[s]weepstakes*

48

COMPLAINT

*gameplay entails [] real money, online gaming*" in the United States, "where [real money] online gaming is largely prohibited."[15]

137.    VGW cannot now deny what it has already admitted: its casinos target U.S. states that lack any competition due to state anti-gambling laws, then illegally siphon away those residents' funds in "real money, online gaming" under the fig leaf of "[s]weepstakes gameplay."

138.    Journalists reporting on Chumba Casino soon after it opened repeated that same admission, noting that "Chumba Casino is currently the only social casino to allow virtual and ***real money gaming*** on one platform legally in the United States. Fun play is permitted using the virtual gold coin currency or ***real money play is allowed with the use of 'Sweeps Cash'***."[16]

139.    The head of product development for massive iGaming (*i.e.*, real money) casino game developer BetSoft Gaming echoed that admission, noting in 2014 that "[t]he social gaming and ***gambling*** markets are converging at a rapid rate, and what Virtual Gaming Worlds has created here is an unstoppable vehicle for the delivery of the best ***iGaming*** content in the industry."[17] The real money casino industry recognizes that gambling with SC is real money iGaming.

140.    And even the VGW Casinos' ***own live table game dealers cannot keep VGW's story straight***: these dealers have apparently characterized SC gambling as real money gambling so much that VGW now places disclaimers on its website proactively disclaiming liability whenever ***its own live dealers tell gamblers they are engaged in real money gambling***.[18]

---

[15] Press Release, Synergy Plus Limited, *SYNERGY PLUS LIMITED ENTERS AGREEMENT TO ACQUIRE VGW HOLDINGS LIMITED* (October 27, 2015), at 1-2 (emphasis added; on file with author).

[16] Glo Wood, LCB, *New Chumba Casino Affiliate Program Launches* (April 23, 2014), https://bit.ly/4miOE7M (emphasis added).

[17] *Id.* (emphasis added); see also BetSoft, https://betsoft.com/ (last visited August 1. 2025) (iGaming only).

[18] *See, e.g.*, Chumba Casino, *Social Live Casino*, https://bit.ly/3U7bCTt (last visited August 1, 2025) (offering live dealer blackjack, roulette, slots, and baccarat; disclaiming that "*VGW Group offers free-to-play social casino games for entertainment only, with NO REAL MONEY gambling. **Any errors by hosts implying otherwise are unintentional and will be corrected. VGW Group is not liable for such errors***.") (bold emphasis added).

III.    **VGW TARGETS GAMBLERS IN STATES WHERE GAMBLING IS ILLEGAL**

141.    Rather than relying on indiscriminate mass marketing campaigns to amass its billions of dollars in annual revenue, VGW employs location-specific marketing tools (like Google Ads location targeting and similar tools within Facebook) to direct its ads to specific states. Then, within those states, VGW directs its ads to specific gambling-related demographics (such as age, gender, and income), in order to target that state's most valuable and vulnerable residents.

142.    As a former VGW marketing consultant stated, VGW gave him an "almost unheard-of large marketing budget" with which to use these targeted ads to lure gamblers to the VGW Casinos[19]:

While working at VGW I oversaw an almost unheard-of large marketing budget. There are not many companies in the world that spend USD $4 Million+ in online digital marketing. The impact on the North American market was profound. VGW grew (and keep growing) their userbase and company size to be one of the biggest sweepstake companies in North American market. I can pride myself to say that I was definitely part of this growth.

I worked for VGW and I oversaw an approximate USD$4,000,000 marketing budget to drive a lower Cost of Acquiring a new Customer (CPA) for their two brands Chumba Casino & Global Poker which are two brands exclusively based in North America.

I used advanced digital strategies and tech tools to lower the CPA and I utilised my full breadth of knowledge and capabilities to do so.

I was working with tech tools such as Facebook, Sizmek, Google Ads, Google Analytics, Tableau & Marketo.

143.    As Google admits, "Google Ads location targeting allows your ads to appear in the geographic locations that you select."[20] This allows  VGW and its partners to target gamblers *solely in the states where VGW is operating*—such as the Class States—and avoid the growing list of

---

[19] *Virtual Gaming Worlds Case Study*, https://bit.ly/3HgM57k (last visited July 31, 2025); Andreas Consulting, *Virtual Gaming Worlds (VGW) - Achieving Exceptional Growth*, https://bit.ly/3UItzYE (last visited July 31, 2025).

[20] Google Ads Help, *Target ads to geographic locations*, https://bit.ly/4lb26cS (last visited July 31, 2025).

COMPLAINT

1    states in which VGW no longer operates (like Washington, Delaware, Connecticut, New York, and

2    several others).

3        144.    Other marketing experts also recommend using Google Ads because it allows

4    companies to "[t]arget ads to geographic locations" and "customize campaigns by location"[21]:

## Why use Google Ads location targeting?

Google Ads location targeting helps you connect with the right audience by focusing your campaigns on specific geographic areas.

Whether you're a local business aiming to boost foot traffic or a national brand tailoring offers to regions, location targeting turns your ad spend into a precision tool for reaching the people who matter most.

Using Google Ads location targeting helps you:

👆 **Show your ads to the right audience**. Reach people in the locations where your products or services are most relevant. Whether targeting a neighborhood, a city, or a country, location targeting ensures your ads are seen by the right people, increasing the chances of engagement and conversions.

👆 **Maximise ad spend efficiency**. Stop wasting money on areas that don't convert. Focus your budget on high-performing regions or exclude locations where interest is low, ensuring every dollar works harder for you.

👆 **Customise campaigns by location**. Different locations often mean different customer needs. Location targeting lets you tailor your ads to resonate with local preferences, seasonal trends, or regional events. If you're a national bookstore chain, you can advertise summer reading lists in Florida while promoting more 'cozy' winter reads in Montana.

22        145.    VGW also contracted with other businesses who had customers in the states where

23    VGW operates its casinos. VGW enlisted these other businesses to help VGW target the business'

24    customers using the business' expansive knowledge of their customers' locations, preferences, and

25    demographics.

---

[21] Stu Edwards, GROWTH MINDED MARKETING, *Google Ads Location Targeting: 8 best practices and why it matters for your business* (May 19, 2025), https://bit.ly/40JVtHh.

COMPLAINT

146.    For example, VGW used SiriusXM Media to target specific SiriusXM Radio and Pandora Radio[22] customers, resulting in Chumba Casino and LuckyLand Slots exceeding their targeting goals by 45% and 33%, respectively[23]:



## The Challenge

Few sectors are as hot right now as online gaming, and Virtual Gaming Worlds (VGW) is one of the top contenders. But to help them achieve their growth targets, they needed to drive a high volume of new players to their online social casinos, Chumba Casino and LuckyLand Slots. Not only that, but they needed to do so efficiently and effectively. To do this, they created cost-per-conversion goals to benchmark performance against their other advertising channels. Along with meeting this goal, they needed to get in front of specific targeted audiences to ensure they connected with the correct audience to drive action.

## The Results

A multi-format ad approach and precision targeting were instrumental in helping VGW reach, and impact, their target audience. Pandora enabled Chumba Casino and LuckyLand Slots to reach the right people whilst they were in the mood and mindset for entertainment. And the results were a win all around: **the 6-month campaign drove highly efficient conversions for both brands, surpassing their original cost-per-conversion goals**—all proving how audio works to drive action.

---

[22] Pandora Radio is headquartered and principally operated out of Oakland, California.

[23] SiriusXM Media, *Precision Targeting Drives Low-Cost-per-Conversion for Virtual Gaming Worlds* (Sept. 20, 2022), https://bit.ly/4mi0PBU.

COMPLAINT

147.    VGW similarly worked with Reddit to target Reddit's users in VGW's operating states (including the Class States). This geographic and demographic targeting resulted in a ***287% increase*** in Reddit users becoming VGW Casino gamblers:[24]



148.    VGW also targets individual gamblers (including spouses and parents of Plaintiffs and Class Members), in VGW's operating states by sending them unsolicited offers for VGW Casino-branded prepaid Mastercard debit cards:

---

[24] Reddit Business, *How the Reddit Pixel + Conversions API helps VGW unlock the full power of Reddit ads*, https://bit.ly/4lY2ZXv ("VGW also successfully achieved their goal of driving first time purchases, improving their first purchase rate by 287%") (last visited July 31, 2025).

COMPLAINT

149.    VGW selects gamblers in certain states. VGW both knows which states it is targeting and which gamblers in those states it is targeting. VGW also knows the gamblers' physical addresses and computer/mobile device IP addresses, which have been verified by Jumio. VGW then sends offers for, and physical VGW Casino-branded prepaid Mastercard debit cards to, the gamblers' emails and home addresses.

150.    Gamblers are often targeted for a separate prepaid Mastercard for *each* VGW Casino at which the gambler plays (meaning that players are targeted up to three separate times, and can hold up to three different cards at once).

151.    Cardholders can log in to a special webpage on the VGW Casinos' websites to check their card balance, transfer winnings to their bank or other financial institutions, and deposit additional funds onto the card in order to gamble at the casinos.[25]

152.    These prepaid Mastercard debit cards allow gamblers to transfer money onto the cards, then transfer that money to the VGW Casinos, where the gamblers purchase GC/SC packages with which to gamble. If gamblers win their wagers, VGW provides an expedited cashout feature in which gamblers receive their winnings in less than 15 minutes instead of the normal 3-5 business days.[26]

153.    However, these features are just another trap to keep gamblers betting: holders of the prepaid Mastercard debit card note that gamblers can only withdraw the amount *they deposited onto the card from their bank*. This means that if a gambler deposited $500 into a VGW Casino from the prepaid Mastercard—but won $5,000—*the gambler could withdraw only $500 in cash from the card and would have to gamble the rest back into a VGW Casino*. This mechanism finagles lucky gamblers into gambling all their profits back into the VGW Casinos.

154.    Additionally, VGW uses the prepaid Mastercard debit cards for another reason: to allow gamblers whose banks refuse to transfer money to the VGW Casinos (including due to those

---

[25] *See, e.g.*, Chumba Casino, https://my.chumbacard.com/ (last visited July 31, 2025).

[26] *See, e.g.*, LuckyLand Slots, *FAQ*, https://my.luckylandcard.com/Home/Faq ("Funds transferred to a personal bank account via standard transfer will take 3-5 business days to arrive. Funds transferred to a personal debit account via express transfer [*i.e.*, prepaid Mastercard] will take up to 15 minutes to arrive.") (last visited July 31, 2025).

COMPLAINT

transfers being flagged for potential fraud or illegal gambling) to load the money onto the prepaid Mastercard debit card, and then transfer the money to the VGW Casinos to hide the fact that the money is going to the VGW Casinos. These Mastercard debit cards also make it easier for gamblers to hide gambling activity from their spouses and children (including spouses who may have tried to prevent transfers to VGW from jointly-held financial accounts).

155.    Along with prepaid Mastercard offers, VGW also targets gamblers in their home states (including the Class States) by sending those gamblers unsolicited free gifts in order to entice them to play (or return to playing). These gifts include things like espresso machines, and VGW Casino-branded merchandise (*e.g.*, hats). VGW identifies these gamblers, selects which gifts to provide, and then mails them to the gamblers in their home states.

156.    VGW also targets individual gamblers in their home states (including the Class States) by sending emails to gamblers' IP addresses that VGW knows are located in VGW-operating states (as verified by Jumio):



COMPLAINT

157.    VGW necessarily targets its advertising campaigns by state because VGW casinos either do not operate in, have been made illegal in, or have been shut down by state governments in a significant number of states. VGW does not spend advertising dollars in those states because VGW cannot or does not operate in those states (and/or because advertising the VGW Casinos in those states is illegal). Thus, state-specific targeted advertising is a fundamental feature of VGW's advertising—a feature that is only becoming more and more important as VGW is being shut down or forced out of more and more states.

158.    These targeted advertisements are intentionally crafted to draw in the target populations, including vulnerable groups. For example, the below targeted advertisement was sent in July 2025. This advertisement draws in would-be gamblers with the promise of "the rush of *real casino action from the comfort of your home*"; it further promises "24/7" casino game play "Anytime, Anywhere"[27]:

---

[27] These advertisements further confirm that the gamblers' are gambling "from . . . [their] home"— that the casino is being bring brought "to [their] fingertips" and "on [their] desktop or mobile device" in their home state—as opposed to the gambling specifically and exclusively occurring in Malta (or other VGW locations).

Hi

Ready to feel the rush of real casino action from the comfort of your home?

Step into the excitement with **Live Roulette** – where every spin is streamed as it happens and is h
by professional dealers in real time. Whether you're a seasoned player or just getting started, live ro
brings that authentic casino vibe right to your fingertips.

**Why You'll Love It:**

- **Real Dealers, Real Action:** Interact with professional live dealers in real time.
- **Authentic Casino Atmosphere:** Feel the thrill of a real casino with high-quality video strea
- **Play Anytime, Anywhere:** Access live tables on your desktop or mobile device 24/7.
- **Regular Promotions & Rewards:** You could be rewarded just for playing at the tables.

Don't just watch – **play live** and experience every moment like you're there. Start your Chumba
Casino journey today!

Simply click on the link below.

**SPIN THE WHEEL**

## IV. VGW USES MULTIPLE CALIFORNIA PROMOTERS TO TARGET AND TRICK UNSUSPECTING GAMBLERS IN THEIR HOME STATES

159.    VGW runs through California its primary promotional activities targeting the spouses and parents of Plaintiffs and Class Members and uses multiple California-based celebrity promoters and gambling influencers to do so.

160.    As one example, since at least 2023, VGW has used Ryan Seacrest as Chumba Casino's primary celebrity endorser. Mr. Seacrest, a California resident since at least 2006, is one of the most famous and recognizable celebrities in America. He is an Emmy winner and the current host of *Wheel of Fortune*. He is a former co-host of *Live With Kelly and Ryan* with Kelly Ripa. He is the former host of *American Idol*; the current host of his radio show *On Air with Ryan Seacrest*; the current host of Casey Kasem's former show *American Top 40*; the current host of *Dick Clark's New Year's Rockin' Eve*; and a past host for the Olympic Games. Mr. Seacrest has also produced *Keeping up with the Kardashians* and all its spins offs. Few celebrities have the ability to reach so many Americans on such a consistent basis.

161.    Mr. Seacrest's cross-generational reach and trustworthy reputation were an ideal combination for VGW, which needs high profile trusted names to ensnare gamblers' attention and

57

deceive them into believing that VGW's illegal casinos are trustworthy and lawfully available in their home states. That is why, in or about December 2023, VGW hired Mr. Seacrest to become Chumba Casino's primary celebrity endorser.

162.    Since hiring Mr. Seacrest, VGW has continuously and prolifically promoted Chumba Casino using Mr. Seacrest (and his name, likeness, image, and voice) on radio, television, podcast, social media, streaming, and website platforms. These promotions include videos of Ryan Seacrest gambling at the Chumba Casino, along with more traditional advertisements. They also include paid endorsements in which Mr. Seacrest is compensated for promoting Chumba Casino across and through his California-based media empire.

163.    VGW even created a special webpage for Ryan Seacrest fans at the Chumba Casino (https://www.chumbacasino.com/ryan-seacrest). There, Mr. Seacrest's fans can see his advertisements, listen to him legitimatize Chumba Casino, and be deceived by VGW into believing that Chumba Casino is "fun" and "free." Once on the Ryan Seacrest webpage, gamblers can link directly to Chumba Casino's casino games and slot machines, or create a gambling account.

164.    To entice Mr. Seacrest to promote and legitimize the Chumba Casino, VGW pays Mr. Seacrest (among other things) an "affiliate" commission on every deposit by every gambler who signs up for a Chumba Casino account through Mr. Seacrest's webpage.

165.    If potential gamblers begin the process of signing up for a Chumba Casino account—but ultimately choose not to verify their identify and deposit money—VGW begins aggressively targeting them in their home states with Mr. Seacrest's image trying to get them to deposit money. VGW sends these specially targeted messages to IP addresses of computers and devices it knows are located in the Class States. For example, in June 2025, individuals who had not verified their identity with Jumio received the following Ryan Seacrest advertisement to encourage them to verify and begin gambling:

COMPLAINT



166.    Once gamblers complete their verification, VGW begins a new targeting campaign—all directed at persons and IP addresses it has *verified* are located in the Class States—with even more Ryan Seacrest-themed advertisements and emails, including branded "Ryan Seacrest Scratchers" (*i.e.*, digital scratch-off lottery tickets), through location-targeted Facebook and other advertisements[28]:



---

[28] Like Google Ads, Facebook's ads are also targeted to VGW's operating states. *See, e.g.*, Meta Business Help Center, *About location targeting*, https://bit.ly/44Y1cf4  (Facebook's "[l]ocation targeting allows you to reach people living in or recently in locations such as countries, regions or cities.") (last visited July 31, 2025).

167.    VGW intentionally exploits and abuses the public's trust of Mr. Seacrest by consistently featuring him in plainly misleading advertisements. For example, many of VGW's Chumba Casino advertisements using Mr. Seacrets *exclusively* refer to Chumba Casino as a "social casino" (the *GC* side of Chumba Casino)—yet those same advertisements show a non-stop series of gamblers winning **real money SC prizes**. For example, in one YouTube advertisement,[29] Ryan Seacrest repeatedly refers to VGW as a "social casino" that offers "social casino games." Yet the advertisement shows three people (including Mr. Seacrest) winning massive SC jackpots worth hundreds of thousands of **real dollars** each—and not a single GC (social casino) jackpot. This advertisement is untruthful and misleading.



168.    These misleading statements are neither accidental nor isolated. Indeed, they are repeated throughout VGW's prolific Ryan Seacrest advertisements, including the advertisement that appears at the very top of VGW's official Ryan Seacrest Chumba Casino webpage. That advertisement (as shown below) invites gamblers to "Get ready to spin with Ryan Seacrest!" and tells them to "[s]pin the **social casino** reels for your chance to redeem incredible prizes"[30]:

---

[29] Chumba Casino, YOUTUBE, *Life's a beach with Chumba*, https://bit.ly/4mi1bZg (last visited July 31, 2025).

[30] Chumba Casino, https://www.chumbacasino.com/ryan-seacrest (last visited July 31, 2025) (emphasis added).

COMPLAINT



Get ready to spin with Ryan Seacrest!

Welcome to Chumba Casino, where the fun just keeps on rollin'! Spin the social casino reels for your chance to redeem incredible prizes.

CREATE ACCOUNT

EPIC WIN
SC 45,833

169.    Yet the image VGW projects onto the iPad Mr. Seacrest is holding is an "EPIC WIN" of more than $45,000 in **SC**, even though SC ***are not and cannot be*** part of a "social casino" (which can only use GC or their equivalent). Additionally, the advertisement states that players can win "incredible prizes" from the "social casino." Impliedly, the GCs that can be won from the social casino side are ***not*** "incredible prizes"—because the advertisements only show real money SC wins, and not a single GC social casino win.

170.    Similarly, just below that advertisement on VGW's Ryan Seacrest website, VGW again misleads customers by stating that they can win ***redeemable special prizes*** (*i.e.*, SC) with ***every*** spin:

We're rocking the reels with Ryan Seacrest! Care to join us?

What's better than playing Chumba Casino? Playing Chumba with Ryan Seacrest, that's what! So, why not join the excitement? Discover hundreds of casino-style games at your fingertips. Plus, with every Chumba spin, you'll have the chance to redeem some reel-y special prizes too.

171.    But as VGW well knows, there is ***not*** a chance to win SC with every spin (you can never win SC from a GC spin), and GC are not "redeem[able]"—only SC are. Nor are GC "special prizes," as made clear by VGW only showing SC wins in Mr. Seacrest's (and other) advertisements. VGW's statement is a blatant falsehood.

172.    VGW thus uses Mr. Seacrest to promote and disseminate from California intentionally misleading advertisements that consumers can win real money playing VGW's social casino games. Those consumers do not realize the truth until after they have deposited money into Chumba Casino (which Chumba Casino then pays Mr. Seacrest a commission upon in California). And, when customers chase the real money SC wins they see in VGW's advertisements featuring

61

1    Mr. Seacrest, they in the aggregate lose their money and have to deposit more—giving VGW

2    another payday at their expense.

3        173.    These are classic bait-and-switch tactics. VGW knows the difference between social

4    and sweepstakes casinos. It knows that *sweepstakes* coins cannot be played in, nor won from,

5    VGW's *social* casino operations. Yet they still engaged, and continue to engage, in a longstanding

6    campaign to mislead and deceive consumers into believing just that.

7        174.    VGW also knows that the VGW Casinos are offered in states where real money

8    gambling is illegal—yet it intentionally lures in new gamblers from these states with the promise

9    of winning **real money** prizes. VGW's longstanding, consistently misleading campaign regarding

10    fundamental aspects of the VGW Casinos demonstrates that they are ***knowingly*** pursuing this

11    strategy from California, and using Mr. Seacrest in California, to legitimize VGW's illegal gaming

12    operations and rope in new gamblers in the Class States with fresh money to lose.

13        175.    VGW heavily leverages Mr. Seacrest's vast media empire to promote the Chumba

14    Casino. For example, VGW has Mr. Seacrest promote Chumba Casino on all his other media

15    ventures, which confers additional legitimacy to Chumba Casino and lulls consumers into a false

16    sense of security.

17        176.    For example, VGW ties together Mr. Seacrest's hosting of the eminently legitimate

18    *Wheel of Fortune* game show (recorded and broadcast from Los Angeles, California), which VGW

19    pays Mr. Seacrest to co-promote through his shows *On Air with Ryan Seacrest* and *American Top*

20    *40* (both recorded and broadcast from Los Angeles, California):



COMPLAINT

177.    VGW heavily markets to consumers using the purported similarities between Chumba Casino's casino "games" and actual games like *Wheel of Fortune* (in which players can only win money and never lose money).

178.    For example, in VGW's official press release announcing its hiring of Mr. Seacrest, it says Mr. Seacrest joined VGW to promote Chumba Casino because "Who doesn't love games?"[31] But Chumba Casino is a casino—it offers gambling, not games. It exploits players, and its games are designed to *take* as much money from them as possible (especially the SC games that VGW uses Mr. Seacrest to promote).

179.    Indeed, in many of Mr. Seacrest's advertisements for Chumba Casino, VGW ensures Mr. Seacrest wears a suit that resembles his typical outfit for *Wheel of Fortune*.

180.    Other advertisements include videos in which Mr. Seacrest references *Dick Clark's New Year's Rockin' Eve* by saying that VGW is "rocking my world."[32] VGW uses similar "rocking the reels" language on its Ryan Seacrest webpage.

181.    As shown below, VGW also uses Mr. Seacrest to further legitimize its illegal casinos by having Mr. Seacrest post videos and photographs to his fans showing him gambling at the Chumba Casino:

---

[31] Press Release, VGW, *VGW's Chumba Casino Partners with Television Host and Radio Personality Ryan Seacrest* (Dec. 22, 2023), https://bit.ly/4m1wg3J.

[32] Chumba Casino, YOUTUBE, *Ryan Seacrest with Chumba Casino*, https://bit.ly/4oh4rpl (last visited July 31, 2025).



182.    VGW's advertisements featuring Mr. Seacrest are filme**d**, produced, and/or disseminated in, from, and through California. Mr. Seacrest's work is performed in California, as is the work for his various companies which are also involved in filming, producing, and/or disseminating these advertisements from California.[33]

183.    As a second example, VGW has also partnered with Brian Christopher to promote and legitimize its illegal casinos from California to the Class states.

184.    Brian Christopher claims to be the most famous *gambling influencer* in the world: he posts videos of himself playing, analyzing, and recommending slot machines at VGW and other casinos on multiple social medias platforms (*e.g.*, YouTube, Facebook, Instagram, TikTok, and Kick), and he often has multiple channels on a single platform. Brian Christopher boasts more than

---

[33] These Ryan Seacrest companies include Ryan Seacrest Enterprises, Inc.; Ryan Seacrest Company, LLC; and Ryan Seacrest Productions, LLC (collectively, the "Ryan Seacrest Entities"). Each of these entities is registered with the California Secretary of State to conduct business in California and is a California company and/or principally operated from Los Angeles or Beverly Hills, California.

2 million global subscribers and 50 million monthly global video views (he reportedly crossed a "world-record one billion gaming video views in 2024").[34]

185.     Brian Christopher further touts that he and his gambling-based social media empire "has been credited for creating 'the other streaming platform' which has **opened up [the casino] industry to new targeted B2C [business to consumer] audience opportunities**."[35] In other words, Brian Christopher is credited with helping casinos realize that they could directly target gamblers and potential gamblers wherever they are located by creating and promoting gambling videos.

186.     Thus, Brian Christopher is perfectly situated to promote the VGW Casinos, which is why VGW partnered with him to do so.

187.     VGW uses Brian Christopher to exploit his vast social media network for the promotion and advertisement of Chumba Casino and LuckyLand Slots from California to the Class states. Brian Christopher's website (https://www.bcslots.com) links directly to Chumba Casino and LuckyLand Slots through a menu of his "Partners":



188.     Each link leads users to special VGW-created, Brian Christopher-themed, webpages (https://www.chumbacasino.com/bcslots and https://luckylandslots.com/bcslots). On those special VGW webpages, visitors can link to Brian Christopher's various social media pages to watch Brian Christopher gamble with SC at the VGW Casinos. VGW also shows visitors a curated list of Brian

---

[34] Rege Behe, CDC GAMING (Dec. 28, 2024), *The industry looks back on 2024, and forward to 2025 (Part 2)*, https://bit.ly/40L7lsG (Brian Christopher "passed a world-record one billion gaming video views in 2024").

[35] *Id.*

COMPLAINT

Christopher's favorite slots at the relevant VGW Casino, and provides a link to create an account for each casino (in which Brian Christopher receives a percentage of deposits):





189.    VGW and Brian Christopher also use the same type of targeted email and social media marketing that features Mr. Seacrest (including Brian Christopher scratchers) to specifically reach gamblers and would-be gamblers in VGW's operating states.

66

190.    Brian Christopher also has a special social media channel dedicated solely to Chumba Casino and LuckyLand Slots called "BCSpins":



191.    Brian Christopher describes this channel as "Social Casino Gaming"—and separates this channel from his "real money" channels "BCBets" (which is dedicated to his BetMGM partnership) and "BCSlots" (which is dedicated to traditional casino slot gambling). His BCSpins avatar even holds a gold coin that is a clear reference to the non-redeemable *social casino* gold coins at Chumba Casino and LuckyLand Slots (as opposed to the cash-redeemable *sweepstakes casino* green SC coins available at both casinos).

192.    Using the BCSpins channel, Brian Christopher partners with VGW to offer livestream slot tournaments to his followers and other viewers. For example, on July 28, 2025, LuckyLand Slots (from California) solicited players by targeted email in their home states to participate in a "Beat Brian Tourney!":



COMPLAINT

1    193.    LuckyLand Slots sent **multiple** targeted emails on that day to lure players in the

2    Class States to join the hour-long event.

3    194.    The event proceeded in two parts.[36] First, from his studio in Palm Springs,

4    California, Brian Christopher gambled on slot machines for 25 minutes while speaking with

5    viewers who commented and responded via a live chat function. Brian Christopher played various

6    slot machines, with wagers up to 100 SC ($100) on each pull. While he lost more than 1,000 SC

7    ($1,000) in the first few minutes of the livestream, his upbeat positive attitude and affable demeanor

8    normalized his outrageous wagers and large losses to the VGW Casinos.

9    195.    After the players were warmed up, Brian Christopher began the second half of the

10    event—a slot tournament in which gamblers chose one of three slot machines and attempted to win

11    more SC than Brian Christopher in 20 minutes. Gamblers earned points—which corresponded to

12    the total amount they won in SC—and competed to be at the top of the points leaderboard, which

13    was updated live. At least 800 hundred gamblers joined the tournament and wagered their own SC

14    on VGW's slot machines.

15    196.    At the end of the tournament, the top 10 remaining gamblers share the "Prize

16    Pool"—an ever-growing amount based on the total amount of money wagered in the tournament

17    (starting at 1,000 SC) often reaching between 1,500 and 2,000 SC—*i.e.*, $1,500 to $2,000. Brian

18    Christopher often wagers 7.50 SC ($7.50) or 10 SC ($10) per spin so that he can accumulate large

19    wins and stay high on the leaderboard.[37] Players are therefore incentivized to place similarly large

20    wagers in order to increase their chance to "Beat Brian." All gamblers who are higher on the

21    leaderboard than Brian Christopher at the end of 20 minutes win an extra 100 SC ($100).

22    197.    As shown below, the livestream featured a real time leaderboard, Brian's slot

23    machine gameplay, and Brian himself offering commentary:

24

25

26    ───────────────

27    [36] Brian Christopher Spins, YouTube, *LIVE Beating Brian is Easier than you Think*,
https://bit.ly/3HglXJJ (starting at 29:40) (last visited Aug. 1, 2025).

28    [37] *Id.*; Brian Christopher Slots, YouTube, *Final Live of 2024 – Beat BC Tournament Finale!*,
https://bit.ly/3HglYNN (starting at 30:00) (last visited July 31, 2025).

COMPLAINT



198.    During the livestream, Brian actively encouraged viewers to gamble and keep gambling, and spurred their hopes that they might win more than he did.

199.    The three slot machine options—Luckland 7's, Twisted Spins, and Life's a Beach—are each created, owned, and maintained by LuckyLand Slots. So VGW designed the tournament to steer players toward VGW's in-house slot machines, which generate a larger profit for VGW because it does not need to share the revenue with a third-party game developer. Brian Christopher also makes money at least through his partnership commissions earned on tournament (and other) deposits.

200.    Brian Christopher's channels also help VGW mislead consumers by promoting Chumba Casino and LuckyLand Slots as mere "social casinos," while heavily focusing their content on cash-redeemable SC play and SC wins (including the video in the screenshot below):

COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15







16   201.   Brian Chistopher also records himself cashing out his SC and having VGW deposit

17   large sums of cash directly into his bank account on camera.[38]

18   202.   Brian Christopher also knows that VGW is not allowed to offer certain slot machines

19   in certain states, and he expressly acknowledges that fact on air.[39] Thus, Brian Christopher knows

20   that these game developers and VGW disagree on which states allow gambling on their slot

21   machines. The slot machine Brian Christopher was referring to was developed by Playtech (VGW's

22   largest third-party game developer).[40]

23   203.   Like VGW, Brian Christopher clearly knows the difference between social and

24   sweepstakes casinos—yet he prolifically promotes his biggest SC wins as the centerpiece of his

25   "social casino" channel.

26   [38] Brian Christopher Slots, YOUTUBE, *Final Live of 2024 – Beat BC Tournament Finale!*,

27   https://bit.ly/4ld8fp0 (starting at 1:04:15; cashing in $14,984.25) (last visited July 31, 2025).
     [39] *Id.* (starting at 1:02:40).

28   [40] *Id.* (video showing game banned in certain states developed by Playtech).

70

204.    Brian Christopher's actual knowledge of VGW's illegal gambling scheme is also evidenced by his decision to ***develop his own slot machines that are playable for SC at the VGW Casinos and three traditional casinos in California***:






205.    VGW appears to recognize the unique partnership between VGW and Brian Christopher, identifying it in its audited 2024 Annual Report filed with the Australian Securities & Investments Commission as VGW's "first branded content" partnership:

71

**Investment in content**

To maintain customer satisfaction and engagement with our Brands, the Group continues to focus on the development of high quality, fun and engaging content. The Group creates this content using its in-house development studio, Golden Feather Studios, which continues to produce some of the strongest performing games, and second-party development funnels - which are external resources to build games designed by our content team. Exciting content delivered during the year included  the release of 9 Flags, our second biggest game of the fiscal year.  The Group also had its first branded content launched being BC Pop n Pays, in conjunction with Brian Christopher and Gaming Arts, and The Godfather from our partners at Atlantic Digital. Both games were exclusive releases.

VGW HOLDINGS LIMITED AND CONTROLLED ENTITIES                                                4

206.    Brian Christopher's actual knowledge has been confirmed by his public statements. Brian Christopher told media sources that he researches all his casino partnerships, including the potential illegality of those partnerships. He warned would-be influencers that if they don't "do their own research," then "they could get in serious trouble with the law."[41] He provided the example of his choice "***not to partner with crypto casinos due to the fact that it's unregulated***."[42]

207.    Brian Christopher knows casinos—including the VGW Casinos—are designed to ensure gamblers lose money in the aggregate. He understands that the VGW Casinos provide free GC and SC to draw in gamblers who will lose money in the casinos. He furthermore knows that VGW's tactics to lure in new gamblers is effective, that gamblers are signing up because of him and through his webpages, and that players will lose money at the VGW Casinos as a result of following and believing his endorsements.

208.    The VGW Casinos also have playthrough requirements, which (as Brian Christopher explains) "is simply how many times you have to play through the money or bonus before you can cash it out. If you're familiar with physical casinos and free play, you know that you can't just cash in free play – you have to play it through a machine once. In the online gaming world, this would be a 1x Playthrough Requirement."[43] Chumba typically uses a 1x playthrough requirement, but can require up to 20x.[44]

---

[41] Christian Holmes, CASINO REPORTS (April 25, 2024), https://bit.ly/3UFSAnh.

[42] *Id.* (emphasis added).

[43] FlipTheSwitch, https://bit.ly/46yJr7k (last visited July 31, 2025).

[44] Chumba Casino Terms & Conditions (version 16.0; dated July 17, 2025) § 6.13 (setting 1x playthrough and reserving the right to increase it to 20x) (accessible at https://bit.ly/4lfclNx).

209.    Via these playthrough requirements, VGW forces gamblers to gamble at least the amount of SC that the gambler intends to withdraw *before* the withdrawal. As a result, VGW gamblers are even less likely to cash money out of the VGW Casinos than if they had gambled cash in a traditional casino.

210.    VGW and Brian Christopher also create specially-curated libraries of Brian Christopher videos designed to make players believe that the odds of winning at the VGW Casinos—particularly large jackpots and other wins based on large bets—are far higher than they actually are. Only a portion of Brian Christopher's gambling at the VGW Casinos is posted; thus, viewers see a misleading partial picture of his win/loss rate. Losses are never promoted—the jackpots and huge wins are. These win-focused videos are then repackaged (sometimes multiple times) into a series of clips and advertisements designed to drive viewers to the videos in which Brian Christopher wins large jackpots.

211.    These large jackpots and other wins are tied to the fact that Brian Christopher is making large bets (often the maximum allowed by the games) of up to *$200 per spin*.[45] VGW and Brian Christopher also curate special playlists of videos in which Brian Christopher places large bets and wins large jackpots. Similarly, they create short video clips that compile these wins and jackpots so viewers can consumer a nonstop stream of large bet, large win videos.

212.    VGW provides links to these videos on Brian Christopher's Chumba Casino and LuckyLand Slots webpages, so players can navigate to the videos directly from the casinos.

213.    Large jackpots are VGW's best marketing tool. But VGW is using that tool in a misleading manner that creates the impression of far better odds than gamblers will experience (and that their large jackpots will be actually be paid to them). This, in turn, encourages more players to sign up and deposit larger amounts of money so that they can place larger bets (like Brian Christopher) to win (and actually receive) the same large jackpots they see him win. That makes both VGW and Brian Christpher more money and commissions.

---

[45] *See, e.g.*, Brian Christopher Spins, YOUTUBE, *THESE BONUSES ARE CRAZY! – Best of Chumba and Luckyland*, https://bit.ly/3JdBtGS (winning series of jackpots at Chumba Casino and LuckyLand Slots with spins up to $200) (last visited July 31, 2025);  Brian Christopher Spins, YOUTUBE, *LIVE Scratch & WIN w/ Luckyland Slots us*, https://bit.ly/4ltf4TL (winning $11,808 betting $100 per spin) (last visited July 31, 2025).

214.    In short, VGW and Brian Christopher are knowingly and intentionally working together to mislead the public into believing that they have better odds of winning at the VGW Casinos than they do, falsely convincing players to deposit larger amounts of money because they can win as much and as often as Brian Christopher. But, of course, the spouses and parents of Plaintiffs and Class Members cannot win like Brian Christopher does—and so VGW and Brian Christopher win instead, at Plaintiffs' and Class Members' expense.

## V.    VGW VERIFIES THE AGE, GEOLOCATION, AND IDENTITY OF EACH GAMBLER THROUGH CALIFORNIA, AND REPEATEDY RE-VERIFIES GAMBLERS' LOCATIONS FROM CALIFORNIA

215.    Every casino needs a "bouncer" to let in who the casino wants to gamble, and keep out those who are too young to gamble, or who the casino no longer allows to gamble. The VGW Casinos are no different. VGW uses the California-based company Jumio to perform these functions.

216.    Indeed, just like a traditional "bouncer," Jumio stands at the virtual door of the VGW Casinos and makes sure that no one enters unless Jumio has verified: (1) their identity; (2) their age, including that they are of the minimum age the VGW requires (formerly 18 and over; now 21 and over[46]); (3) their location, including that they are physically located in a state VGW operates within (and that they are not located in a state where VGW does not operate). Through its tracking cookies, Jumio also monitors and re-verifies gamblers' locations—ensuring they continuously play in only the states where VGW operates.

217.    Jumio knows that it is acting as a "bouncer" for a real money casino. Indeed, Jumio provides VGW with the same or similar services that Jumio provides to many other real money casinos, sportsbooks, and gambling-specific cryptocurrency providers around the world—a fact that Jumio prominently and repeatedly advertises to gain more casino verification business.[47]

---

[46] *See* Chav Vasilev, GAMING TODAY, *Chumba Casino, LuckyLand lots, and Global Poker Raise Minimum Age to 21* (Feb. 19, 2025), https://bit.ly/4oksfZx (noting that VGW is raising the minimum gambling age to 21 "to match that of most real-money gaming options").

[47] *See, e.g.*, Jumio, *Jumio Partners*, https://bit.ly/3UaLrve (providing services to other real money casino and casino game "partners" OpenBet, Playtech, Bragg/Oryx Gaming, NuxGame, Bede Gaming, and Microgame) (last visited July 31, 2025); Jumio, *Case Study – Stanleybet*, https://bit.ly/4oh44er (describing partnership with Stanleybet) (last visited July 31, 2025); Jumio,

218.    If the VGW Casinos did not offer gambling, there would be no need to verify anyone's age, identity, or location—much less to do so using Jumio and the same technology needed to verify the identity, age, and location for some of the world's most famous real money casinos, sportsbooks, and gambling cryptocurrencies.

219.    This type of age verification is typical at bars and real money casinos. It is not typical in other situations. For example, there is no mandatory third-party age verification for players of online games like Fortnite or online gaming platforms like Xbox Live.

220.    Jumio actually knows or is willfully blind to the fact (including ignoring numerous red flags) that the VGW Casinos are real money casinos.

221.    The fact that VGW raised their gambling age from 18 to 21 to match the age restrictions of Jumio's other real money casino clients only further demonstrates that Jumio knows, or is willfully blind to the fact that, VGW engages in real money illegal gambling. So, too, does that fact that Jumio must verify that gamblers are gambling only in certain states, such as the Class States, in which the VGW Casinos have not been shut down via highly publicized cease-and-desist letters from state gambling regulators and/or attorneys general.

## VI.    VGW CONNECTS TO GAMBLERS' FINANCIAL ACCOUNTS, WITHDRAWS MONEY FROM THOSE ACCOUNTS, AND DEPOSITS GAMBLERS' CASH WINNINGS BACK INTO THOSE ACCOUNTS THROUGH CALIFORNIA

222.    Every casino needs a cashier to take money from players, convert them into casino-specific playable chips or coins, and then convert those chips or coins back into cash. VGW uses the California-based companies Yodlee and Trustly to jointly perform these functions.

---

*Novibet Wagers on Jumio for Faster Customer Onboarding and Streamlined eKYC* (June 10, 2019), https://bit.ly/3IYyOkn (describing partnership with Novibet); Jumio, *Kaizen Gaming Bets on Jumio for Winning Customer Experience* (Feb. 5, 2024), https://bit.ly/41nVVev (describing partnership with Kaizen Gaming); Jumio, *Case Study – Casumo*, https://bit.ly/4lSCTVT partnership with Casumo) (last visited July 31, 2025); Jumio, *Jumio to Provide KYC for New CasinoCoin Crypto Wallet* (March 21, 2018), https://bit.ly/40ML1yI ("Jumio, the leading AI-powered trusted identity as a service provider, has partnered with CasinoCoin (CSC), the cryptocurrency specifically designed for the regulated online gambling industry").

75

1

**A.    VGW Uses Yodlee to Connect to Gamblers' Bank Accounts Through California**

2

3        223.    Yodlee is first of the VGW Casinos' "cashiers." When gamblers want to gamble at

4    the VGW Casinos, they must deposit real money from their bank or other financial accounts. VGW

5    uses Yodlee to link gamblers' financial accounts to VGW, verify the relevant account information,

6    and ensure the account contains sufficient funds to clear the gamblers' anticipated transactions.

7    Yodlee also processes VGW's financial transfers in and out of those linked accounts[48]:

8    **How it Works**

9    # The Payment Enablement Platform

10
11   Envestnet | Yodlee platform offers a full circle of financial services, starting – from initiating and linking a bank account to facilitating a payment transaction.

12   Envestnet | Yodlee is a Nacha preferred partner for Account Verification & Payments. As a preferred partner, Envestnet | Yodlee joins a select group of innovators contributing to Nacha's strategic efforts in support of the payments ecosystem by removing friction, increasing ease, improving cash flow accessibility and efficiency, as well as supporting sound risk management and security for ACH payments.

13

14

15

16   

17

18

19

20

21

22

23

24

25

26

27

---

28   [48] Yodlee, *Payment Solutions for Processors*, https://bit.ly/450xd6k (last visited July 31, 2025).

224.    VGW steers customers to using Yodlee by telling them it allows customers to more quickly verify and link their financial accounts so they can begin gambling faster. For example, Chumba Casino's instructions for how gamblers can "verify [their] Bank account" says to use Yodlee, Chumba Casino's "trusted financial partner" for fast linking, account verification, and financial transfers[49]:



What is Yodlee?

**Yodlee** is a 3rd-party financial software that provides safe and secure financial services.

This tool helps businesses like **Chumba Casino**, by providing an accurate and efficient way to authenticate your bank information and link them to your Chumba Casino account for an easier and faster redemption transaction.

*Automatically linking your bank account via Yodlee* would allow you to directly link your Chumba Casino account to your bank's online banking website to log in and validate your banking information without having to upload a document showing your bank details.

2. On the Redemptions page, click on the "*Add bank account*" link. You will then be asked to choose whether to link your bank account automatically via Yodlee or manually by uploading your banking details:

---

[49] Chumba Casino Help Center, *How do I verify my Bank account?*, https://bit.ly/450noFx (last visited July 31, 2025).

COMPLAINT

225.    Thus, VGW uses Yodlee to facilitate the transfer of gamblers' money into the VGW Casinos, to "purchase" VGW's coin packages, and to gamble. VGW also uses Yodlee to cash out any SC wins and deposit cash back into gamblers' Yodlee-linked accounts.

226.    Yodlee knows that it is acting as the "cashier" for a real money casino. Indeed, *Yodlee provides similar services to other real money casino operations and sportsbooks such as BetMGM, analyzes those customers' real-money gambling patterns, and then uses that analysis to advertise its services to other real money gambling operations*[50]:

The fantasy sports and online gaming industry has seen sustained spending growth over the past few years, though recent data suggests the pace of that growth has begun to slow. As most states have now legalized these activities, the initial surge in consumer interest is stabilizing, signaling a maturing market. Even with this shift, the sector continues to attract significant spending.

Using deidentified consumer transaction data aggregated by Envestnet® | Yodlee®, we analyzed consumer spending patterns across a range of daily fantasy sports platforms. This de-identified data, sourced from millions of credit and debit card transactions, offers a unique glimpse into how users are engaging with leading companies such as DraftKings (DKNG) and FanDuel (FLUT), which collectively account for the majority of spending in this sector. Our analysis also includes insights into emerging competitors like BetMGM and PrizePicks, providing a comprehensive look at the evolving market landscape. By examining factors such as overall spend, user loyalty, and market share, we offer valuable insights for investors seeking to understand the dynamics of this rapidly maturing industry.

227.    That Yodlee works extensively with real money casinos, analyzes their data, and markets itself as a financial partner that understands the real money gambling industry demonstrates that Yodlee actually knows, or is willfully blind to the fact that, VGW engages in real money gambling in violation of the laws of the Class States.

228.    Furthermore, Yodlee monitors the financial transactions that flow through it, like every other financial transaction provider. In this way, Yodlee is aware that players are transferring *thousands* of dollars—and more—to the VGW Casinos. Yodlee is also aware that very few players—if any—transfer more money back into their accounts. Yodlee is further aware that in the aggregate players are losing **millions or billions** of dollars to the VGW Casinos. Together with the other allegations in this Complaint, Yodlee has actual knowledge of the VGW Casinos' illegal gambling scheme and/or ignores numerous red flags of that scheme.

229.    Yodlee must also be aware of the highly-publicized fact that state gambling regulators and attorneys general have shut down VGW in numerous states. After all, this

[50] Aaron Adolphson, *Game On: How Fantasy Sports Spending Trends are Evolving* (Oct. 22, 2024), https://bit.ly/4fkvoVi.

COMPLAINT

development would have been clearly indicated by: (1) VGW's subsequent public withdrawal from such states (or public declaration that it does not operate in such states); and (2) the absence or elimination of transactions from VGW in those states.

230.    Thus, VGW uses Yodlee to directly facilitate VGW's gambling transactions. It also uses Yodlee to collect and analyze those gambling transactions, which Yodlee also uses for itself, its other clients, and the casino industry. Yodlee therefore knows precisely what is occurring: gamblers transfer cash into the casino, gamble it on casino games, then cash out any winnings. This is gambling, a fact that Yodlee knows, or to which it is willfully blind for its and VGW's benefit.

**B.    <u>VGW Uses Trustly to Transfer Money In And Out of Gamblers' Bank Accounts Through California</u>**

231.    Trustly is another of the VGW Casino's "cashiers." Like Yodlee, Trustly facilitates transfers to and from gamblers' bank accounts.[51] For example, as VGW explains on the Chumba Casino website, electronic bank transfers via Trustly is Chumba Casino's primary option for online banking transactions[52]:

## Accepted Payment Methods

You'll be redirected to our payments page, where you can choose from the various payment options:

- Credit or Debit Card
  - **Visa**
  - **Mastercard**
  - **American Express**
  - **Discover**
  - **Apple Pay**
  - **Chumba Prepaid Mastercard®**
- Online Banking via **Trustly**
- Digital/E-wallet via **Skrill** (*currently unavailable for new players*)

232.    Thus, Yodlee, Trustly, and VGW work hand-in-hand to verify gamblers' bank accounts, link those accounts to VGW's accounts, transfer gamblers' cash to VGW for gambling, and then transfer gambling winnings, if any, back from VGW into gamblers' bank accounts.

---

[51] Rocco Leone, *Chumba Casino Payment Methods & Redemption Options July 2025*, VEGAS INSIDER (July 20, 2025), https://bit.ly/4ffYrsY.

[52] Chumba Casino Help Center, *How to purchase Gold Coins Offers?*, https://bit.ly/4fg36Lo (last visited July 31, 2025).

COMPLAINT

233.    The VGW Casinos also expressly steer customers to Trustly for bank transfers. For example, in Chumba Casino's instructions for how gamblers can "purchase Gold Coins using Online Banking," VGW directs gamblers to Trustly as the *first choice* for completing online banking transfers[53]:



234.    Trustly knows that it is acting as the "cashier" for a real gambling casino. Indeed, Trustly provides similar services to other real money casino operations, including a multitude of similar sweepstakes casinos and real money live-dealer casinos[54]:

**Top 2 Trustly Online Casinos**

---

[53] Chumba Casino Help Center, *How to purchase Gold Coins using Online Banking?*, https://bit.ly/45lHnNH (last visited July 31, 2025).

[54] RealMoneyAction.com, *Trustly at Online Casinos*, https://bit.ly/44ZFPKp (last visited July 31, 2025); iNet Casino and iNetBet are live dealer real money online casinos (accessible at https://lobby.inetbet.com:2072/lobby/?SkinId=1 and https://inetbet.com/); Damien Souness, DIMERS (July 28, 2025), https://bit.ly/4ld82Ce (listing six sweepstakes casinos); Vinolin Naidoo, DEADSPIN (July 29, 2025), https://bit.ly/3UOr07j (listing 20 sweepstakes casinos).

80

235.    Trustly's knowledge is made even more clear because it also touts how its services allow all these casino operators to, among other things: (1) achieve "210% Growth in Completed Transactions"; (2) "[i]ncrease conversion" of potential gamblers into depositing gamblers; (3) "onboard players with ease"; (4) "give players instant access to funds for both deposits and withdrawals to deliver a best-in-class gaming experience"; (5) "get[] players to their first deposit quickly"; (6) "mak[e] payouts a breeze"; ensure "maximum uptime, even during peak sporting events and packed casinos"; and (7) allow "[s]ophisticated player profiling [so VGW can] deliver an exceptional player experience to big-spending players with higher [loss] limits"[55]:

## PointsBet maximizes revenue with instant payouts

"At PointsBet, we take consistent measures to make sure we are providing the best experience possible for our players. Deposits and withdrawals via Trustly make sense for the player and us because they are simple, safe, and cost-effective."

**Steven McAleer**
Senior Director, Payments & Fraud at PointsBet

### 210% Growth
in Completed Transactions

Read the case study →

# Why Trustly for Gaming?



### Top technical uptime

Trustly's enterprise-grade connectivity technology delivers maximum uptime, even during peak sporting events and packed casinos.



### High-limits VIP program

Sophisticated player profiling allows operators to deliver an exceptional player experience to big-spending players with higher limits.

# Onboard players quickly

Dynamic risk management solutions and KYC-enhancing products allow for expedited player onboarding, while preventing fraud. Players stay safe and so does your business.

---

[55] Trustly, *Pay by Bank for gaming*, https://bit.ly/3IXJi3q (last visited July 31, 2025); Trustly, *Balancing risk and reward for PointsBet*, https://bit.ly/3U7bSSr (last visited July 31, 2025).

COMPLAINT

# Enable instant deposits and withdrawals

Real-time payment rails and Pay by Bank connectivity give players instant access to funds for both deposits and withdrawals to deliver a best-in-class gaming experience to your customers.

# Convert more players with guaranteed payments

Our simple and secure UX combined with our proprietary risk engine ensures payments are guaranteed, approval rates are maximized, and conversion rates are industry-leading.

# Pay by Bank for players and operators

Increase conversion, lower processing costs, and onboard players with ease using Trustly's Open Banking platform.

# Cashless gaming that works

Trustly's Pay by Bank solution is the first cashless gaming payment product that gets players to their first deposit quickly, while making payouts a breeze.

236.    Trustly also closely follows the legality of the casino gaming and sportsbook industry, and "scal[es] its operations" based on the legality of these operations under state law[56]:

# Trustly's 2024 Big Game Success

 **Trustly**

In the past few years, we've seen a growing number of states legalize sports betting. As the popularity of sports betting continues to rise, the anticipation for increased transaction activity has been palpable, especially during major sporting events. With the arrival of 2024's big game, Trustly stood poised to meet this demand, scaling its operations with seamless precision to handle the anticipated influx.

As the curtains closed on the big game, we are proud to report on our record-breaking growth and continued reliable uptime to support our customers.

---

[56] Trustly, *Trustly's 2024 Big Game Success* (Feb. 13, 2024), https://bit.ly/4ldrFdB.

COMPLAINT

237.    All the above demonstrates that Trustly knows, or is willfully blind to the fact that, VGW engages in real money gambling, which is illegal in the Class States. Trustly knows that what is occurring at VGW is the same thing occurring at other real money gambling casinos and sportsbooks: gamblers transfer cash into the casino, gamble it on casino games, and then cash out any winnings.

238.    Furthermore, Trustly monitors the financial transactions that flow through it, like every other financial transaction provider. In this way, Trustly is aware that players are transferring *thousands* of dollars—and more—to the VGW Casinos. Trustly is also aware that very few players—if any—transfer more money back into their accounts. Trustly is further aware that in the aggregate players are losing **millions or billions** of dollars to the VGW Casinos. Together with the other allegations in this Complaint, Trustly has actual knowledge of the VGW Casinos' illegal gambling scheme and/or ignores numerous red flags of that scheme.

239.    Trustly must also be aware of the highly-publicized fact that state gambling regulators and attorneys general have shut down VGW as an illegal gambling operation in numerous states—as this would be clearly indicated by: (1) substantial industry news coverage of that fact; (2) VGW's subsequent public withdrawal from such states; and (3) the sudden elimination of transactions from VGW in those states. At the very least, red flags abound, and Trustly either knows about them and continues to provide services to VGW anyway, or is somehow keeping itself willfully blind to these obvious red flags for its and VGW's benefit.

## CLASS ACTION ALLEGATIONS

240.    Plaintiffs incorporate and reallege all foregoing allegations of fact.

241.    Plaintiffs bring this action, on behalf of themselves and all others similarly situated, as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(1)–(3) and/or (c)(5).

242.    Plaintiffs seek to represent a multi-state class of members bringing direct personal claims against Defendants. The multi-state class is defined as:

> All spouses and children of persons who, while located in the District of Columbia, and the States of Georgia, Illinois, Kentucky, Massachusetts, Mississippi, New Jersey, New Mexico, Ohio, South Carolina, Tennessee, and Wisconsin, wagered and lost things of value at a VGW Casino and have

not sued for and recovered such losses (collectively, the "Multi-State Class" or "Multi-State Class Members").

243. Plaintiffs also seek to represent a class of members from Missouri bringing direct personal claims against Defendants. That class is defined as:

All spouses of persons who, while located in the State of Missouri, wagered and lost things of value at a VGW Casino and have not sued for and recovered such losses (collectively, the "Missouri Class" or "Missouri Class Members").

244. The Multi-State Class and the Missouri Class are collectively referred to as the "Classes." Members of the Multi-State Class and the Missouri Class are collectively referred to as the "Class Members."

245. Alternatively, and/or in addition to the above, the Multi-State Class is comprised of several sub-classes ("Sub-Classes"; each a "Sub-Class") made of Multi-State Class Members of a particular state, each state being within each Defendant's primary marketing area of the United States. These Sub-Classes are:

a. All spouses and children of persons who, while located in the District of Columbia, wagered and lost things of value worth $25 or more in a VGW Casino and have not sued for and recovered such losses (the "District of Columbia Sub-Class");

b. All spouses and children of persons who, while located in Georgia, wagered and lost things of value in a VGW Casino and have not sued for and recovered such losses (the "Georgia Sub-Class");

a. All spouses and children of persons who, while located in Illinois, wagered and lost things of value worth at least $50 in a VGW Casino and have not sued for and recovered such losses (the "Illinois Sub-Class");

b. All spouses and children of persons who, while located in Kentucky, wagered and lost things of value worth at least $5 within a 24-hour period at a VGW Casino and have not sued for and recovered such losses (the "Kentucky Sub-Class");

COMPLAINT

c.  All spouses and children of persons who, while located in Massachusetts, wagered and lost things of value at a VGW Casino and have not sued for and recovered such losses (the "Massachusetts Sub-Class");

d.  All spouses and children of persons who, while located in Mississippi, wagered and lost things of value at a VGW Casino and have not sued for and recovered such losses (the "Mississippi Sub-Class");

e.  All spouses and children of persons who, while located in New Jersey, wagered and lost things of value at a VGW Casino and have not sued for and recovered such losses (the "New Jersey Sub-Class");

f.  All spouses and children of persons who, while located in New Mexico, wagered and lost things of value at a VGW Casino and have not sued for and recovered such losses (the "New Mexico Sub-Class");

g.  All spouses and children of persons who, while located in Ohio, wagered and lost things of value at a VGW Casino and have not sued for and recovered such losses (the "Ohio Sub-Class");

h.  All spouses and children of persons who, while located in South Carolina, wagered and lost things of value worth at least $50 at a VGW Casino and have not sued for and recovered such losses (the "South Carolina Sub-Class");

i.  All spouses and children of persons who, while located in Tennessee, wagered and lost things of value at a VGW Casino and have not sued for and recovered such losses (the "Tennessee Sub-Class"); and

j.  All spouses and children of persons who, while located in Wisconsin, wagered and lost things of value at a VGW Casino and have not sued for and recovered such losses (the "Wisconsin Sub-Class").

246.  All references to the Multi-State Class include the Sub-Classes.

247.  Excluded from the Classes and Sub-Classes are spouses and children who: (1) created their own account at any of the VGW Casinos; and/or (2) used any other person's account to gamble at the VGW Casinos. Also excluded from the Classes and Sub-Classes are all of

85

Defendants' officers, directors, and employees (except for Defendant Laurence Escalante); any entity in which a Defendant has a controlling interest (except for those named as Defendants herein); and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendants (except for those named as Defendants herein). Further excluded from the Classes and Sub-Classes are members of the judiciary to whom this case is assigned, their families, and members of their staff.

248.    Plaintiffs reserve the right to modify any and all Multi-State Class, Missouri Class, and Sub-Class definitions, including based on discovery and further investigation.

249.    The Multi-State Class, Missouri Class, and each of the Sub-Classes are so large as to make joinder impracticable. The Multi-State Class has hundreds of thousands of members; the Missouri Class has tens of thousands to hundreds of thousands of members; and each Sub-Class also has tens of thousands to hundreds of thousands of members. Disposition of these claims in a single action will provide substantial benefits to all parties and to the Court. Multi-State Class Members, Missouri Class Members, and Sub-Class members are readily ascertainable from information and records in the possession, custody, or control of Defendants, their customers, and/or public records.

250.    Each Multi-State Class, Missouri Class, and/or Sub-Class representatives' claims are typical of the claims of their respective Classes and/or Sub-Classes in that: (1) Defendants operate(d) or aid(ed) in the operation of the VGW Casinos in each of the Class States; (2) the VGW Casinos operate(d) identically in each of the Class States; (3) the VGW Casinos are illegal gambling enterprises under the laws of all the Class States; (4) all Multi-State Class Members, Missouri Class Members, and Sub-Class members had spouses and/or parents that gambled and lost money or other valuable property playing games of chance in the VGW Casinos; (5) all Multi-State Class Members had spouses and/or parents that gambled and lost money or other valuable property playing games of chance in the VGW Casinos; (6) all Missouri Class Members had spouses that gambled and lost money or other valuable property playing games of chance in the VGW Casinos; (7) Plaintiffs are Multi-State Class Members, Missouri Class Members, and/or members of a Sub-Class that had spouses gamble and lose money or other valuable property playing games of chance

86

in the VGW Casinos; (8) all of the Class States allow spouses and/or children of gamblers to recover the money and other valuable property lost by the gamblers at the VGW Casinos; (8) spouses and/or parents of each Plaintiff and each Multi-State Class Member, Missouri Class Member, and/or Sub-Class members gambled and lost money or other valuable property playing games of chance in the VGW Casinos; and (9) each of the California Partners facilitate(d) the relevant gambling operations of the VGW Casinos by providing crucial services to VGW that allow(ed) and caus(ed) the spouses and/or parents of Multi-State Class Members, Missouri Class Members, and/or Sub-Class members to gamble and lose money or other valuable property at the VGW Casinos.

251.    Plaintiffs are members of the Multi-State Class, Missouri Class, and/or Sub-Classes, and they will fairly and adequately represent and protect the interests of all other members. Plaintiffs' counsel are competent and experienced in prosecuting complex class actions, and Plaintiffs have no interest contrary to or in conflict with the interests of any other members of the Classes or Sub-Classes.

252.    Common questions of law and fact exist as to all members of the Multi-State Class, Missouri Class, and Sub-Classes and predominate over any questions solely affecting any individual member of the Classes or Sub-Classes. Among the questions of law and fact common to the claims of the Multi-State Class, Missouri Class, and each Sub-Class are:

   a.    Whether Defendants engaged in the conduct alleged;

   b.    Whether VGW operated illegal gambling enterprises in violation of state and federal laws;

   c.    Whether the California Partners aided and abetted each other and VGW's operation of its illegal gambling enterprise;

   d.    Whether gold coins are things of value;

   e.    Whether sweepstakes coins are things of value;

   f.    Whether the Multi-State Class Members', Missouri Class Members', and Sub Class members' spouses and/or parents lost money or valuable property gambling in VGW's illegal gambling enterprises;

COMPLAINT

g.  Whether the Multi-State Class Members, Missouri Class Members, and Sub Class members are entitled to recover damages, restitution, costs, attorneys' fees, and/or pre- or post-judgment interest; and

h.  Whether the Multi-State Class Members, Missouri Class Members, and Sub Class members are entitled to injunctive or other equitable relief.

253.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Absent a class action, most Multi-State Class Members, Missouri Class Members, and Sub-Class members would likely find the cost of litigating their claims prohibitively high and would have no effective remedy. Given the relatively small size of many of the individual Multi-State Class Members', Missouri Class Members', and Sub-Class members' claims, the significant financial losses suffered at the hands of Defendants, and the complex nature of the issues presented, few (if any) Class Members or Sub-Class members would seek redress for Defendants' violations individually. Class treatment will conserve the resources of the courts and promote consistency and efficiency of adjudication.

254.   Class certification is also appropriate under Rules 23(b)(1)–(3) and/or (c)(5) because:

a.  The prosecution of separate actions by individual Multi-State Class Members, Missouri Class Members, and/or Sub-Class members would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants;

b.  The complexity of issues involved in this action and the expense of litigating the claims (especially after the losses suffered as a result of Defendants' illegal actions), means that few, if any, Multi-State Class Members, Missouri Class Members, or Sub-Class members could afford to seek legal redress individually;

c.  The prosecution of separate actions by individual Multi-State Class Members, Missouri Class Members, and Sub-Class members would create a risk of adjudications that would, as a practical matter, be dispositive of the interests of

other Class Members and/or Sub-Class members not parties to the adjudications, or would substantially impair or impede their ability to protect their interests;

d.  The claims of the Multi-State Class Members, Missouri Class Members, and Sub-Class members are comprised of common issues whose resolution in a class trial would materially advance this litigation;

e.  This action does not present any undue difficulties that would impede its management by the Court as a class action;

f.  The Multi-State Class Members, Missouri Class Members, and Sub-Class members do not have a need to individually control the claims or defenses through separate actions;

g.  Notice to Multi-State Class Members, Missouri Class Members, and Sub-Class members can be effectuated by mail, email, or other means, similar to other cases brought by spouses and/or children;

h.  This appears to be the first and only class action brought by spouses and children against VGW, and there is no other past or pending litigation regarding the relevant gambling losses in any Class State that would render inclusion in this case inappropriate; and

i.  It is highly desirable to concentrate these similar claims in a single forum, particularly a forum within the State of California where VGW US is principally operated and located, and where VGW's aiders and abettors reside and provide their relevant services to VGW.

255.    Subject to additional information obtained through further investigation and discovery, the foregoing definitions of the Multi-State Class, Missouri Class, and all Sub-Classes may be expanded or narrowed by amendment or amended complaint.

COMPLAINT

**FIRST CAUSE OF ACTION**
**Violation of Cal. Bus. & Prof. Code § 17200 (Unfair Competition Law)**
**(Against All Defendants)**
**On Behalf of All Plaintiffs, the Multi-State Class, the Missouri Class, and All Sub-Classes**

256.    Plaintiffs individually, and on behalf of all Multi-State Class Members, Missouri Class Members, and Sub-Class members, hereby repeat and reallege every foregoing allegation of fact.

257.    California's Unfair Competition Law ("UCL") prohibits any person from engaging in "any unlawful, unfair or fraudulent business act or practice." Bus. & Prof. Code § 17200.

258.    The UCL also prohibits any unfair, deceptive, untrue or misleading advertising and any act prohibited by California's False Advertising Law ("FAL"). *Id.*; *see id.* § 17500.

259.    Each Defendant is a "person" within the meaning of the UCL. *Id.* § 17201.

260.    "Under the unlawful prong, the UCL borrows violation of other laws and makes violations of those laws unlawful practices actionable under the UCL. Thus, a violation of another law is a predicate for stating a cause of action under the UCL's unlawful prong." *Moran v. Prime Healthcare Mgmt., Inc.*, 3 Cal. App. 5th 1131, 1142 (2016) (cleaned up). "Virtually any law—federal, state or local—can serve as a predicate for a [UCL] action." *State Farm Fire & Casualty Co. v. Superior Court*, 45 Cal. App. 4th 1093, 1102–03 (1996).

261.    Thus, violations of federal anti-gambling laws constitute violations of the UCL, so long as relevant conduct occurred in California. *Hill v. Workday, Inc.*, 773 F. Supp. 3d 779, 802 (N.D. Cal. 2025) ("California has a clear and substantial interest preventing fraudulent practices in this state and a legitimate and compelling interest in preserving a business climate free of fraud and deceptive practices, and for that reason has a legitimate interest in extending state-created remedies to out-of-state parties harmed by wrongful conduct occurring in California."); *AirWatch LLC v. Mobile Iron, Inc.*, 2013 WL 4757491, at *6 (N.D. Ga. Sept. 4, 2013) (stating "a non-California plaintiff . . . may also bring a claim under the UCL, provided the factual nexus of its claim is sufficiently aligned with California," even if another state's law applies).

90

262.    As alleged throughout this Complaint, Defendants performed relevant conduct in California and/or through (*e.g.*, emanating out of) California into the Class States, which harmed Plaintiffs and Class Members.

263.    Under the UCL, violations of federal statutes may serve as the predicate for stating a cause of action, regardless of whether the federal statute has a private right of action. *Rose v. Bank of Am., N.A.*, 57 Cal. 4th 390, 394, 396-97 (2013) ("Violations of federal statutes, including those governing the financial industry, may serve as the predicate for a UCL cause of action.") (rejecting argument that federal law must have a private right of action); *Process Specialties, Inc. v. Sematech, Inc.*, 2002 WL 35646610, at *13 (E.D. Cal. Jan. 18, 2002) ("[I]t is irrelevant whether a private right of action is implied under the predicate statute where the action is brought under the [UCL], for conduct violating the underlying law.").

264.    18 U.S.C.A. § 1955 ("Section 1955") prohibits any person from "conduct[ing] . . . all or part of an illegal gambling business[.]"

265.    Each Defendant is a "person" within the meaning of Section 1955. 18 U.S.C.A. § 1955.

266.    "For purposes of [Section 1955], one 'conducts' an illegal gambling business by performing any necessary function in the gambling operation, other than that of a mere bettor." *United States v. Miller*, 22 F.3d 1075, 1077 (11th Cir. 1994).

267.    Defendants each "conduct" an illegal gambling business under Section 1955 because, as alleged above, they each perform necessary functions to VGW's gambling operations (which do not include betting at the VGW Casinos).

268.    Section 1955 provides that an "'illegal gambling business' means a gambling business which--(i) is a violation of the law of a State or political subdivision in which it is conducted; (ii) involves five or more persons who conduct . . . all or part of such business; and (iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day." *Id.*

269.    Section 1955 provides that "'State' means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, and any territory or possession of the United States." *Id.*

270.    As alleged throughout this Complaint, VGW operates an "illegal gambling business" under Section 1955 because it operates a business that violates the anti-gambling statutes of the Class States, each of which prohibits the betting, wagering, and/or gambling of money, property, and/or things of value on games of chance, and allows gamblers' spouses or children to recover the value of such lost money, property, or other things of value.

271.    Each of the spouses or parents of the Plaintiffs and Class Members lost money in their respective home states.

272.    As alleged throughout this Complaint, VGW's illegal gambling business involves more than five persons, including other Defendants and the California Partners.

273.    As alleged throughout this Complaint, VGW and the VGW Casinos have been operating continuously (or substantially continuously) for more than 30 days. Based on VGW's multi-billion annual revenues, and the deposit history of Plaintiffs as alleged herein, each of the VGW Casinos have received gross revenues exceeding $2,000 in a single day.

274.    31 U.S.C.A. § 5363 ("Section 5363") prohibits any individual or entity that is "engaged in the business of betting or wagering [to] knowingly accept, in connection with the participation of another person in unlawful Internet gambling--(1) credit, or the proceeds of credit, extended to or on behalf of such other person (including credit extended through the use of a credit card); (2) an electronic fund transfer, or funds transmitted by or through a money transmitting business, or the proceeds of an electronic fund transfer or money transmitting service, from or on behalf of such other person; (3) any check, draft, or similar instrument which is drawn by or on behalf of such other person and is drawn on or payable at or through any financial institution; or (4) the proceeds of any other form of financial transaction . . . which involves a financial institution as a payor or financial intermediary on behalf of or for the benefit of such other person." 31 U.S.C.A. § 5363; *Interactive Media Ent. & Gaming Ass'n Inc. v. Att'y Gen. of U.S.*, 580 F.3d 113, 116 (3d Cir. 2009) ("[Section 5363] prohibits a gambling business from knowingly accepting

certain financial instruments from an individual who places a bet over the Internet if such gambling is illegal at the location in which the business is located or from which the individual initiates the bet.").

275.    As alleged throughout this Complaint, VGW is engaged in the business of betting or wagering: it takes bets/wagers of money or other things of value on games of chance in the VGW Casinos. VGW offers specially-designed casino games in which gamblers can wager and win SC. These casino games are specially designed to operate both non-redeemable GC, and SC that can be (and is) redeemed for cash. VGW's captive game design studios and/or third party game designers create the games for, and/or license the casino games to, VGW to offer to its gamblers. In exchange, the game developers receive a percentage of the value of (at least) the SC that are wagered on their games. VGW's largest third-party game developer, Playtech, confirms that its operating model requires VGW to pay it a percentage of VGW's "Net Gaming Revenue" (which Playtech defines as "Gross Wagers" minus the "Payout on Wagers" minus "Bonuses to Players" and "Tax[es]").[57] Gambling is VGW's business.

276.    As alleged throughout this Complaint, gambling (including internet-based gambling), is illegal in each of the Class States where the gamblers engaged in the gambling transactions. VGW's casino games are also illegal gambling devices used to accomplish illegal gambling in the Class States.

277.    As alleged throughout this Complaint, VGW knowingly accepts electronic financial transfers—including via credit cards, debit cards, bank account transfers, electronic funds transfers, money transmitting businesses, ACH drafts, bank transfers, e-checks, Skrill, Paysafecard, Trustly, gift cards, and prepaid cards (including the VGW-branded prepaid Mastercards).

278.    Much or all of the funds lost by Plaintiffs' and Class Members' spouses and parents were transferred to the VGW Casinos via one of the aforementioned electronic transfer methods, all of which are prohibited by Section 5363.

---

[57]    Playtech plc 2024 Annual Report and Financial Statements at 25 (available at https://bit.ly/419Iyi9).

COMPLAINT

279.    As alleged throughout this Complaint, VGW accepts these electronic financial transfers knowing that the transfers are in connection with the gambler participating in internet gambling. That internet gambling is also illegal as alleged throughout this Complaint.

280.    Plaintiffs and Class Members were harmed by Defendants' conduct in the amount of their spouses' and/or parents' gambling losses.

281.    The UCL also allows violations of other state statutes to serve as the predicate for stating a cause of action under the UCL, regardless of whether those statutes have a private right of action. *Process Specialties*, 2002 WL 35646610, at *13-14 ("[T]he court finds that [plaintiff] may bring its UCL claim based on a violation of Delaware law.") (rejecting argument that a plaintiff "cannot rely on an out-of-state law as a predicate for a UCL claim").

282.    As alleged throughout this Complaint, VGW has violated the state anti-gambling laws of the Class States. These violations, and Defendants' conduct, harmed Plaintiffs, Class Members, and Sub-Class members in the amount of their spouses' and parents' gambling losses.

283.    Under the "unfair" prong of the UCL, conduct violates the UCL if it "threatens an incipient violation of an antitrust law," "violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law," or "otherwise significantly threatens or harms competition." *Process Specialties*, 2002 WL 35646610, at *17.

284.    VGW's actions also "significantly threatens or harms competition" because VGW is operating illegal casinos that are banned in the Class States. By operating illegal unregulated casinos, VGW is significantly threatening and harming legitimate and state-regulated lotteries, casinos, sportsbooks, horse racing, and/or similar gaming activities. Illegal unregulated gaming activities allow VGW to unfairly compete against these legitimate businesses because VGW offers gaming activities that competitors cannot legitimately offer at all, or can only offer in a far more limited or expensive form. VGW has also avoided paying taxes in the Class States and/or to the federal government, while competitors pay such taxes; this further exacerbates VGW's unfair advantage and harms competition. VGW also does not issue Form W2-G's to gamblers whose wins exceed the W-2G reporting thresholds (*e.g.*, a single win of $1,200 or more on a slot machine; $600

94

or more won in a sweepstakes (if the amount won is at least 300 times the size of the wager).[58] This too, advantages VGW vis-à-vis competitors and unfairly drives consumers to its illegal casinos. As also alleged herein, VGW further uses its status as an illegal unregulated casino to improperly deny customers their winnings (after misleading customers into believing those wins would be paid by promoting other alleged winners holding large checks), something that legal regulated gaming businesses cannot do without recourse to the state. By operating illegal unregulated casinos, and operating them unfairly, VGW "significantly threatens or harms competition."

285.    As alleged throughout this Complaint, the California Partners have also violated the "unfair prong" of the UCL. The California Partners' actions "significantly threaten[] or harm[] competition" because they are providing services to illegal gambling enterprises that their competitors cannot legitimately provide. Doing so allows the California Partners to unfairly compete against their competitors who cannot and do not provide services to illegal gambling operations.

286.    Additionally, the California Partners—by themselves, with each other, with VGW, and at the direction of VGW—have aided and abetted VGW, and continue to aid and abet VGW, in its unlawful and unfair business practices in violation of the UCL. This includes by aiding and abetting VGW's violations of Section 5363, Section 1955, and/or the anti-gambling statutes of Class States—by knowingly providing their necessary California-based services, controlling access to the VGW Casinos, and controlling the flow of money between gamblers and VGW—from, in, and through California, as alleged throughout this Complaint.

287.    Defendant Brian Christopher is individually and personally liable for the UCL violations alleged in this Complaint. Under the UCL, "[i]ndividual liability must be predicated on [the individual's] personal participation in the unlawful practices." *People v. Toomey*, 157 Cal. App. 3d 1, 14 (1984). Individual liability turns in part on "a showing of [the individual's] knowledge or participation in the illegal conduct." *Id.* "[I]f the evidence establishes defendant's participation in the unlawful practices, either directly or by aiding and abetting the principal,

---

[58] *See* Internal Revenue Service, *Instructions for Forms W-2G and 5754* (Rev. Jan. 2021), https://bit.ly/3UIunNa (last visited July 31, 2025).

liability under sections 17200 and 17500 can be imposed." *Id.* at 15. Brian Christopher is individually liable for the services he provided to VGW because he "participat[ed] in the illegal conduct" by "aiding and abetting the principal" as alleged throughout this Complaint.

288.    Plaintiffs and Class Members seek restitution and injunctive relief for each UCL violation.

**SECOND CAUSE OF ACTION**
**Violation of D.C. Code Ann. § 16-1702**
**(Against All Defendants)**
**On Behalf of the District of Columbia Sub-Class**

289.    Plaintiffs, on behalf of the District of Columbia Sub-Class, hereby repeat and reallege every foregoing allegation of fact.

290.    Section 16-702 of the District of Columbia Code Annotated states that "A person who, at any time or sitting, by playing at cards, dice or any other game, or by betting on the sides or hands of persons who play, loses to a person so playing or betting, a sum of money, or other valuable thing, amounting to $25 or more, and pays or delivers the money or thing, or any part thereof, may, within three months after the payment or delivery, sue for and recover the money, goods or other valuable thing, so lost and paid or delivered, or any part thereof, or the full value thereof, by a civil action, from the winner thereof, with costs. If the person who loses the money or other thing, does not, within three months actually and bona fide, and without collusion, sue, and with effect prosecute, therefor, any person may sue for, and recover treble the value of the money, goods, chattels, and other things, with costs of suit, by a civil action against the winner, one-half to the use of the plaintiff, the remainder to the use of the District of Columbia."

291.    Members of the District of Columbia Sub-Class are spouses and/or children of persons who, while located in the District of Columbia: (1) paid or delivered sums of money or other things of value to a VGW Casino, including as consideration for gambling; (2) wagered, gambled, and bet sums of money or things of value on games of chance at a VGW Casino; (3) lost money or things of value to a VGW Casino; and (4) have not successfully sued to recover those losses ("District of Columbia Gamblers").

COMPLAINT

292.   Upon information and belief, all District of Columbia Gamblers have not sued for and recovered their losses to Defendants, or had any other person successfully sue for and recover those losses.

293.   Accordingly, on behalf of members of the District of Columbia Sub-Class (and for their joint use with the District of Columbia), and pursuant to D.C. Code Ann. § 16-1702, Plaintiffs seek: (1) to recover all money or other things of value lost by District of Columbia Gamblers to a VGW Casino, statutory treble damages, statutory costs, attorney's fees, and pre- and post-judgment interest; (2) injunctive and other equitable relief; and (3) any other relief deemed appropriate by the Court.

294.   The California Partners aid and abet VGW's violations of the District of Columbia's anti-gambling statutes and are equally liable for the District of Columbia Gamblers' losses and related damages. Each of the California Partners knows that it is facilitating gambling at the VGW Casinos in the District of Columbia. This facilitation includes knowingly: (1) soliciting and luring gamblers to the VGW Casinos with targeted customized advertisements, promotions, and enticements in their home states; (2) facilitating the gamblers' entry into the VGW Casinos; (3) connecting gamblers' financial accounts to the VGW Casinos; (4) transferring cash from gamblers' financial accounts to the VGW casinos, so gamblers can wager SC (and either lose those SC, or win SC that can be redeemed dollar-for-dollar in cash); and/or (5) transferring the gamblers' cash winnings back to the gamblers' financial accounts.

295.   The California Partners' services facilitate gambling at VGW's casinos—and are a substantial and essential factor and cause in bringing that gambling about—because they are directly tied to soliciting gamblers, verifying the gamblers' identities and locations, taking the gamblers' money and facilitating the purchase of the GC/SC packages, and paying the gamblers their SC winnings. Without these services, there would be no gamblers, and/or no gambling transactions could be completed. In short, no gambling could occur. Thus, the California Partners are also a but-for and proximate cause of the gamblers' losses, and the losses of the gamblers' spouses and children. Indeed, the California Partners all know that the vast majority of people they solicit, authorize, and/or transfer money for will (and did) lose all or most of their money to the

97

VGW Casinos. All the California Partners understand that slot machines and other casino games have odds that favor the house, not the player. That is how VGW makes billions in revenue each year—revenues that it uses to pay the California Partners, including the partner commissions to Brian Christopher. It is also how VGW can afford to have record-breaking marketing budgets that pay some of the biggest celebrities, gambling influencers, and companies in the world to not only promote the VGW Casinos, but exploit their knowledge of their own customers, clients, followers, listeners, and communities to do so. Each of the California Partners knowingly helped, and continue to help, VGW enlist more and more people to lose money at the VGW Casinos.

296.    The California Partners' services therefore concern—and give substantial assistance and encouragement to—VGW and its illegal gambling enterprise. The California Partners' services are a substantial factor in causing the Plaintiffs' and Class Members' losses at the VGW Casinos because: (1) no gambling can occur without them; and (2) Plaintiffs' and Class Members' spouses or parents would not have gambled without them (and/or would have gambled substantially less without them).

297.    During the entire relevant period, VGW has intentionally misrepresented the nature of its gambling operations and fraudulently concealed the truth of its illegal gambling enterprise from the spouses and children of the District of Columbia Gamblers. Due to these intentional misrepresentations and fraudulent concealments, these spouses and children did not and could not have reasonably discovered that VGW was operating an illegal casino under District of Columbia and federal law, despite the spouses' and children's reasonable due diligence.

**THIRD CAUSE OF ACTION**
**Violation of Ga. Code Ann. § 13-8-3**
**(Against All Defendants)**
**On Behalf of the Georgia Sub-Class**

298.    Plaintiffs, on behalf of the Georgia Sub-Class, hereby repeat and reallege every foregoing allegation of fact.

299.    Section 13-8-3 of the Annotated Georgia Code states that "[m]oney paid or property delivered upon a gambling consideration may be recovered from the winner by the loser by institution of an action for the same within six months after the loss and, after the expiration of that

COMPLAINT

time, by institution of an action by any person, at any time within four years, for the joint use of himself and the educational fund of the county."

300.   Members of the Georgia Sub-Class are spouses and/or children of persons who, while located in Georgia: (1) paid or delivered sums of money or other property or things of value to a VGW Casino, including as consideration for gambling; (2) wagered and gambled sums of money, property, or things of value on games of chance at a VGW Casino; (3) lost money, property, or things of value to a VGW Casino; and (4) have not successfully sued to recover those losses ("Georgia Gamblers").

301.   Upon information and belief, all Georgia Gamblers have not sued for and recovered their losses to Defendants, or had any other person successfully sue for and recover those losses.

302.   Accordingly, on behalf of the Georgia Sub-Class (and for the joint use of the Geogia Sub-Class members and the educational fund of each gamblers' county of residence), and pursuant to Ga. Code Ann. § 13-8-3, Plaintiffs seek: (1) to recover all money or other things of value lost by Georgia Gamblers to a VGW Casino, costs, attorney's fees, and pre- and post-judgment interest; (2) injunctive and other equitable relief; and (3) any other relief deemed appropriate by the Court.

303.   The California Partners aid and abet VGW's violations of Georgia's anti-gambling statutes and are equally liable for the Georgia Gamblers' losses and related damages. Each of the California Partners knows that it is facilitating gambling at the VGW Casinos in Georgia. This facilitation includes knowingly: (1) soliciting and luring gamblers to the VGW Casinos with targeted customized advertisements, promotions, and enticements in their home states; (2) facilitating the gamblers' entry into the VGW Casinos; (3) connecting gamblers' financial accounts to the VGW Casinos; (4) transferring cash from gamblers' financial accounts to the VGW casinos, so gamblers can wager SC (and either lose those SC, or win SC that can be redeemed dollar-for-dollar in cash); and/or (5) transferring the gamblers' cash winnings back to the gamblers' financial accounts.

304.   The California Partners' services facilitate gambling at VGW's casinos—and are a substantial and essential factor and cause in bringing that gambling about—because they are directly tied to soliciting gamblers, verifying the gamblers' identities and locations, taking the

gamblers' money and facilitating the purchase of the GC/SC packages, and paying the gamblers their SC winnings. Without these services, there would be no gamblers, and/or no gambling transactions could be completed. In short, no gambling could occur. Thus, the California Partners are also a but-for and proximate cause of the gamblers' losses, and the losses of the gamblers' spouses and children. Indeed, the California Partners all know that the vast majority of people they solicit, authorize, and/or transfer money for will (and did) lose all or most of their money to the VGW Casinos. All the California Partners understand that slot machines and other casino games have odds that favor the house, not the player. That is how VGW makes billions in revenue each year—revenues that it uses to pay the California Partners, including the partner commissions to Brian Christopher. It is also how VGW can afford to have record-breaking marketing budgets that pay some of the biggest celebrities, gambling influencers, and companies in the world to not only promote the VGW Casinos, but exploit their knowledge of their own customers, clients, followers, listeners, and communities to do so. Each of the California Partners knowingly helped, and continue to help, VGW enlist more and more people to lose money at the VGW Casinos.

305.   The California Partners' services therefore concern—and give substantial assistance and encouragement to—VGW and its illegal gambling enterprise. The California Partners' services are a substantial factor in causing the Plaintiffs' and Class Members' losses at the VGW Casinos because: (1) no gambling can occur without them; and (2) Plaintiffs' and Class Members' spouses or parents would not have gambled without them (and/or would have gambled substantially less without them).

306.   During the entire relevant period, VGW has intentionally misrepresented the nature of its gambling operations and fraudulently concealed the truth of its illegal gambling enterprise from the spouses and children of Georgia Gamblers. Due to these intentional misrepresentations and fraudulent concealments, these spouses and children did not and could not have reasonably discovered that VGW was operating an illegal casino under Georgia and federal law, despite the spouses' and children's reasonable due diligence.

1
2
3

**FOURTH CAUSE OF ACTION**
**Violation of 720 ILCS 5/28-8**
**(Against All Defendants)**
**On Behalf of the Illinois Sub-Class**

4      307.    Plaintiffs, including Plaintiff John Brown individually, on behalf of the Illinois Sub-

5    Class, hereby repeat and reallege every foregoing allegation of fact.

6      308.    Section 720 ILCS 5/28-8 of the Illinois Compiled Statutes states that "[a]ny person

7    who by gambling shall lose to any other person, any sum of money or thing of value, amounting to

8    the sum of $50 or more and shall pay or deliver the same or any part thereof, may sue for and

9    recover the money or other thing of value, so lost and paid or delivered, in a civil action against the

10   winner thereof, with costs," and that "[i]f within 6 months, such person . . . does not in fact pursue

11   his remedy, any person may initiate a civil action against the winner. The court or the jury, as the

12   case may be, shall determine the amount of the loss. After such determination, the court shall enter

13   a judgment of triple the amount so determined."

14      309.    Plaintiff Brown and members of the Illinois Sub-Class are spouses and/or children

15   of persons who, while located in Illinois: (1) paid or delivered sums of money or other things of

16   value to a VGW Casino; (2) gambled sums of money or things of value on games of chance at a

17   VGW Casino; (3) lost at least $50 worth of money or things of value to a VGW Casino; and (4)

18   have not successfully sued to recover those losses ("Illinois Gamblers").

19      310.    Upon information and belief, all Illinois Gamblers have not sued for and recovered

20   their losses to Defendants, or had any other person successfully sue for and recover those losses.

21      311.    Accordingly, on behalf of himself and the Illinois Sub-Class, and pursuant to 720

22   ILCS 5/28-8, Plaintiffs and Plaintiff Brown seek: (1) to recover all money or other things of value

23   lost by Illinois Gamblers to a VGW Casino, statutory treble damages, costs, attorney's fees, and

24   pre- and post-judgment interest; (2) injunctive and other equitable relief; and (3) any other relief

25   deemed appropriate by the Court.

26      312.    The California Partners aid and abet VGW's violations of Illinois' anti-gambling

27   statutes and are equally liable for the Illinois Gamblers' losses and related damages. Each of the

28

COMPLAINT

California Partners knows that it is facilitating gambling at the VGW Casinos in Illinois. This facilitation includes knowingly: (1) soliciting and luring gamblers to the VGW Casinos with targeted customized advertisements, promotions, and enticements in their home states; (2) facilitating the gamblers' entry into the VGW Casinos; (3) connecting gamblers' financial accounts to the VGW Casinos; (4) transferring cash from gamblers' financial accounts to the VGW casinos, so gamblers can wager SC (and either lose those SC, or win SC that can be redeemed dollar-for-dollar in cash); and/or (5) transferring the gamblers' cash winnings back to the gamblers' financial accounts.

313.    The California Partners' services facilitate gambling at VGW's casinos—and are a substantial and essential factor and cause in bringing that gambling about—because they are directly tied to soliciting gamblers, verifying the gamblers' identities and locations, taking the gamblers' money and facilitating the purchase of the GC/SC packages, and paying the gamblers their SC winnings. Without these services, there would be no gamblers, and/or no gambling transactions could be completed. In short, no gambling could occur. Thus, the California Partners are also a but-for and proximate cause of the gamblers' losses, and the losses of the gamblers' spouses and children. Indeed, the California Partners all know that the vast majority of people they solicit, authorize, and/or transfer money for will (and did) lose all or most of their money to the VGW Casinos. All the California Partners understand that slot machines and other casino games have odds that favor the house, not the player. That is how VGW makes billions in revenue each year—revenues that it uses to pay the California Partners, including the partner commissions to Brian Christopher. It is also how VGW can afford to have record-breaking marketing budgets that pay some of the biggest celebrities, gambling influencers, and companies in the world to not only promote the VGW Casinos, but exploit their knowledge of their own customers, clients, followers, listeners, and communities to do so. Each of the California Partners knowingly helped, and continue to help, VGW enlist more and more people to lose money at the VGW Casinos.

314.    The California Partners' services therefore concern—and give substantial assistance and encouragement to—VGW and its illegal gambling enterprise. The California Partners' services are a substantial factor in causing the Plaintiffs' and Class Members' losses at the VGW Casinos

102

because: (1) no gambling can occur without them; and (2) Plaintiffs' and Class Members' spouses or parents would not have gambled without them (and/or would have gambled substantially less without them).

315.    During the entire relevant period, VGW has intentionally misrepresented the nature of its gambling operations and fraudulently concealed the truth of its illegal gambling enterprise from the spouses and children of Illinois Gamblers. Due to these intentional misrepresentations and fraudulent concealments, these spouses and children did not and could not have reasonably discovered that VGW was operating an illegal casino under Illinois and federal law, despite the spouses' and children's reasonable due diligence.

**FIFTH CAUSE OF ACTION**
**Violation of Ky. Rev. Stat. Ann. §§ 372.020 and 372.040**
**(Against All Defendants)**
**On Behalf of the Kentucky Sub-Class**

316.    Plaintiffs, including Plaintiff Trena Ostlund individually, on behalf of the Kentucky Sub-Class, hereby repeat and reallege every foregoing allegation of fact.

317.    Section 372.020 of the Kentucky Revised Statutes states that "[i]f any person loses to another at one (1) time, or within twenty-four (24) hours, five dollars ($5) or more, or anything of that value, and pays, transfers or delivers it, the loser . . . may recover it, or its value, from the winner . . . by action brought within five (5) years after the payment, transfer or delivery."

318.    Section 372.040 of the Kentucky Revised Statutes states that "[i]f the loser . . . does not, within six (6) months after its payment or delivery to the winner, sue for the money or thing lost, and prosecute the suit to recovery with due diligence, any other person may sue the winner, and recover treble the value of the money or thing lost, if suit is brought within five (5) years from the delivery or payment."

319.    Plaintiff Ostlund and members of the Kentucky Sub-Class are spouses and/or children of persons who, while located in Kentucky: (1) paid, transferred, or delivered money or other things of value to a VGW Casino; (2) wagered money or other things of value on games of chance at a VGW Casino; (3) lost at least $5 worth of money or things of value to a VGW Casino

103

at one time or within a 24-hour period; and (4) have not successfully sued to recover those losses ("Kentucky Gamblers").

320.    Upon information and belief, all Kentucky Gamblers have not sued for, diligently prosecuted and/or recovered their losses to Defendants, or had any other person successfully sue for and recover those losses.

321.    Accordingly, on behalf of herself and the Kentucky Sub-Class, and pursuant to Ky. Rev. Stat. Ann. §§ 372.020 and 372.040, Plaintiffs and Plaintiff Ostlund seek: (1) to recover all money or other things of value lost by Kentucky Gamblers to a VGW Casino, statutory treble damages, costs, attorney's fees, and pre- and post-judgment interest; (2) injunctive and other equitable relief; and (3) any other relief deemed appropriate by the Court.

322.    The California Partners aid and abet VGW's violations of Kentucky's anti-gambling statutes and are equally liable for the Kentucky Gamblers' losses and related damages. Each of the California Partners knows that it is facilitating gambling at the VGW Casinos in Kentucky. This facilitation includes knowingly: (1) soliciting and luring gamblers to the VGW Casinos with targeted customized advertisements, promotions, and enticements in their home states; (2) facilitating the gamblers' entry into the VGW Casinos; (3) connecting gamblers' financial accounts to the VGW Casinos; (4) transferring cash from gamblers' financial accounts to the VGW casinos, so gamblers can wager SC (and either lose those SC, or win SC that can be redeemed dollar-for-dollar in cash); and/or (5) transferring the gamblers' cash winnings back to the gamblers' financial accounts.

323.    The California Partners' services facilitate gambling at VGW's casinos—and are a substantial and essential factor and cause in bringing that gambling about—because they are directly tied to soliciting gamblers, verifying the gamblers' identities and locations, taking the gamblers' money and facilitating the purchase of the GC/SC packages, and paying the gamblers their SC winnings. Without these services, there would be no gamblers, and/or no gambling transactions could be completed. In short, no gambling could occur. Thus, the California Partners are also a but-for and proximate cause of the gamblers' losses, and the losses of the gamblers' spouses and children. Indeed, the California Partners all know that the vast majority of people they

1    solicit, authorize, and/or transfer money for will (and did) lose all or most of their money to the

2    VGW Casinos. All the California Partners understand that slot machines and other casino games

3    have odds that favor the house, not the player. That is how VGW makes billions in revenue each

4    year—revenues that it uses to pay the California Partners, including the partner commissions to

5    Brian Christopher. It is also how VGW can afford to have record-breaking marketing budgets that

6    pay some of the biggest celebrities, gambling influencers, and companies in the world to not only

7    promote the VGW Casinos, but exploit their knowledge of their own customers, clients, followers,

8    listeners, and communities to do so. Each of the California Partners knowingly helped, and continue

9    to help, VGW enlist more and more people to lose money at the VGW Casinos.

10    324.    The California Partners' services therefore concern—and give substantial assistance

11    and encouragement to—VGW and its illegal gambling enterprise. The California Partners' services

12    are a substantial factor in causing the Plaintiffs' and Class Members' losses at the VGW Casinos

13    because: (1) no gambling can occur without them; and (2) Plaintiffs' and Class Members' spouses

14    or parents would not have gambled without them (and/or would have gambled substantially less

15    without them).

16    325.    During the entire relevant period, VGW has intentionally misrepresented the nature

17    of its gambling operations and fraudulently concealed the truth of its illegal gambling enterprise

18    from the spouses and children of Kentucky Gamblers. Due to these intentional misrepresentations

19    and fraudulent concealments, these spouses and children did not and could not have reasonably

20    discovered that VGW was operating an illegal casino under Kentucky and federal law, despite the

21    spouses' and children's reasonable due diligence.

**SIXTH CAUSE OF ACTION**
**Violation of Mass. Gen. Laws Ann. ch. 137, § 1**
**(Against All Defendants)**
**On Behalf of the Massachusetts Sub-Class**

25    326.    Plaintiffs, on behalf of the Massachusetts Sub-Class, hereby repeat and reallege

26    every foregoing allegation of fact.

27    327.    Chapter 137, Section 1 of the Massachusetts General Laws Annotated states that

28    "[w]hoever, by playing at cards, dice or other game, or by betting on the sides or hands of those

105

gaming . . . loses to a person so playing or betting money or goods, and pays or delivers the same or any part thereof to the winner, . . . may recover such money or the value of such goods in contract; and if he does not within three months after such loss, payment or delivery, without covin or collusion, prosecute such action with effect, any other person may sue for and recover in tort treble the value thereof."

328.    Members of the Massachusetts Sub-Class are spouses and/or children of persons who, while located in Massachusetts: (1) paid or delivered sums of money or other valuable goods to a VGW Casino; (2) bet, wagered, and gambled sums of money or other valuable goods on games of chance and gambling devices at a VGW Casino; (3) lost sums of money or other valuable property to a VGW Casino; and (4) have not successfully sued to recover those losses ("Massachusetts Gamblers").

329.    Upon information and belief, all Massachusetts Gamblers have not sued for and recovered their losses to Defendants, or had any other person successfully sue for and recover those losses.

330.    Accordingly, on behalf of the members of the Massachusetts Sub-Class, and pursuant to Mass. Gen. Laws Ann. ch. 137, § 1, Plaintiffs seek: (1) to recover all money or other things of value lost by Massachusetts Gamblers to a VGW Casino, statutory treble damages, costs, attorney's fees, and pre- and post-judgment interest; (2) injunctive and other equitable relief; and (3) any other relief deemed appropriate by the Court.

331.    The California Partners aid and abet VGW's violations of Massachusetts' anti-gambling statutes and are equally liable for the Massachusetts Gamblers' losses and related damages. Each of the California Partners knows that it is facilitating gambling at the VGW Casinos in Massachusetts. This facilitation includes knowingly: (1) soliciting and luring gamblers to the VGW Casinos with targeted customized advertisements, promotions, and enticements in their home states; (2) facilitating the gamblers' entry into the VGW Casinos; (3) connecting gamblers' financial accounts to the VGW Casinos; (4) transferring cash from gamblers' financial accounts to the VGW casinos, so gamblers can wager SC (and either lose those SC, or win SC that can be

1  redeemed dollar-for-dollar in cash); and/or (5) transferring the gamblers' cash winnings back to the

2  gamblers' financial accounts.

3      332.    The California Partners' services facilitate gambling at VGW's casinos—and are a

4  substantial and essential factor and cause in bringing that gambling about—because they are

5  directly tied to soliciting gamblers, verifying the gamblers' identities and locations, taking the

6  gamblers' money and facilitating the purchase of the GC/SC packages, and paying the gamblers

7  their SC winnings. Without these services, there would be no gamblers, and/or no gambling

8  transactions could be completed. In short, no gambling could occur. Thus, the California Partners

9  are also a but-for and proximate cause of the gamblers' losses, and the losses of the gamblers'

10 spouses and children. Indeed, the California Partners all know that the vast majority of people they

11 solicit, authorize, and/or transfer money for will (and did) lose all or most of their money to the

12 VGW Casinos. All the California Partners understand that slot machines and other casino games

13 have odds that favor the house, not the player. That is how VGW makes billions in revenue each

14 year—revenues that it uses to pay the California Partners, including the partner commissions to

15 Brian Christopher. It is also how VGW can afford to have record-breaking marketing budgets that

16 pay some of the biggest celebrities, gambling influencers, and companies in the world to not only

17 promote the VGW Casinos, but exploit their knowledge of their own customers, clients, followers,

18 listeners, and communities to do so. Each of the California Partners knowingly helped, and continue

19 to help, VGW enlist more and more people to lose money at the VGW Casinos.

20      333.    The California Partners' services therefore concern—and give substantial assistance

21 and encouragement to—VGW and its illegal gambling enterprise. The California Partners' services

22 are a substantial factor in causing the Plaintiffs' and Class Members' losses at the VGW Casinos

23 because: (1) no gambling can occur without them; and (2) Plaintiffs' and Class Members' spouses

24 or parents would not have gambled without them (and/or would have gambled substantially less

25 without them).

26      334.    During the entire relevant period, VGW has intentionally misrepresented the nature

27 of its gambling operations and fraudulently concealed the truth of its illegal gambling enterprise

28 from the spouses and children of Massachusetts Gamblers. Due to these intentional

107

misrepresentations and fraudulent concealments, these spouses and children did not and could not have reasonably discovered that VGW was operating an illegal casino under Massachusetts and federal law, despite the spouses' and children's reasonable due diligence.

**SEVENTH CAUSE OF ACTION**
**Violation of Miss. Code Ann. § 87-1-5**
**(Against All Defendants)**
**On Behalf of the Mississippi Sub-Class**

335.    Plaintiffs, including Plaintiff Cleveland Granderson individually, on behalf of the Illinois Sub-Class, hereby repeat and reallege every foregoing allegation of fact.

336.    Section 87-1-5 of the Annotated Mississippi Code states that "[i]f any person, by playing at any game whatever, or by betting on the sides or hands of such as do play at any game, . . . or by any wager whatever, shall lose any money, property, or other valuable thing, real or personal, and shall pay or deliver the same or any part thereof, the person so losing and paying or delivering the same, or his wife or children, may sue for and recover such money, property, or other valuable thing so lost and paid or delivered, or any part thereof, from the person knowingly receiving the same, with costs."

337.    Plaintiff Granderson and members of the Mississippi Sub-Class are spouses and/or children of persons who, while located in Mississippi: (1) paid or delivered sums of money, property, or other things of value to a VGW Casino; (2) bet, wagered, and gambled sums of money, property, or things of value on games of chance at a VGW Casino; (3) lost money, property, or things of value to a VGW Casino; and (4) have not successfully sued to recover those losses ("Mississippi Gamblers").

338.    Upon information and belief, all Mississippi Gamblers have not sued for and recovered their losses to Defendants, or had any other person successfully sue for and recover those losses.

339.    Accordingly, on behalf of himself and the Mississippi Sub-Class, and pursuant to Miss. Code Ann. § 87-1-5, Plaintiff Granderson seeks to recover: all money, property, or things of value lost by Mississippi Gamblers to a VGW Casino, pre- and post-judgment interest, statutory

1  costs, attorney's fees, statutory treble damages, and any other relief deemed appropriate by the

2  Court.

3       340.    The California Partners aid and abet VGW's violations of Mississippi's anti-

4  gambling statutes and are equally liable for the Mississippi Gamblers' losses and related damages.

5  Each of the California Partners knows that it is facilitating gambling at the VGW Casinos in

6  Mississippi. This facilitation includes knowingly: (1) soliciting and luring gamblers to the VGW

7  Casinos with targeted customized advertisements, promotions, and enticements in their home

8  states; (2) facilitating the gamblers' entry into the VGW Casinos; (3) connecting gamblers'

9  financial accounts to the VGW Casinos; (4) transferring cash from gamblers' financial accounts to

10  the VGW casinos, so gamblers can wager SC (and either lose those SC, or win SC that can be

11  redeemed dollar-for-dollar in cash); and/or (5) transferring the gamblers' cash winnings back to the

12  gamblers' financial accounts.

13       341.    The California Partners' services facilitate gambling at VGW's casinos—and are a

14  substantial and essential factor and cause in bringing that gambling about—because they are

15  directly tied to soliciting gamblers, verifying the gamblers' identities and locations, taking the

16  gamblers' money and facilitating the purchase of the GC/SC packages, and paying the gamblers

17  their SC winnings. Without these services, there would be no gamblers, and/or no gambling

18  transactions could be completed. In short, no gambling could occur. Thus, the California Partners

19  are also a but-for and proximate cause of the gamblers' losses, and the losses of the gamblers'

20  spouses and children. Indeed, the California Partners all know that the vast majority of people they

21  solicit, authorize, and/or transfer money for will (and did) lose all or most of their money to the

22  VGW Casinos. All the California Partners understand that slot machines and other casino games

23  have odds that favor the house, not the player. That is how VGW makes billions in revenue each

24  year—revenues that it uses to pay the California Partners, including the partner commissions to

25  Brian Christopher. It is also how VGW can afford to have record-breaking marketing budgets that

26  pay some of the biggest celebrities, gambling influencers, and companies in the world to not only

27  promote the VGW Casinos, but exploit their knowledge of their own customers, clients, followers,

28

COMPLAINT

listeners, and communities to do so. Each of the California Partners knowingly helped, and continue to help, VGW enlist more and more people to lose money at the VGW Casinos.

342.    The California Partners' services therefore concern—and give substantial assistance and encouragement to—VGW and its illegal gambling enterprise. The California Partners' services are a substantial factor in causing the Plaintiffs' and Class Members' losses at the VGW Casinos because: (1) no gambling can occur without them; and (2) Plaintiffs' and Class Members' spouses or parents would not have gambled without them (and/or would have gambled substantially less without them).

343.    During the entire relevant period, VGW has intentionally misrepresented the nature of its gambling operations and fraudulently concealed the truth of its illegal gambling enterprise from the spouses and children of Mississippi Gamblers. Due to these intentional misrepresentations and fraudulent concealments, these spouses and children did not and could not have reasonably discovered that VGW was operating an illegal casino under Mississippi and federal law, despite the spouses' and children's reasonable due diligence.

**EIGHTH CAUSE OF ACTION**
**Violation of Mo. Ann. Stat. §§ 434.030 and 434.040**
**(Against All Defendants)**
**On Behalf of the Missouri Class**

344.    Plaintiffs, including Plaintiffs Matthew Blatt and Zachary Parker individually, on behalf of the Missouri Sub-Class, hereby repeat and reallege every foregoing allegation of fact.

345.    Section 434.030 of the Annotated Missouri Statutes states that "[a]ny person who shall lose any money or property at any game, gambling device or by any bet or wager whatever, may recover the same by a civil action."

346.    Section 434.040 of the Annotated Missouri Statutes states that "[t]he heirs, executors, administrators, wife and creditors of the person losing, may have the same remedy against the winner as provided in section 434.030."

347.    Plaintiffs Blatt and Parker, and members of the Missouri Sub-Class, are spouses of persons who, while located in Missouri: (1) paid or delivered sums of money or other valuable property to a VGW Casino; (2) bet, wagered, and gambled sums of money or other valuable

110

property on games of chance and gambling devices at a VGW Casino; (3) lost sums of money or other valuable property to a VGW Casino; and (4) have not successfully sued to recover those losses ("Missouri Gamblers").

348.    Upon information and belief, all Missouri Gamblers have not sued for and recovered their losses to Defendants, or had any other person successfully sue for and recover those losses.

349.    Accordingly, on behalf of themselves and the Missouri Sub-Class, and pursuant to Mo. Ann. Stat. §§ 434.030 and 434.040, Plaintiffs and Plaintiffs Blatt and Parker seek: (1) to recover all money or other things of value lost by Missouri Gamblers to a VGW Casino, costs, attorney's fees, and pre- and post-judgment interest; (2) injunctive and other equitable relief; and (3) any other relief deemed appropriate by the Court.

350.    The California Partners aid and abet VGW's violations of Missouri's anti-gambling statutes and are equally liable for the Missouri Gamblers' losses and related damages. Each of the California Partners knows that it is facilitating gambling at the VGW Casinos in Missouri. This facilitation includes knowingly: (1) soliciting and luring gamblers to the VGW Casinos with targeted customized advertisements, promotions, and enticements in their home states; (2) facilitating the gamblers' entry into the VGW Casinos; (3) connecting gamblers' financial accounts to the VGW Casinos; (4) transferring cash from gamblers' financial accounts to the VGW casinos, so gamblers can wager SC (and either lose those SC, or win SC that can be redeemed dollar-for-dollar in cash); and/or (5) transferring the gamblers' cash winnings back to the gamblers' financial accounts.

351.    The California Partners' services facilitate gambling at VGW's casinos—and are a substantial and essential factor and cause in bringing that gambling about—because they are directly tied to soliciting gamblers, verifying the gamblers' identities and locations, taking the gamblers' money and facilitating the purchase of the GC/SC packages, and paying the gamblers their SC winnings. Without these services, there would be no gamblers, and/or no gambling transactions could be completed. In short, no gambling could occur. Thus, the California Partners are also a but-for and proximate cause of the gamblers' losses, and the losses of the gamblers' spouses and children. Indeed, the California Partners all know that the vast majority of people they

solicit, authorize, and/or transfer money for will (and did) lose all or most of their money to the VGW Casinos. All the California Partners understand that slot machines and other casino games have odds that favor the house, not the player. That is how VGW makes billions in revenue each year—revenues that it uses to pay the California Partners, including the partner commissions to Brian Christopher. It is also how VGW can afford to have record-breaking marketing budgets that pay some of the biggest celebrities, gambling influencers, and companies in the world to not only promote the VGW Casinos, but exploit their knowledge of their own customers, clients, followers, listeners, and communities to do so. Each of the California Partners knowingly helped, and continue to help, VGW enlist more and more people to lose money at the VGW Casinos.

352.    The California Partners' services therefore concern—and give substantial assistance and encouragement to—VGW and its illegal gambling enterprise. The California Partners' services are a substantial factor in causing the Plaintiffs' and Class Members' losses at the VGW Casinos because: (1) no gambling can occur without them; and (2) Plaintiffs' and Class Members' spouses or parents would not have gambled without them (and/or would have gambled substantially less without them).

353.    During the entire relevant period, VGW has intentionally misrepresented the nature of its gambling operations and fraudulently concealed the truth of its illegal gambling enterprise from the spouses and children of Missouri Gamblers. Due to these intentional misrepresentations and fraudulent concealments, these spouses and children did not and could not have reasonably discovered that VGW was operating an illegal casino under Missouri and federal law, despite the spouses' and children's reasonable due diligence.

**NINTH CAUSE OF ACTION**
**Violation of N.J. Stat. Ann. §§ 2A:40-1, 2A:40-5, and 2A:40-6**
**(Against All Defendants)**
**On Behalf of the New Jersey Sub-Class**

354.    Plaintiffs, on behalf of the New Jersey Sub-Class, hereby repeat and reallege every foregoing allegation of fact.

355.    Section 2A:40-5 of the New Jersey Statutes Annotated states that "[i]f any person shall lose any money, goods, chattels or other valuable thing, in violation of section 2A:40-1 of this

title, and shall pay or deliver the same or any part thereof to the winner, or to any person to his use, or to a stakeholder, such person may sue for and recover such money, or the value of such goods, chattels, or other valuable thing, from such winner, or from such depositary, or from such stakeholder, whether the same has been delivered or paid over by such stakeholder or not, in a civil action provided such action is brought within 6 calendar months after payment or delivery."

356.    Section 2A:40-1 of the New Jersey Statutes Annotated states that "[a]ll wagers, bets or stakes made to depend upon any race or game, or upon any gaming by lot or chance, or upon any lot, chance, casualty or unknown or contingent event, shall be unlawful."

357.    Section 2A:40-6 of the New Jersey Statutes Annotated states that "[i]f the person who shall lose and pay such money, or lose and deliver such thing or things as aforesaid [in section 2A:40-5], shall not, within the time aforesaid, without collusion, sue for the money or other thing or things so lost and paid, or delivered, any other person may sue for and recover the same, with costs of suit, from such winner, depositary or stakeholder as aforesaid; the one moiety thereof to the use of the person suing for the same, and the other moiety to the use of the state; provided the action is instituted within 6 calendar months from and after the expiration of the time limited in section 2A:40-5 of this title for the loser to sue for the same."

358.    Members of the New Jersey Sub-Class are spouses and/or children of persons who, while located in New Jersey: (1) paid or delivered sums of money, goods, chattel, or other things of value to a VGW Casino; (2) bet, wagered, and gambled sums of money, goods, chattel, or other things of value on games of chance at a VGW Casino; (3) lost sums of money, goods, chattel, or other things of value to a VGW Casino; and (4) have not successfully sued to recover those losses ("New Jersey Gamblers").

359.    Upon information and belief, all New Jersey Gamblers have not sued for and recovered their losses to Defendants, or had any other person successfully sue for and recover those losses.

360.    Accordingly, on behalf of the New Jersey Sub-Class, and pursuant to N.J. Stat. Ann. §§ 2A:40-1, 2A:40-5, and 2A:40-6, Plaintiffs seek (jointly on behalf of the New Jersey Sub-Class and the State of New Jersey): (1) to recover all money or other things of value lost by New Jersey

Gamblers to a VGW Casino, statutory costs, attorney's fees, and pre- and post-judgment interest; (2) injunctive and other equitable relief; and (3) any other relief deemed appropriate by the Court.

361.    The California Partners aid and abet VGW's violations of New Jersey's anti-gambling statutes and are equally liable for the New Jersey Gamblers' losses and related damages. Each of the California Partners knows that it is facilitating gambling at the VGW Casinos in New Jersey. This facilitation includes knowingly: (1) soliciting and luring gamblers to the VGW Casinos with targeted customized advertisements, promotions, and enticements in their home states; (2) facilitating the gamblers' entry into the VGW Casinos; (3) connecting gamblers' financial accounts to the VGW Casinos; (4) transferring cash from gamblers' financial accounts to the VGW casinos, so gamblers can wager SC (and either lose those SC, or win SC that can be redeemed dollar-for-dollar in cash); and/or (5) transferring the gamblers' cash winnings back to the gamblers' financial accounts.

362.    The California Partners' services facilitate gambling at VGW's casinos—and are a substantial and essential factor and cause in bringing that gambling about—because they are directly tied to soliciting gamblers, verifying the gamblers' identities and locations, taking the gamblers' money and facilitating the purchase of the GC/SC packages, and paying the gamblers their SC winnings. Without these services, there would be no gamblers, and/or no gambling transactions could be completed. In short, no gambling could occur. Thus, the California Partners are also a but-for and proximate cause of the gamblers' losses, and the losses of the gamblers' spouses and children. Indeed, the California Partners all know that the vast majority of people they solicit, authorize, and/or transfer money for will (and did) lose all or most of their money to the VGW Casinos. All the California Partners understand that slot machines and other casino games have odds that favor the house, not the player. That is how VGW makes billions in revenue each year—revenues that it uses to pay the California Partners, including the partner commissions to Brian Christopher. It is also how VGW can afford to have record-breaking marketing budgets that pay some of the biggest celebrities, gambling influencers, and companies in the world to not only promote the VGW Casinos, but exploit their knowledge of their own customers, clients, followers,

listeners, and communities to do so. Each of the California Partners knowingly helped, and continue to help, VGW enlist more and more people to lose money at the VGW Casinos.

363.    The California Partners' services therefore concern—and give substantial assistance and encouragement to—VGW and its illegal gambling enterprise. The California Partners' services are a substantial factor in causing the Plaintiffs' and Class Members' losses at the VGW Casinos because: (1) no gambling can occur without them; and (2) Plaintiffs' and Class Members' spouses or parents would not have gambled without them (and/or would have gambled substantially less without them).

364.    During the entire relevant period, VGW has intentionally misrepresented the nature of its gambling operations and fraudulently concealed the truth of its illegal gambling enterprise from the spouses and children of New Jersey Gamblers. Due to these intentional misrepresentations and fraudulent concealments, these spouses and children did not and could not have reasonably discovered that VGW was operating an illegal casino under New Jersey and federal law, despite the spouses' and children's reasonable due diligence.

**TENTH CAUSE OF ACTION**
**Violation of N.M. Stat. Ann. § 44-5-1 and 44-5-3**
**(Against All Defendants)**
**On Behalf of the New Mexico Sub-Class**

365.    Plaintiffs, on behalf of the New Mexico Sub-Class, hereby repeat and reallege every foregoing allegation of fact.

366.    Section 44-5-1 of the New Mexico Statutes Annotated states that "[a]ny person who shall lose any money or property at any game at cards, or at any gambling device, may recover the same by action of debt, if money; if property, by action of trover, replevin or detinue."

367.    Section 44-5-3 of the New Mexico Statutes Annotated states that "[t]he spouse, children, heirs, executors, administrators and creditors of the person losing may have the same remedy against the winner."

368.    Members of the New Mexico Sub-Class are spouses and/or children of persons who, while located in New Mexico: (1) paid or delivered sums of money or property to a VGW Casino; (2) bet, wagered, and gambled sums of money or property on games of chance and gambling

devices at a VGW Casino; (3) lost sums of money or property to a VGW Casino; and (4) have not successfully sued to recover those losses ("New Mexico Gamblers").

369.    Upon information and belief, all New Mexico Gamblers have not sued for and recovered their losses to Defendants, or had any other person successfully sue for and recover those losses.

370.    Accordingly, on behalf of the New Mexico Sub-Class, and pursuant to N.M. Stat. Ann. § 44-5-1 and 44-5-3, Plaintiffs seek: (1) to recover all money or other things of value lost by New Mexico Gamblers to a VGW Casino, costs, attorney's fees, and pre- and post-judgment interest; (2) injunctive and other equitable relief; and (3) any other relief deemed appropriate by the Court.

371.    The California Partners aid and abet VGW's violations of New Mexico's anti-gambling statutes and are equally liable for the New Mexico Gamblers' losses and related damages. Each of the California Partners knows that it is facilitating gambling at the VGW Casinos in New Mexico. This facilitation includes knowingly: (1) soliciting and luring gamblers to the VGW Casinos with targeted customized advertisements, promotions, and enticements in their home states; (2) facilitating the gamblers' entry into the VGW Casinos; (3) connecting gamblers' financial accounts to the VGW Casinos; (4) transferring cash from gamblers' financial accounts to the VGW casinos, so gamblers can wager SC (and either lose those SC, or win SC that can be redeemed dollar-for-dollar in cash); and/or (5) transferring the gamblers' cash winnings back to the gamblers' financial accounts.

372.    The California Partners' services facilitate gambling at VGW's casinos—and are a substantial and essential factor and cause in bringing that gambling about—because they are directly tied to soliciting gamblers, verifying the gamblers' identities and locations, taking the gamblers' money and facilitating the purchase of the GC/SC packages, and paying the gamblers their SC winnings. Without these services, there would be no gamblers, and/or no gambling transactions could be completed. In short, no gambling could occur. Thus, the California Partners are also a but-for and proximate cause of the gamblers' losses, and the losses of the gamblers' spouses and children. Indeed, the California Partners all know that the vast majority of people they

solicit, authorize, and/or transfer money for will (and did) lose all or most of their money to the VGW Casinos. All the California Partners understand that slot machines and other casino games have odds that favor the house, not the player. That is how VGW makes billions in revenue each year—revenues that it uses to pay the California Partners, including the partner commissions to Brian Christopher. It is also how VGW can afford to have record-breaking marketing budgets that pay some of the biggest celebrities, gambling influencers, and companies in the world to not only promote the VGW Casinos, but exploit their knowledge of their own customers, clients, followers, listeners, and communities to do so. Each of the California Partners knowingly helped, and continue to help, VGW enlist more and more people to lose money at the VGW Casinos.

373.    The California Partners' services therefore concern—and give substantial assistance and encouragement to—VGW and its illegal gambling enterprise. The California Partners' services are a substantial factor in causing the Plaintiffs' and Class Members' losses at the VGW Casinos because: (1) no gambling can occur without them; and (2) Plaintiffs' and Class Members' spouses or parents would not have gambled without them (and/or would have gambled substantially less without them).

374.    During the entire relevant period, VGW has intentionally misrepresented the nature of its gambling operations and fraudulently concealed the truth of its illegal gambling enterprise from the spouses and children of New Mexico Gamblers. Due to these intentional misrepresentations and fraudulent concealments, these spouses and children did not and could not have reasonably discovered that VGW was operating an illegal casino under New Mexico and federal law, despite the spouses' and children's reasonable due diligence.

### ELEVENTH CAUSE OF ACTION
**Violation of Ohio Rev. Code Ann. §§ 3763.02 and 3763.04**
**(Against All Defendants)**
**On Behalf of the Ohio Sub-Class**

375.    Plaintiffs, including Plaintiff Karim Laury individually, on behalf of the Ohio Sub-Class, hereby repeat and reallege every foregoing allegation of fact.

376.    Section 3763.02 of the Ohio Revised Code states that "[i]f a person, by playing a game, or by a wager, loses to another, money or other thing of value, and pays or delivers it or a

COMPLAINT

part thereof, to the winner thereof, such person losing and paying or delivering, within six months after such loss and payment or delivery, may sue for and recover such money or thing of value or part thereof, from the winner thereof, with costs of suit."

377.    Section 3763.04 of the Ohio Revised Code states that "[i]f a person losing money or thing of value, as provided in section 3763.02 of the Revised Code, within the time therein specified, and without collusion or deceit, does not sue, and effectively prosecute, for such money or thing of value, any person may sue for and recover it, with costs of suit, against such winner, for the use of such person prosecuting such suit."

378.    Plaintiff Laury and members of the Ohio Sub-Class are spouses and/or children of persons who, while located in Ohio: (1) paid or delivered money or things of value to a VGW Casino; (2) played or wagered money or things of value on games of chance at a VGW Casino; (3) lost the money or things of value to a VGW Casino; and (4) have not successfully sued to recover those losses ("Ohio Gamblers").

379.    Upon information and belief, all Ohio Gamblers have not sued for and recovered their losses to Defendants, or had any other person successfully sue for and recover those losses.

380.    Accordingly, on behalf of himself and the Ohio Sub-Class, and pursuant to Ohio Rev. Code Ann. § 3763.04, Plaintiffs and Plaintiff Laury seek: (1) to recover all money or other things of value lost by Ohio Gamblers to a VGW Casino, statutory costs, attorney's fees, and pre- and post-judgment interest; (2) injunctive and other equitable relief; and (3) any other relief deemed appropriate by the Court.

381.    The California Partners aid and abet VGW's violations of Ohio's anti-gambling statutes and are equally liable for the Ohio Gamblers' losses and related damages. Each of the California Partners knows that it is facilitating gambling at the VGW Casinos in Ohio. This facilitation includes knowingly: (1) soliciting and luring gamblers to the VGW Casinos with targeted customized advertisements, promotions, and enticements in their home states; (2) facilitating the gamblers' entry into the VGW Casinos; (3) connecting gamblers' financial accounts to the VGW Casinos; (4) transferring cash from gamblers' financial accounts to the VGW casinos, so gamblers can wager SC (and either lose those SC, or win SC that can be redeemed dollar-for-

dollar in cash); and/or (5) transferring the gamblers' cash winnings back to the gamblers' financial accounts.

382.    The California Partners' services facilitate gambling at VGW's casinos—and are a substantial and essential factor and cause in bringing that gambling about—because they are directly tied to soliciting gamblers, verifying the gamblers' identities and locations, taking the gamblers' money and facilitating the purchase of the GC/SC packages, and paying the gamblers their SC winnings. Without these services, there would be no gamblers, and/or no gambling transactions could be completed. In short, no gambling could occur. Thus, the California Partners are also a but-for and proximate cause of the gamblers' losses, and the losses of the gamblers' spouses and children. Indeed, the California Partners all know that the vast majority of people they solicit, authorize, and/or transfer money for will (and did) lose all or most of their money to the VGW Casinos. All the California Partners understand that slot machines and other casino games have odds that favor the house, not the player. That is how VGW makes billions in revenue each year—revenues that it uses to pay the California Partners, including the partner commissions to Brian Christopher. It is also how VGW can afford to have record-breaking marketing budgets that pay some of the biggest celebrities, gambling influencers, and companies in the world to not only promote the VGW Casinos, but exploit their knowledge of their own customers, clients, followers, listeners, and communities to do so. Each of the California Partners knowingly helped, and continue to help, VGW enlist more and more people to lose money at the VGW Casinos.

383.    The California Partners' services therefore concern—and give substantial assistance and encouragement to—VGW and its illegal gambling enterprise. The California Partners' services are a substantial factor in causing the Plaintiffs' and Class Members' losses at the VGW Casinos because: (1) no gambling can occur without them; and (2) Plaintiffs' and Class Members' spouses or parents would not have gambled without them (and/or would have gambled substantially less without them).

384.    During the entire relevant period, VGW has intentionally misrepresented the nature of its gambling operations and fraudulently concealed the truth of its illegal gambling enterprise from the spouses and children of Ohio Gamblers. Due to these intentional misrepresentations and

COMPLAINT

fraudulent concealments, these spouses and children did not and could not have reasonably discovered that VGW was operating an illegal casino under Ohio and federal law, despite the spouses' and children's reasonable due diligence.

## TWELFTH CAUSE OF ACTION
### Violation of S.C. Code Ann. §§ 32-1-10 and 32-1-20
### (Against All Defendants)
### On Behalf of the South Carolina Sub-Class

385.    Plaintiffs, on behalf of the South Carolina Sub-Class, hereby repeat and reallege every foregoing allegation of fact.

386.    Section 32-1-10 of the Code of Laws of South Carolina 1976 Annotated states that "[a]ny person who shall at any time or sitting, by playing at cards, dice table or any other game whatsoever or by betting on the sides or hands of such as do play at any of the games aforesaid, lose to any person or persons so playing or betting, in the whole, the sum or value of fifty dollars and shall pay or deliver such sum or value or any part thereof shall be at liberty, within three months then next ensuing, to sue for and recover the money or goods so lost and paid or delivered or any part thereof from the respective winner or winners thereof, with costs of suit, by action to be prosecuted in any court of competent jurisdiction."

387.    Section 32-1-20 of the Code of Laws of South Carolina 1976 Annotated states that "[i]n case any person who shall lose such money or other thing as aforesaid shall not, within the time aforesaid, really and bona fide and without covin or collusion sue and with effect prosecute for the money or other things so by him or them lost and paid and delivered as aforesaid, it shall be lawful for any other person, by any such action or suit as aforesaid, to sue for and recover the same and treble the value thereof, with costs of suit, against such winner or winners as aforesaid, the one moiety thereof to the use of the person that will sue for the same and the other moiety to the use of the county in which the offense shall have been committed."

388.    Members of the South Carolina Sub-Class are spouses and/or children of persons who, while located in South Carolina: (1) paid or delivered money, goods, or other things of value to a VGW Casino; (2) played or wagered money, goods, or other things of value on games of chance

120

at a VGW Casino; (3) lost money, goods, or other things of value worth $50 or more to a VGW Casino; and (4) have not successfully sued to recover those losses ("South Carolina Gamblers").

389.    Upon information and belief, all South Carolina Gamblers have not sued for and recovered their losses to Defendants, or had any other person successfully sue for and recover those losses.

390.    Accordingly, on behalf of the South Carolina Sub-Class (and for the joint benefit of the spouses and children of South Carolina Gamblers and the county in which each gambler resides), and pursuant to S.C. Code Ann. §§ 32-1-10 and 32-1-20, Plaintiffs seek: (1) to recover all money, goods, or other things of value lost by South Carolina Gamblers to a VGW Casino, statutory treble damages, statutory costs, attorney's fees, and pre- and post-judgment interest; (2) injunctive and other equitable relief; and (3) any other relief deemed appropriate by the Court.

391.    The California Partners aid and abet VGW's violations of South Carolina's anti-gambling statutes and are equally liable for the South Carolina Gamblers' losses and related damages. Each of the California Partners knows that it is facilitating gambling at the VGW Casinos in South Carolina. This facilitation includes knowingly: (1) soliciting and luring gamblers to the VGW Casinos with targeted customized advertisements, promotions, and enticements in their home states; (2) facilitating the gamblers' entry into the VGW Casinos; (3) connecting gamblers' financial accounts to the VGW Casinos; (4) transferring cash from gamblers' financial accounts to the VGW casinos, so gamblers can wager SC (and either lose those SC, or win SC that can be redeemed dollar-for-dollar in cash); and/or (5) transferring the gamblers' cash winnings back to the gamblers' financial accounts.

392.    The California Partners' services facilitate gambling at VGW's casinos—and are a substantial and essential factor and cause in bringing that gambling about—because they are directly tied to soliciting gamblers, verifying the gamblers' identities and locations, taking the gamblers' money and facilitating the purchase of the GC/SC packages, and paying the gamblers their SC winnings. Without these services, there would be no gamblers, and/or no gambling transactions could be completed. In short, no gambling could occur. Thus, the California Partners are also a but-for and proximate cause of the gamblers' losses, and the losses of the gamblers'

spouses and children. Indeed, the California Partners all know that the vast majority of people they solicit, authorize, and/or transfer money for will (and did) lose all or most of their money to the VGW Casinos. All the California Partners understand that slot machines and other casino games have odds that favor the house, not the player. That is how VGW makes billions in revenue each year—revenues that it uses to pay the California Partners, including the partner commissions to Brian Christopher. It is also how VGW can afford to have record-breaking marketing budgets that pay some of the biggest celebrities, gambling influencers, and companies in the world to not only promote the VGW Casinos, but exploit their knowledge of their own customers, clients, followers, listeners, and communities to do so. Each of the California Partners knowingly helped, and continue to help, VGW enlist more and more people to lose money at the VGW Casinos.

393.    The California Partners' services therefore concern—and give substantial assistance and encouragement to—VGW and its illegal gambling enterprise. The California Partners' services are a substantial factor in causing the Plaintiffs' and Class Members' losses at the VGW Casinos because: (1) no gambling can occur without them; and (2) Plaintiffs' and Class Members' spouses or parents would not have gambled without them (and/or would have gambled substantially less without them).

394.    During the entire relevant period, VGW has intentionally misrepresented the nature of its gambling operations and fraudulently concealed the truth of its illegal gambling enterprise from the spouses and children of South Carolina Gamblers. Due to these intentional misrepresentations and fraudulent concealments, these spouses and children did not and could not have reasonably discovered that VGW was operating an illegal casino under South Carolina and federal law, despite the spouses' and children's reasonable due diligence.

### THIRTEENTH CAUSE OF ACTION
**Violation of Tenn. Code Ann. §§ 29-19-104 and 29-19-105**
**(Against All Defendants)**
**On Behalf of the Tennessee Sub-Class**

395.    Plaintiffs, including Plaintiff Eve Fields individually, on behalf of the Tennessee Sub-Class, hereby repeat and reallege every foregoing allegation of fact.

COMPLAINT

396.    Section 29-19-104 of the Tennessee Code states that "[a]ny person who has paid any money, or delivered anything of value, lost upon any game or wager, may recover such money, thing, or its value, by action commenced within ninety (90) days from the time of such payment or delivery."

397.    Section 29-19-105 of the Tennessee Code states that "[a]ny other person may, after the expiration of the ninety (90) days, and within twelve (12) months thereafter, recover the amount of such money, thing, or its value, by action for the use of the spouse; or, if no spouse, the child or children; and, if no child or children, the next of kin of the loser."

398.    Plaintiff Fields and members of the Tennessee Sub-Class are spouses and/or children of persons who, while located in Tennessee: (1) paid or delivered money or things of value to a VGW Casino; (2) played or wagered money or things of value on games of chance at a VGW Casino; (3) lost money or things of value to a VGW Casino; and (4) have not successfully sued to recover those losses ("Tennessee Gamblers").

399.    Upon information and belief, all Tennessee Gamblers have not sued for and recovered their losses to Defendants, or had any other person successfully sue for and recover those losses.

400.    Accordingly, on behalf of themselves and the Tennessee Sub-Class, and pursuant to Tenn. Code Ann. §§ 29-19-104 and 29-19-105, Plaintiffs and Plaintiff Fields seek: (1) to recover all money or other things of value lost by Tennessee Gamblers to a VGW Casino, costs, attorney's fees, and pre- and post-judgment interest; (2) injunctive and other equitable relief; and (3) any other relief deemed appropriate by the Court.

401.    The California Partners aid and abet VGW's violations of Tennessee's anti-gambling statutes and are equally liable for the Tennessee Gamblers' losses and related damages. Each of the California Partners knows that it is facilitating gambling at the VGW Casinos in Tennessee. This facilitation includes knowingly: (1) soliciting and luring gamblers to the VGW Casinos with targeted customized advertisements, promotions, and enticements in their home states; (2) facilitating the gamblers' entry into the VGW Casinos; (3) connecting gamblers' financial accounts to the VGW Casinos; (4) transferring cash from gamblers' financial accounts to

the VGW casinos, so gamblers can wager SC (and either lose those SC, or win SC that can be redeemed dollar-for-dollar in cash); and/or (5) transferring the gamblers' cash winnings back to the gamblers' financial accounts.

402.    The California Partners' services facilitate gambling at VGW's casinos—and are a substantial and essential factor and cause in bringing that gambling about—because they are directly tied to soliciting gamblers, verifying the gamblers' identities and locations, taking the gamblers' money and facilitating the purchase of the GC/SC packages, and paying the gamblers their SC winnings. Without these services, there would be no gamblers, and/or no gambling transactions could be completed. In short, no gambling could occur. Thus, the California Partners are also a but-for and proximate cause of the gamblers' losses, and the losses of the gamblers' spouses and children. Indeed, the California Partners all know that the vast majority of people they solicit, authorize, and/or transfer money for will (and did) lose all or most of their money to the VGW Casinos. All the California Partners understand that slot machines and other casino games have odds that favor the house, not the player. That is how VGW makes billions in revenue each year—revenues that it uses to pay the California Partners, including the partner commissions to Brian Christopher. It is also how VGW can afford to have record-breaking marketing budgets that pay some of the biggest celebrities, gambling influencers, and companies in the world to not only promote the VGW Casinos, but exploit their knowledge of their own customers, clients, followers, listeners, and communities to do so. Each of the California Partners knowingly helped, and continue to help, VGW enlist more and more people to lose money at the VGW Casinos.

403.    The California Partners' services therefore concern—and give substantial assistance and encouragement to—VGW and its illegal gambling enterprise. The California Partners' services are a substantial factor in causing the Plaintiffs' and Class Members' losses at the VGW Casinos because: (1) no gambling can occur without them; and (2) Plaintiffs' and Class Members' spouses or parents would not have gambled without them (and/or would have gambled substantially less without them).

404.    During the entire relevant period, VGW has intentionally misrepresented the nature of its gambling operations and fraudulently concealed the truth of its illegal gambling enterprise

1    from the spouses and children of Tennessee Gamblers. Due to these intentional misrepresentations

2    and fraudulent concealments, these spouses and children did not and could not have reasonably

3    discovered that VGW was operating an illegal casino under Tennessee and federal law, despite the

4    spouses' and children's reasonable due diligence.

**FOURTEENTH CAUSE OF ACTION**
**Violation of Wis. Stat. Ann. § 895.056**
**(Against All Defendants)**
**On Behalf of the Wisconsin Sub-Class**

8    405.    Plaintiffs, on behalf of the Wisconsin Sub-Class, hereby repeat and reallege every

9    foregoing allegation of fact.

10    406.    Section 895.056(3) of the Wisconsin Statutes Annotated states that "[a] wagerer

11    may, within 6 months after any delivery by the wagerer or the stakeholder of the property put up,

12    staked or deposited, sue for and recover the property from the winner thereof if the property has

13    been delivered over to the winner. . . . If the wagerer does not sue for and recover the property,

14    which was put up, staked or deposited, within the time specified . . . any other person may, in the

15    person's behalf and the person's name, sue for and recover the property for the use and benefit of

16    the wagerer's family or heirs, in case of the wagerer's death. The suit may be brought against . . . .

17    [t]he winner of the property, within one year from the delivery of the property to the winner."

18    407.    Under Section 895.056(1)(b), a "wagerer" is "any person who, by playing at any

19    game or by betting or wagering on any game, election, horse or other race, ball playing, cock

20    fighting, fight, sport or pastime or on the issue or event thereof, or on any future contingent or

21    unknown occurrence or result in respect to anything whatever, shall have put up, staked or

22    deposited any property with any stakeholder or 3rd person, or shall have lost and delivered any

23    property to any winner thereof."

24    408.    Further, Section 895.056(1)(a) states that "property" includes "money, property or

25    [any] thing in action."

26    409.    Members of the Wisconsin Sub-Class are spouses and/or children of persons who,

27    while located in Wisconsin: (1) paid or delivered money, property, or things of value to a VGW

28

COMPLAINT

Casino; (2) played or wagered money, property, or things of value on games of chance at a VGW Casino; (3) lost money, property, or things of value to a VGW Casino; and (4) have not successfully sued to recover those losses ("Wisconsin Gamblers").

410.    Upon information and belief, all Wisconsin Gamblers have not sued for and recovered their losses to Defendants, or had any other person successfully sue for and recover those losses.

411.    Accordingly, on behalf of the Wisconsin Sub-Class (and in the Wisconsin Gamblers' names and for the benefit of their spouses and children), and pursuant to Wis. Stat. Ann. § 895.056, Plaintiffs seek: (1) to recover all money, property, or other things of value lost by Wisconsin Gamblers to a VGW Casino, costs, attorney's fees, and pre- and post-judgment interest; (2) injunctive and other equitable relief; and (3) any other relief deemed appropriate by the Court.

412.    The California Partners aid and abet VGW's violations of Wisconsin's anti-gambling statutes and are equally liable for the Wisconsin Gamblers' losses and related damages. Each of the California Partners knows that it is facilitating gambling at the VGW Casinos in Wisconsin. This facilitation includes knowingly: (1) soliciting and luring gamblers to the VGW Casinos with targeted customized advertisements, promotions, and enticements in their home states; (2) facilitating the gamblers' entry into the VGW Casinos; (3) connecting gamblers' financial accounts to the VGW Casinos; (4) transferring cash from gamblers' financial accounts to the VGW casinos, so gamblers can wager SC (and either lose those SC, or win SC that can be redeemed dollar-for-dollar in cash); and/or (5) transferring the gamblers' cash winnings back to the gamblers' financial accounts.

413.    The California Partners' services facilitate gambling at VGW's casinos—and are a substantial and essential factor and cause in bringing that gambling about—because they are directly tied to soliciting gamblers, verifying the gamblers' identities and locations, taking the gamblers' money and facilitating the purchase of the GC/SC packages, and paying the gamblers their SC winnings. Without these services, there would be no gamblers, and/or no gambling transactions could be completed. In short, no gambling could occur. Thus, the California Partners are also a but-for and proximate cause of the gamblers' losses, and the losses of the gamblers'

126

spouses and children. Indeed, the California Partners all know that the vast majority of people they solicit, authorize, and/or transfer money for will (and did) lose all or most of their money to the VGW Casinos. All the California Partners understand that slot machines and other casino games have odds that favor the house, not the player. That is how VGW makes billions in revenue each year—revenues that it uses to pay the California Partners, including the partner commissions to Brian Christopher. It is also how VGW can afford to have record-breaking marketing budgets that pay some of the biggest celebrities, gambling influencers, and companies in the world to not only promote the VGW Casinos, but exploit their knowledge of their own customers, clients, followers, listeners, and communities to do so. Each of the California Partners knowingly helped, and continue to help, VGW enlist more and more people to lose money at the VGW Casinos.

414. The California Partners' services therefore concern—and give substantial assistance and encouragement to—VGW and its illegal gambling enterprise. The California Partners' services are a substantial factor in causing the Plaintiffs' and Class Members' losses at the VGW Casinos because: (1) no gambling can occur without them; and (2) Plaintiffs' and Class Members' spouses or parents would not have gambled without them (and/or would have gambled substantially less without them).

415. During the entire relevant period, VGW has intentionally misrepresented the nature of its gambling operations and fraudulently concealed the truth of its illegal gambling enterprise from the spouses and children of Wisconsin Gamblers. Due to these intentional misrepresentations and fraudulent concealments, these spouses and children did not and could not have reasonably discovered that VGW was operating an illegal casino under Wisconsin and federal law, despite the spouses' and children's reasonable due diligence.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully seek an order:

A. Certifying this case as a class action;

B. Appointing Plaintiffs as class representatives of the proposed Multi-State Class, Missouri Class, and/or their respective Sub-Classes;

C. Appointing Susman Godfrey L.L.P. as lead class counsel representing the Multi-

State Class, Missouri Class, and each Sub-Class;

      D.     Entering judgment for Plaintiffs, Multi-State Class Members, Missouri Class Members, and the members of each Sub-Class;

      E.     Awarding Plaintiffs, Multi-State Class Members, Missouri Class Members, and the members of each Sub-Class compensatory damages, restitution, disgorgement, statutory damages, statutory penalties, and statutory treble or exemplary damages, in amounts to be determined, as appropriate and as allowed by law;

      F.     Awarding injunctive relief, including non-monetary relief and all such other legal, specific, or equitable relief as the Court deems proper;

      G.     Awarding pre- and post-judgment interest according to law;

      H.     Awarding attorneys' fees and costs as required or permitted by law; and

      I.     Granting such further and other relief as may be just and proper.

### **JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated:  August 20, 2025                 */s/ Bryan Caforio*

                                      Bryan Caforio
                                      Krysta Kauble Pachman
                                      Erik L. Wilson
                                        Julian Schneider
                                      **SUSMAN GODFREY L.L.P.**
                                      1900 Avenue of the Stars, Suite 1400
                                      Los Angeles, California 90067-6029
                                      Tel: (310) 789-3100
                                      bcaforio@susmangodfrey.com
                                      kpachman@susmangodfrey.com
                                      ewilson@susmangodfrey.com
                                      jschneider@susmangodfrey.com

                                      *Counsel for Plaintiffs*

COMPLAINT

1

## **JURY DEMAND**

Pursuant to Fed. R. Civ. P. 38(b), plaintiff demands trial by jury of all of the claims asserted in this complaint so triable.

Dated:  August 20, 2025                    */s/ Bryan Caforio*

Bryan Caforio
Krysta Kauble Pachman
Erik L. Wilson
Julian Schneider
**SUSMAN GODFREY L.L.P.**
1900 Avenue of the Stars, Suite 1400
Los Angeles, California 90067-6029
Tel: (310) 789-3100
bcaforio@susmangodfrey.com
kpachman@susmangodfrey.com
ewilson@susmangodfrey.com
jschneider@susmangodfrey.com

*Counsel for Plaintiffs*

COMPLAINT