UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JOHN BROWN, et al.,
Plaintiffs,
v.
VGW HOLDINGS US INC., et al.,
Defendants.

Case No. 25-cv-07071-AMO

**ORDER RE DEFENDANTS' MOTION TO COMPEL ARBITRATION AND MOTION TO DISMISS**

Re: Dkt. Nos. 38, 39

Plaintiffs John Brown, Trena Ostlund, Zachary Parker, and Eve Fields bring this putative class action against Defendants VGW Holdings US Inc.; VGW US, Inc.; VGW LuckyLand Inc.; Laurence Escalante; VGW Holdings Limited; VGW Malta Holding Limited; VGW Malta Limited; VGW Games Limited; VGW GP Limited (collectively "VGW Defendants"); and Jumio Corporation; Yodlee, Inc.; Trustly, Inc.; and Brian Christopher Misfud (collectively "Partner Defendants").[1] Plaintiffs allege the VGW Defendants, in coordination with the Partner Defendants, operate illegal online gambling applications, and seek to reclaim monetary losses from use of these applications under various state statutes.

Defendants move to compel arbitration, or in the alternative, move to dismiss the Complaint for lack of subject-matter jurisdiction and lack of personal jurisdiction. The Court initially held a hearing on May 7, 2026, and requested supplemental briefing on the motion to compel arbitration. Pursuant to Federal Rule of Civil Procedure 78(b) and Civil Local Rule 7-1(b), the Court finds this motion appropriate for decision without further oral argument. Having considered the parties' submissions, the Court **DENIES** Defendants' motion to compel arbitration

[1] Plaintiffs Cleveland Granderson, Matthew Blatt, and Karim Laury have voluntarily dismissed their claims without prejudice. *See* Dkt. No. 37.

United States District Court
Northern District of California

United States District Court
Northern District of California

and **DENIES** the motion to dismiss for lack of subject-matter jurisdiction. Further, the Court **DENIES** Defendants' motion to dismiss for lack of personal jurisdiction.

**FACTUAL ALLEGATIONS**[2]

The VGW Defendants operate the applications Chumba Casino, LuckyLand Slots, and Global Poker. Dkt. No. 1 ¶ 108.[3] Players can access these applications online through a website, mobile phone, or computer application. *Id.* ¶ 111. The Chumba Casino app allows players "to play over 200 slot machines and various casino table games like blackjack, roulette, and craps." *Id.* LuckyLand Slots permits players to operate more than 100 virtual slot machines. *Id.* Global Poker provides players with access to "various poker games, slot machines, table games like blackjack and baccarat, and many other casino games." *Id.* Once players sign up with one of these apps, they "can spend real money to buy virtual casino chip coins that can be used to play these casino games." *Id.*

Within the apps, players utilize a "two-coin system." *Id.* ¶ 113. Gold Coins ("GC") can be used for in-app gameplay but cannot be redeemed for cash. *Id.* Sweepstakes Coins ("SC") can be redeemed for $1. *Id.* Whenever a player purchases GC, the player "also receives at least the amount they paid in SC." *Id.* ¶ 116. For example, if a player "deposits $300 at Chumba, they will receive millions of unredeemable GC and $315 worth of cash-redeemable SC . . . ." *Id.* The games themselves "are based entirely or predominately on chance, not skill." *Id.* ¶ 118. "A wager is placed on the outcome of a game, and the outcome of that game is determined by randomizing algorithms (random/pseudorandom number generators) whose outputs cannot be controlled by either party." *Id.*

Plaintiffs further allege the VGW Defendants advertise their apps as "gambling." *Id.* ¶ 135. For instance, the VGW Defendants allegedly stated in a press release that the company: "develops and operates proprietary technology in real money gaming"; the VGW Defendants are

---

[2] This section comprises the well-pleaded allegations from the Complaint, which are taken as true and viewed in the light most favorable to Plaintiffs for the purpose of the instant motion. *See Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

[3] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

United States District Court
Northern District of California

"targeting . . . the unrealised United States real-money gaming market"; and that VGW's "[s]weepstakes gameplay entails [] real money, online gaming" in the United States, "where [real money] online gaming is largely prohibited." *Id.* ¶ 136 (alterations in original). Using Google Ads, Sirius XM, and Reddit, the VGW Defendants allegedly targeted potential players in specific states to increase usage of the apps. *Id.* ¶¶ 142-47. Additionally, the VGW Defendants allegedly sent unsolicited offers to players regarding prepaid Mastercard debit cards. *Id.* ¶¶ 148-54. Per the Complaint, the VGW Defendants targeted their advertisements to players and potential players in only certain states because the VGW apps "either do not operate in, have been made illegal in, or have been shut down by state governments in a significant number of states." *Id.* ¶ 157.

As part of the VGW Defendants' advertising efforts, Plaintiffs aver the VGW Defendants worked with promoters in California. Specifically, the VGW Defendants worked with celebrity Ryan Seacrest and Defendant Brian Christopher Misfud. *Id.* ¶¶ 160, 183. Seacrest is well known as the former host of the television series *American Idol*, as well as the current host of *Wheel of Fortune*, *Live With Kelly and Ryan*, and *Dick Clark's New Year's Rockin' Eve*, among others. *Id.* ¶ 160. As alleged:

> advertisements featuring Mr. Seacrest are filmed, produced, and/or disseminated in, from, and through California. Mr. Seacrest's work is performed in California, as is the work for his various companies which are also involved in filming, producing, and/or disseminating these advertisements from California.

*Id.* ¶ 182.

Defendant Misfud is well known on various social media platforms for posting "videos of himself playing, analyzing, and recommending slot machines . . . ." *Id.* ¶ 184. Plaintiffs allege Misfud's channels include "more than 2 million global subscribers and 50 million monthly global video views," and purports to be "the most famous ***gambling influencer*** in the world." *Id.* (alterations in original). Through the alleged partnership, Misfud's social media platforms provide links to websites for the VGW Defendants' apps for prospective players to sign up. *Id.* ¶ 188. Further, Misfud operates a social media channel called "BCSpins" dedicated to the Chumba Casino and LuckyLand Slots apps, and offers "livestream slot tournaments to his followers and other viewers." *Id.* ¶ 190-92. During these livestreams, Misfud notes that the VGW Defendants'

apps cannot be offered in certain states. *Id.* ¶ 202. These events were allegedly filmed from his studio in Palm Springs, California. *Id.* ¶ 194.

As part of the partnership with the VGW Defendants, Misfud also allegedly developed his own slot machines available on the apps and in "traditional casinos" in California. *Id.* ¶ 204. Plaintiffs go on to aver Misfud and the VGW Defendants curate libraries of Misfud's videos to mislead audiences about the likelihood of winning while playing on the apps. *Id.* ¶ 210. In short, Misfud and the VGW Defendants post videos focused on Misfud placing large bets and winning at the virtual slot machines, without showing his losses, so as to misrepresent the odds of success for players and encourage higher betting. *Id.* ¶¶ 208-14.

As to the Partner Defendants, Jumio verifies a prospective player's identity, age, and location to determine whether they meet the minimum age threshold and are located in a state where the VGW Defendants' apps are not prohibited. *Id.* ¶¶ 215-16. Moreover, Plaintiffs allege Jumio is aware the VGW Defendants operate a gambling enterprise because age verification is not required for other kinds of gaming, and because the VGW Defendants raised the age verification threshold from 18 to 21 to match restrictions Jumio enforces in other real-money casino contexts. *Id.* ¶¶ 217-21.

Defendant Yodlee connects players' bank accounts to the VGW Defendants and reviews the account information to ensure a player has enough funds in the account to clear their transactions. *Id.* ¶ 223. Plaintiffs assert Yodlee knew the VGW Defendants were operating a real-money gambling enterprise given its experience providing services to other gambling entities. *Id.* ¶¶ 226-27. Additionally, Yodlee was allegedly aware that players rarely transferred money back into their accounts, while injecting millions or billions of dollars—in aggregate—into the apps. *Id.* ¶ 228. Trustly provides a similar service and is the primary option for players transferring funds on the Chumba Casino app. *Id.* ¶ 231. Plaintiffs allege Trustly also knew the VGW Defendants were operating a real-money gambling enterprise given its monitoring of player transactions. *Id.* ¶¶ 237-39. Further, Plaintiffs include screenshots of Trustly's public posts describing the "PointsBet" program, which include statements such as: "get[] players to their first deposit quickly"; "mak[e] payouts a breeze"; "maximum uptime, even during peak sporting events

and packed casinos"; and "[s]ophisticated player profiling [so VGW can] deliver an exceptional player experience to big-spending players with higher [loss] limits." *Id.* ¶ 235.

**DISCUSSION**

The Court first addresses Defendants' pending motion to compel arbitration. Because it concludes that motion should be denied, the Court goes on to consider Defendants' alternative bases for dismissal—lack of subject-matter jurisdiction and lack of personal jurisdiction.

## I. MOTION TO COMPEL ARBITRATION

The Federal Arbitration Act ("FAA") provides arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for revocation of any contract." 9 U.S.C. § 2. "[A]rbitration agreements [are] on an equal footing with other contracts," and therefore, a court must "enforce them according to their terms." *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 67 (2010) (internal citations omitted). In adjudicating a motion to compel arbitration, "a court's inquiry is limited to two 'gateway' issues: '(1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue.'" *Lim v. TForce Logistics, LLC*, 8 F.4th 992, 999 (9th Cir. 2021) (quoting *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000)). Further, the court applies a summary judgment standard to resolve the motion. *Hansen v. LMB Mortg. Servs., Inc.*, 1 F.4th 667, 670 (9th Cir. 2021). To prevail under this standard, Defendants must show there is no genuine issue of fact as to the formation of an agreement to arbitrate. *See id.*

The parties dispute whether the doctrine of equitable estoppel should require Plaintiffs to arbitrate their claims. Ordinarily, state law governs the threshold issue of contract formation in the context of the FAA, "if that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally." *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630-31 (2009) (citing *Perry v. Thomas*, 482 U.S. 483, 493, n. 9 (1987). However, the Ninth Circuit has recognized an exception for cases involving the New York Convention. The New York Convention is "a multilateral treaty that addresses international arbitration," and is implemented in Chapter 2 of the Federal Arbitration Act ("FAA"). *MouseBelt Labs Pte. Ltd. v. Armstrong*, 674 F. Supp. 3d 728, 734 (N.D. Cal. 2023) (citations omitted). "To satisfy the jurisdictional prerequisites

of the Convention," four elements must be shown:

> (1) there is an agreement in writing within the meaning of the Convention; (2) the agreement provides for arbitration in the territory of a signatory of the Convention; (3) the agreement arises out of a legal relationship, whether contractual or not, which is considered commercial; and (4) a party to the agreement is not an American citizen, or that the commercial relationship has some reasonable relation with one or more foreign states.

*Id.* (citing *Balen v. Holland America Line Inc.*, 583 F.3d 647, 654-55 (9th Cir. 2009)). In such cases, the Court applies "federal substantive law" and looks to "ordinary contract and agency principles." *Setty v. Shrinivas Sugandhalaya LLP*, 3 F.4th 1166, 1168 (9th Cir. 2021). Here, neither party contests the New York Convention applies, so the Court looks to federal substantive law on the threshold issue of contract formation.

Defendants urge the application of equitable estoppel to require the Plaintiffs, all of whom are nonsignatories, to be bound by the arbitration agreements their spouses signed. There are precious few cases identifying federal substantive law on equitable estoppel. For instance, much of the Ninth Circuit authority cited by Plaintiffs analyzes state law principles of contract formation, not federal substantive law. *See, e.g.*, *Namisnak v. Uber Techs., Inc.*, 971 F.3d 1088, 1094 (9th Cir. 2020) (applying California law); *In re Henson*, 869 F.3d 1052, 1060 (9th Cir. 2017) (applying California law); *Murphy v. DirecTV, Inc.*, 724 F.3d 1218, 1229 (9th Cir. 2013) (applying California law). Whereas Defendants rely on out-of-circuit precedent, such as the Fourth Circuit's decision in *International Paper Co. v. Schwabedissen Maschinen & Anlagen GmbH*, 206 F.3d 411 (4th Cir. 2000), as well as the Ninth Circuit's opinion in *Mundi v. Union Security Life Insurance Co.*, 555 F.3d 1042 (9th Cir. 2009), which subsequent decisions have framed as a determination of California law. *See Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1130 n.5 (9th Cir. 2013) ("Although the court in *Mundi* cited federal equitable estoppel cases, rather than looking directly to applicable state law, the court applied the same substantive law on equitable estoppel that a California court would have applied."). *Setty* itself does not provide dispositive insight, as it involved the application of equitable estoppel to a *signatory* plaintiff. 3 F.4th at 1169.

Among this thin authority, the Ninth Circuit's decision in *Comer v. Micor, Inc.*, 436 F.3d

1098 (9th Cir. 2006), is most on point. There, the court considered a motion to compel arbitration of a federal claim, specifically breach of fiduciary duty under the Employee Retirement Income Security Act of 1974 ("ERISA"). *Id.* at 1100. In analyzing the parties' arguments on equitable estoppel, the court did not identify or apply state substantive law, instead relying on federal authority. *Id.* Further, given the basis of the suit was an ERISA claim, *Comer* involved a question of "the arbitrability of federal claims by or against non-signatories to an arbitration agreement," as set out in *Setty*. 3 F.4th at 1168. For these reasons, the Court employs the equitable estoppel standard from *Comer* to this case.

"Equitable estoppel 'precludes a party from claiming the benefits of a contract while simultaneously attempting to avoid the burdens that contract imposes.'" *Comer*, 436 F.3d at 1101 (citation omitted). The Ninth Circuit has broadly recognized two lines of cases involving equitable estoppel in the arbitration context. *Id.*

> Under the first of these lines, *nonsignatories* have been held to arbitration clauses where the nonsignatory knowingly exploits the agreement containing the arbitration clause despite having never signed the agreement. Under the second line of cases, *signatories* have been required to arbitrate claims brought by nonsignatories at the nonsignatory's insistence because of the close relationship between the entities involved.

*Id.* (internal quotations omitted) (alterations in original). As here, *Comer* involved application of the doctrine to a nonsignatory plaintiff, so the court considered whether the plaintiff had "knowingly exploit[ed] the agreement." *Id.* at 1102. The court determined equitable estoppel did not apply for two reasons. First, the plaintiff "was simply a participant in trusts managed by others for his benefit." *Id.* As a mere participant in two ERISA plans operated by Micor, Inc., the plaintiff "did not seek to enforce the terms of the management agreements [between Micor, Inc. and investment firm Smith Barney], nor otherwise to take advantage of them" through that participation. *Id.* Second, the plaintiff did not knowingly exploit those agreements because he brought a lawsuit based on ERISA, "not on the investment management agreements." *Id.* Relying on *Comer*, the Court now turns to the substance of the parties' dispute.

Here, Plaintiffs did not knowingly exploit the agreements signed between the VGW Defendants and their spouses. Plaintiffs do not assert causes of action to enforce the terms of

those agreements they did not sign—they bring claims under state statutes and the California Unfair Competition Law. As in *Comer*, Plaintiffs here base their claims on a statutory obligation existing outside the terms of the relevant agreement, namely the state gambling reclamation statutes.

Defendants contend equitable estoppel should apply for three reasons. First, they argue Plaintiffs rely on the agreement to establish a key element of their claims, specifically whether the GC and SC constitute "things of value" under state law. *See, e.g.*, Dkt. No. 1 ¶ 270. Defendants contend Plaintiffs can only show the SC and GC are "things of value" by referring to the agreements, which establish the virtual coins can be exchanged for money. Dkt. No. 68 at 14. The Court disagrees. To start, it is not clear Plaintiffs need to refer to the agreements to show that GC and SC are "things of value." Indeed, "things of value" is a statutory phrase, not a contractual term, and so Plaintiffs are not limited to the four corners of the agreements to establish SC or GC fall within the statute's ambit. Further, *Comer* does not support Defendants' expansive argument. There, the plaintiff sued Smith Barney for breach of fiduciary duty under ERISA. *Comer*, 436 F.3d at 1100. Of course, to establish a fiduciary relationship pursuant to 29 U.S.C. § 1002(21)(A), the plaintiff could have relied on the investment agreement to show Smith Barney "render[ed] investment advice for a fee or other compensation . . . ." However, that level of connection to the underlying agreement did not constitute "knowing[] exploit[ation]." *Comer*, 436 F.3d at 1102. Plaintiffs do no more here. Just as the *Comer* plaintiff's attenuated use of the agreement did not warrant equitable estoppel, the instant Plaintiffs' potential use of the underlying agreements to support their argument that "things of value" were exchanged on the VGW Defendants' apps, does not rise to the level of "knowing[] exploit[ation]." *Id.*

Second, Defendants assert equitable estoppel applies because Plaintiffs "are standing in the shoes of their signatory spouses and pursuing derivative causes of action." Dkt. No. 68 at 10. Not so. Defendants rely on *Quackenbush v. Allstate Ins. Co.*, 121 F.3d 1372 (9th Cir. 1997), as federal substantive law to support this standing-in-the-shoes theory, but *Quackenbush* did not address equitable estoppel. Nor does the case provide relevant analysis on the derivative claim theory asserted here, since the *Quackenbush* plaintiff was a "court-appointed liquidator and trustee," not a

spouse with a distinct cause of action. *Id*. at 1375. Defendants' remaining cases did not consider federal substantive law on equitable estoppel. *See Zynga, Inc. v. Mills*, 431 So. 3d 935, 941 (Ala. 2025) (interpreting Alabama law on "derivative" claims); *Fair Gaming Advocates MA LLC v. VGW Holdings Ltd.*, 2024 WL 5279408 (Mass. Super. Ct. Dec. 12, 2024) (relying on authority from the Appeals Court of Massachusetts, the Second Circuit, and the Third Circuit); *Langone v. Kaiser*, 12-CV-2073, 2013 WL 5567587, at *3 (N.D. Ill. Oct. 9, 2013) (interpreting the meaning of "winners" and "losers" under the Illinois Loss Recovery Act). Absent an indication that federal law in the Ninth Circuit recognizes a standing-in-the-shoes theory of equitable estoppel, the Court will not import that standard from other jurisdictions.

Last, Defendants contend Plaintiffs knowingly exploited the underlying agreements because they benefitted from their spouses' winnings on the apps as shared marital property. Dkt. No. 68 at 18-19. In *Comer*, equitable estoppel did not apply when the plaintiff was "simply a participant in trusts managed by others for his benefit." 436 F.3d at 1102. So too here. Plaintiffs' incidental benefit from their spouses' winnings is no greater than the *Comer* plaintiff's incidental benefit from the investment decisions of an ERISA fiduciary. Indeed, both the *Comer* plaintiff and the instant Plaintiffs ultimately alleged significant monetary *losses*, not gains. Defendants' remaining authority does not compel a different result. In *Everett v. Paul Davis Restoration Inc.*, 771 F.3d 380, 384 (7th Cir. 2014), the court held a nonsignatory spouse exploited the benefits of a franchise agreement signed by her husband because she had a financial interest in the franchise rights acquired. Unlike the instant case, the *Everett* plaintiff "clearly . . . owned, controlled, and operated" the relevant business involved in the franchise agreement signed by her husband. *Id*. at 382. There are no similar indications here that Plaintiffs had any involvement in their spouses' use of the VGW Defendants' apps or awareness of the agreements their spouses signed.

In *Hofer v. Emley*, No. 19-CV-02205-JSC, 2019 WL 4575389, at *2 (N.D. Cal. Sept. 20, 2019), two brothers had rented a vehicle from the defendant, Getaround, a car-sharing company. Though only one of the brothers signed the rental agreement containing the arbitration provision, the court required arbitration by both brothers of all claims based on equitable estoppel. *Id*. at *5 - *6. Applying California law, the court reasoned the nonsignatory brother had been aware of the

car rental and directly received the only benefit from that agreement—ability to use the vehicle. *Id*. Moreover, the nonsignatory brother's negligence claim was based on a duty flowing from the rental agreement. *Id*. at *6. The instant case differs in both respects. Plaintiffs do not allege they played on the apps, were aware of any agreements with the VGW Defendants, nor do they allege an increase in their marital property from any winnings. Further, Plaintiffs' claims under state gambling reclamation statutes do not originate from the breach of any duty or provision inherent in the underlying agreements with the VGW Defendants. Accordingly, *Hofer* is inapposite.

For these reasons, the Court **DENIES** Defendants' motion to compel arbitration based on equitable estoppel.

## II. MOTION TO DISMISS FOR LACK OF SUBJECT-MATTER JURISDICTION

Within the motion to compel arbitration, Defendants advance a discrete argument on subject-matter jurisdiction. Defendants assert Plaintiffs cannot bring claims under the laws of California, Georgia, Massachusetts, Mississippi, New Jersey, New Mexico, Ohio, South Carolina, the District of Columbia, and Wisconsin, because no plaintiff resides in any of those jurisdictions. Dkt. No. 39 at 21. The Court rejects this argument.

On prior occasions, the Court has determined the question of whether a plaintiff may bring claims on behalf of putative class members in states where he does not reside is not a question of standing. *See, e.g.*, *Judge v. Academia, Inc.*, No. 25-CV-05857-AMO, 2026 WL 1256876, at *11 (N.D. Cal. May 7, 2026) (noting "whether a sister-state claim can be asserted in the case is 'a matter of typicality, adequacy, and predominance under Rule 23, not Article III standing'" (citation omitted)); *see also Weinberg v. Twitter, Inc.*, No. 23-CV-04016-AMO, 2024 WL 3908112, at *5 (N.D. Cal. Aug. 21, 2024) (same). Rather, the question is more properly reserved for a Rule 23 analysis when the plaintiff moves to certify a class. Accordingly, Defendants' motion to dismiss for lack of subject-matter jurisdiction is **DENIED**.

## III. MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

The VGW U.S. Entities and the VGW Foreign Entities move to dismiss the Complaint for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2). The Court first reviews the relevant allegations and declarations submitted by the parties. Then, the Court

analyzes that factual background under the personal jurisdiction standard.

**A. Relevant Jurisdictional Allegations and Declarations**

Broadly, the Complaint asserts claims against three categories of defendants: 1) the VGW U.S. Entities, 2) the VGW Foreign Entities, and 3) the Partner Defendants. Only the former two categories of parties have moved to dismiss under Rule 12(b)(2). *See* Dkt. No. 38. Accordingly, the Court lays out the relevant allegations as to the VGW Defendants.

**1. VGW U.S. Entities**

Defendants VGW Holdings US Inc., VGW US, Inc., and VGW LuckyLand Inc. (collectively "VGW U.S. Entities") are all Delaware corporations. Dkt. No. 1 ¶¶ 47-49. VGW Holdings is the parent company of the latter two entities, which are wholly owned subsidiaries. *Id.* ¶ 47. Plaintiffs allege that each entity has its principal place of business in California, and shares the same office, as well as the same registered agent for purposes of its registration with the California Secretary of State. *Id.* ¶¶ 47-49. Additionally, Plaintiffs allege Derek Brinkman manages all three entities, which are referred to internally as "VGW US." *Id.* ¶ 76. Brinkman is based out of San Francisco, as are other key officers, such as VGW US's Vice President of Product, Hui Cheng, and the Director of Operations, Abe Barakat. *Id.* ¶ 77. Further, the Complaint alleges various employees operate out of California, the company receives official correspondence in San Francisco, marketing for LuckyLand Slots occurs out of California, design of the games occurs in California, and the VGW U.S. Entities advertised positions in these departments based out of San Francisco. *Id.* ¶¶ 79-83. Last, Plaintiffs note reputable websites, such as Dun & Bradstreet, the Better Business Bureau, and Built In, identify the VGW U.S. Entities as headquartered in San Francisco. *Id.* ¶ 84.

The declaration of Caterina Cavallaro, Associate General Counsel of VGW Holdings Pty Ltd. f/k/a/ VGW Holdings Ltd., contests certain of these allegations. To start, Cavallaro states none of the VGW U.S. Entities had a San Francisco office at the time this suit was filed. Dkt. No. 40 ¶ 14. The San Francisco office was closed on December 16, 2022, and prior to that closure, personnel had "predominantly worked remotely since the onset of the COVID-19 lockdowns." *Id.* The VGW U.S. Entities began subleasing space in Boulder, Colorado, on October 17, 2023, and

United States District Court
Northern District of California

relocated to a new office there on February 3, 2024. *Id.* ¶ 16. Prior to the filing of the instant suit, VGW Holdings US Inc. and VGW LuckyLand Inc. changed their principal address to Boulder, Colorado, on their Statements of Information filed with the California Secretary of State. Dkt. Nos. 40-2, 40-3. On the day the Complaint was filed, VGW US, Inc. similarly changed its principal address. Dkt. No. 40-1. As to personnel, Cavallaro states the VGW U.S. Entities do not have any human resources employees located in California, and other California employees support operations on a nationwide basis. Dkt. No. 40 ¶¶ 19, 23. The declaration confirms Brinkman and Cheng work remotely from California, but Barakat has not worked with the VGW U.S. Entities since December 21, 2022. *Id.* ¶ 20-22. As to advertising, Cavallaro declares none of the VGW U.S. Entities manages social media for the games in California, but rather such operations are handled in Australia, the Philippines, and Canada. *Id.* ¶ 24. Finally, regarding the screenshots from websites such as Dun & Bradstreet, Cavallaro states the postings were out of date and have since been corrected. *Id.* ¶¶ 17-18.

**2. VGW Foreign Entities**

The VGW Foreign Entities comprise Laurence Escalante, VGW Holdings Limited, VGW Malta Holding Limited, VGW Malta Limited, VGW Games Limited, and VGW GP Limited. Escalante resides in Australia, and is the "founder, director, Chief Executive Officer, and 100% owner of VGW who runs and controls the VGW empire he created." Dkt. No. 1 ¶ 51. VGW Holdings Limited is an Australian parent company to wholly owned subsidiary entities, including the U.S. and foreign VGW entities. *Id.* ¶ 52. Through public financial reports, VGW Holdings Limited represents the revenue from these subsidiaries as its own, and notes it owns and operates the Chumba Casino, LuckyLand Slots, and Global Poker applications. *Id.* ¶ 53. Plaintiffs further allege the Terms and Conditions for these applications, as well as the Privacy Policy indicate the provisions apply to all VGW entities, and identifies "VGW Holdings Limited and any applicable subsidiaries" as operating the applications. *Id.* ¶¶ 54-56. As to the remaining foreign entities, VGW Malta Holding Limited, VGW Malta Limited, VGW Games Limited, and VGW GP Limited are all companies formed in the Island of Malta. *Id.* ¶¶ 58-61. Plaintiffs allege these entities maintain offices in Australia, and ultimately fall under the direction of Escalante and

United States District Court
Northern District of California

VGW Holdings Limited. *Id.*

Per the Complaint, Escalante "sits at the top of the VGW pyramid, directing and controlling each and every downstream entity, including all California operations and all operations occurring in or through California." *Id.* ¶ 87. He is the CEO and CFO of the VGW U.S. Entities as well. *Id.* In a recent communication with shareholders, Escalante referred to the VGW entities as "his" gaming business, which Plaintiffs contend shows his control over all downstream companies. *Id.* ¶ 88.

The Cavallaro Declaration contests certain of these allegations. First, Cavallaro clarifies Escalante only owns between 85% and 90% of the VGW entities. Dkt. No. 50-1 ¶ 2. Second, Cavallaro states VGW Holdings Limited, VGW Holdings US, VGW US, VGW Games and VGW Malta Holding do not own or operate any of the gaming applications relevant to this suit. Dkt. No. 40 ¶ 9. Third, the Declaration notes the games are the same no matter the location where the user accesses them, and the VGW entities do not purposefully target consumers in California through "marketing or other business activities." *Id.* ¶ 11. Last, Cavallaro declares the VGW entities send promotional emails to registered customers, but those emails are "agnostic as to the location of the customer." *Id.* ¶ 12.

### B. Personal Jurisdiction Analysis

Under Federal Rule of Civil Procedure 12(b)(2), a defendant may move to dismiss the complaint for lack of personal jurisdiction. "Where a defendant moves to dismiss a complaint for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating that jurisdiction is appropriate." *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004). "The court assumes the truth of any uncontested allegations, but a defendant may dispute facts through supporting affidavits or evidence. Once the defendant has raised a factual dispute as to the complaint's jurisdictional allegations, the burden shifts to the plaintiff to 'make a *prima facie* showing of jurisdictional facts.'" *In re Baby Food Prods. Liab. Litig.*, No. 24-MD-03101-JSC, 2025 WL 986959, at *3 (N.D. Cal. Apr. 2, 2025) (internal citations omitted); *see also Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1223 (9th Cir. 2011).

Absent a federal statute governing personal jurisdiction, a district court applies the long-

arm statute of the forum state to determine the court's reach. *See Yamashita v. LG Chem, Ltd.*, 62 F.4th 496, 502 (9th Cir. 2023). California's long-arm statute is co-extensive with the limits of the federal Due Process Clause. *Schwarzenegger*, 374 F.3d at 800. So, the Court applies the federal standard. To exercise personal jurisdiction over a nonresident defendant, the defendant must have at least "minimum contacts" with the forum "such that the exercise of jurisdiction 'does not offend traditional notions of fair play and substantial justice.'" *Id.* at 801 (citation omitted). Personal jurisdiction can be either general or specific. *Briskin v. Shopify, Inc.*, 135 F.4th 739, 750 (9th Cir. 2025). Here, Plaintiffs assert the VGW Defendants are subject to both general and specific personal jurisdiction in California. Defendants dispute both assertions. The Court analyzes each in turn.

**1. General Personal Jurisdiction**

General personal jurisdiction arises when "the defendant's contacts with the forum state [are] 'so continuous and systematic as to render [it] essentially at home in the forum State.'" *Yamashita*, 62 F.4th at 503 (citation omitted). "[T]he paradigmatic circumstance for exercising general jurisdiction," occurs when "the corporate defendant is incorporated or has its principal place of business in the forum state." *Williams v. Yamaha Motor Co.*, 851 F.3d 1015, 1020 (9th Cir. 2017). The Supreme Court has looked to the location of a company's president and his office, the location where the company's files are maintained, and the location from which the company's activities are overseen, when identifying the "principal place of business" for purposes of general jurisdiction. *Daimler AG v. Bauman*, 571 U.S. 117, 129 (2014) (citing *Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437, 448 (1952)). In the instant case, Plaintiffs contend general personal jurisdiction exists over the VGW U.S. Entities because they are headquartered in California. The Court disagrees.

Considering both the well-pleaded allegations and the Cavallaro Declaration, Plaintiffs have shown some executives work remotely from California, one of the three VGW U.S. Entities may have had an office in San Francisco at the time the Complaint was filed, and the gaming applications were designed in California. Cavallaro stated in her sworn declaration that no social media marketing for the VGW applications occurs in California, and the offices—as well as HR

personnel—for all three companies are located in Colorado. Dkt. No. 40 ¶¶ 16-24. As to Brinkman and Cheng, the Complaint indicates they serve important roles in the VGW U.S. Entities, but ultimately, control lies with Escalante, who is both the CEO and CFO. Dkt. No. 1 ¶¶ 87-88. In accordance with *Daimler*, this level of contact with the forum does not permit the exercise of general personal jurisdiction. The Supreme Court noted it is insufficient for the defendant's contacts to be "continuous and systematic"; rather, they must be "so 'continuous and systematic' as to render [it] essentially at home in the forum State." *Daimler AG*, 571 U.S. at 139. Indeed, the Court has determined banking in the forum state, purchasing equipment and training, and sending personnel into the forum state do not make a defendant entity "at home." *See id*. at 131 (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416 (1984)). Even extensive capital investment and thousands of employees located in a forum state do not suffice to establish general personal jurisdiction. *BNSF Ry. Co. v. Tyrrell*, 581 U.S. 402, 414 (2017) (holding general personal jurisdiction did not exist even when the defendant entity maintained "over 2,000 miles of railroad track and more than 2,000 employees" in the forum state). Ultimately, the "magnitude" of contacts does not drive the analysis, but instead the Court must perform "an appraisal of a corporation's activities in their entirety." *Id*. Here, the presence of certain executives, and the design of the applications, does not suffice to meet Plaintiffs' burden.

In response, Plaintiffs argue the Court may look back "a reasonable time" prior to the Complaint's filing to determine whether the VGW U.S. Entities' contacts with California create general personal jurisdiction. Dkt. No. 48 at 13. For this proposition, Plaintiffs rely on *Kormylo v. Forever Resorts, LLC*, 2015 WL 106379, at *10 (S.D. Cal. Jan. 6, 2015), *Delphix Corp. v. Embarcadero Techs., Inc.*, 749 F. App'x 502 (9th Cir. 2018), and *Gianelli v. Schoenfeld*, 2:21-CV-00477-JAM-KJN PS, 2021 WL 4690724, at *5 (E.D. Cal. Oct. 7, 2021). The Court finds these cases unpersuasive on this point. In *Kormylo*, the district court determined it was proper to look back three to seven years when evaluating whether a defendant's contacts with the forum established general personal jurisdiction. 2015 WL 106379, at *10. But in so holding, the court relied on pre-*Daimler* cases to assess whether there were "continuous and systematic contacts sufficient for general personal jurisdiction." *Id*. This analysis does not align with *Daimler*, which

emphasized the need for something beyond mere "continuous and systematic" contacts. *Daimler AG*, 571 U.S. at 139. Under *Kormylo*, a defendant could be considered "at home" in one jurisdiction, subsequently move all operations and executive authority such that it is "at home" in a new jurisdiction, but be required to defend all manner of suits in both locations. Such a rule conflicts with *Daimler*'s reasoning, which asserted a principal place of business has "the virtue of being unique" and "ordinarily indicates only one place." *Id*. at 137. So, the Court is not persuaded to follow *Kormylo* on this point as its analysis does not reckon with *Daimler* and its progeny. *See also Ranza v. Nike, Inc.*, 793 F.3d 1059, 1069 (9th Cir. 2015) ("Because the assertion of judicial authority over a defendant is much broader in the case of general jurisdiction than specific jurisdiction, a plaintiff invoking general jurisdiction must meet an exacting standard for the minimum contacts required." (citation and internal quotation marks omitted).).

*Delphix Corp. v. Embarcadero Techs., Inc.*, takes Plaintiffs no further. In an unpublished decision, the Ninth Circuit held "a general jurisdiction inquiry should consider all of a defendant's contacts with the forum state prior to the filing of the lawsuit, rather than just those contacts that are related to the particular cause of action the plaintiff asserts." *Delphix Corp.*, 749 F. App'x at 505-06. But there, the Ninth Circuit relied on *Steel v. United States*, 813 F.2d 1545, 1549 (9th Cir. 1987), a decision on *specific* personal jurisdiction. Accordingly, the Court does not find the *Delphix Corp.* reasoning persuasive as to general personal jurisdiction. Likewise, the Court declines to follow *Gianelli*, which relied on *Delphix Corp*. and *Steel*. *See Gianelli*, 2021 WL 4690724, at *5 (E.D. Cal. Oct. 7, 2021).

Given the well-pleaded allegations, and the facts disputed by the Cavallaro Declaration, Plaintiffs have failed to make a *prima facie* showing of jurisdictional facts to support the Court's exercise of general personal jurisdiction over the VGW U.S. Entities.

**2. Specific Personal Jurisdiction**

Next, the Court considers whether Plaintiffs have made a *prima facie* showing of specific personal jurisdiction over all VGW Defendants. The specific personal jurisdiction test comprises three prongs: "(1) the defendant must either 'purposefully direct his activities' toward the forum or 'purposefully avail[ ] himself of the privileges of conducting activities in the forum'; (2) 'the

claim must be one which arises out of or relates to the defendant's forum-related activities'; and (3) 'the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.'" *Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1068 (9th Cir. 2017). To assess specific personal jurisdiction in tort cases, the court inquires "whether a defendant 'purposefully direct[ed] his activities' at the forum state, applying an 'effects' test that focuses on the forum in which the defendant's actions were felt, whether or not the actions themselves occurred within the forum." *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1206 (9th Cir. 2006) (citation omitted). That said, the Ninth Circuit does not recognize "'a rigid dividing line between' purposeful direction and purposeful availment, and the first prong of the personal jurisdiction test 'may be satisfied by purposeful availment, by purposeful direction, or by some combination thereof.'" *Briskin*, 135 F.4th at 751 n.10 (quoting *Davis v. Cranfield Aerospace Sols., Ltd.*, 71 F.4th 1154, 1162 (9th Cir. 2023)). Here, Plaintiffs have carried their burden as to specific personal jurisdiction.

**a. Purposeful availment or purposeful direction**

Regarding the first prong of the test, the Ninth Circuit's decision in *Ayla, LLC v. Alya Skin Pty. Ltd.*, 11 F.4th 972 (9th Cir. 2021), proves dispositive. There, the court considered whether specific personal jurisdiction was proper over an Australian skincare company. *Id.* at 977. When determining whether the company had purposefully directed its activities toward the forum, or purposefully availed itself of the forum, the Ninth Circuit considered the company's contractual relationships with other entities. *Id.* at 982. Specifically, the court noted the defendant had "contracts with a fulfilment center located in Idaho to ship its products throughout the United States and elsewhere." *Id.* These contractual agreements were critical to the personal jurisdiction analysis, and the court noted: "When a defendant corporation chooses to associate itself with a forum through a contractual relationship that 'envision[s] continuing and wide-reaching contacts,' the defendant purposefully avails itself of the forum and satisfies minimum contacts." *Id.* As applied to the instant case, Plaintiffs allege the VGW Defendants have long-standing contracts with the Partner Defendants—all California entities—who provide core operational support, such as payment processing, age verification, and advertising. Though Defendants argue the Partner

United States District Court
Northern District of California

Defendants' contacts with the forum should not bear on the personal jurisdiction analysis for the VGW Defendants, they fail to address *Ayla*. Given these "ongoing" contractual relationships that "envisioned performance" in California, Plaintiffs have carried their burden as to the first prong. *Id*.

Importantly, this analysis applies to all VGW Defendants. The Complaint alleges all VGW entities have contracted with the Partner Defendants, and the Cavallaro Declaration does not respond to, or dispute, such allegations. Cavallaro only notes VGW Luckyland, VGW Malta, and VGW GP own and operate the three applications at issue in this case. Dkt. No. 40 ¶¶ 4-6. She does not address whether only certain VGW entities have ongoing contractual relationships with the Partner Defendants such that the remaining entities do not have minimum contacts with California. Accordingly, the Court need not wade into the parties' dispute regarding an alter ego relationship between the VGW Foreign Entities and the VGW U.S. Entities. The uncontested allegations of the Complaint permit a reasonable inference of an ongoing relationship between all VGW entities and the Partner Defendants sufficient to make a *prima facie* showing of purposeful availment.

**b. Claims "arising out of or relating to" the forum contacts**

Next, Plaintiffs must make a *prima facie* showing that their claims arise out of or relate to the forum contacts. In analyzing the second prong, the Ninth Circuit has observed, "[t]he first half of that standard asks about causation; but the back half, after the 'or,' contemplates that some relationships will support jurisdiction without a causal showing." *Briskin*, 135 F.4th at 760 (citing *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 362 (2021)). Put differently, "a plaintiff's injury relates to a defendant's forum contacts if similar injuries will tend to be caused by those contacts." *Yamashita*, 62 F.4th at 505. But ultimately, "specific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction." *Bristol-Myers Squibb Co. v. Superior Ct. of California, San Francisco Cnty.*, 582 U.S. 255, 262 (2017). Here, too, Plaintiffs have carried their burden.

Plaintiffs assert Defendants violated California's UCL as well as numerous other state gambling laws. Critical to all of those claims are the monetary transactions between users of the

United States District Court
Northern District of California

gaming applications and the VGW Defendants. Indeed, Plaintiffs seek to recover money lost by their spouses while using the alleged gambling platforms. The contractual agreements with Jumio, Trustly, and Yodlee are causally related to Plaintiffs' lost funds because users of the applications could not transfer money—or even access the application—absent the payment processing and age verification services provided via the VGW Defendants' relationship with the Partner Defendants. Such allegations fall squarely within the Ninth Circuit's interpretation of the "arising out of or relating to" specific personal jurisdiction requirement. *Briskin*, 135 F.4th at 760.

In response, Defendants contend Plaintiffs cannot satisfy the second prong of the test because they "do not allege that they or their spouses played the Games in California, incurred any losses in California, or have any other suit-related connection to California." Dkt. No. 50 at 18. As explained previously, that is not the case. Granted, Plaintiffs do not reside in California, and do not allege their spouses used any of the Defendant applications in California. But they do allege a suit-related connection to the forum. The age verification and payment processing features that make use of the LuckyLand Slots, Chumba Casino, and Global Poker applications possible, originate from the ongoing contractual relationship between the VGW Defendants and the Partner Defendants. And Plaintiffs' alleged loss of money is precisely the kind of injury one would expect from payment processing activity.

**c. Fair play and substantial justice**

Having made a *prima facie* showing as to the first two prongs of the specifical personal jurisdiction test, "the burden [then] shifts to [defendants] to 'present a compelling case that the presence of some other considerations would render jurisdiction unreasonable.'" *Briskin*, 135 F.4th at 751. Citing *Sher v. Johnson*, 911 F.2d 1357, 1361 (9th Cir. 1990), the VGW Defendants assert jurisdiction would be unreasonable because: 1) California has no interest in this dispute involving out-of-state plaintiffs; 2) the forum is not convenient for Defendants or Plaintiffs; and 3) the dispute resolution mechanism outlined in the motion to compel arbitration provides an adequate alternative forum. Dkt. No. 50 at 20. The Court is unpersuaded.

To start, the California forum may prove convenient for the collection of evidence and testimony of witnesses from the Partner Defendant entities. Additionally, at least some VGW

United States District Court
Northern District of California

employees and operations occur out of California. Further, since equitable estoppel does not compel Plaintiffs to arbitrate their claims, the alternative dispute resolution mechanism does not render personal jurisdiction unreasonable in this case. Though Defendants are correct to note California's interest in this suit is less pronounced given the absence of California plaintiffs, this lone consideration does not make litigation in this Court "so gravely difficult and inconvenient that a party unfairly is at a severe disadvantage in comparison to his opponent." *Sher*, 911 F.2d at 1365. Consequently, Defendants have failed to meet their burden of showing specific personal jurisdiction is unreasonable.

* * *

For these reasons, the VGW Defendants' motion to dismiss for lack of personal jurisdiction is **DENIED**.

## CONCLUSION

In sum, Defendants' motion to compel arbitration is **DENIED**. Additionally, Defendants' alternative motion to dismiss for lack of subject-matter jurisdiction is **DENIED**. Last, Defendants' motion to dismiss for lack of personal jurisdiction is **DENIED**.

**IT IS SO ORDERED.**

Dated: September 18, 2026

ARACELI MARTÍNEZ-OLGUÍN
United States District Judge